UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-v-

CHRISTOPHER PENCE,

Defendant.

AFFIDAVIT OF DEFENDANT
CHRISTOPHER PENCE IN
SUPPORT OF HIS PRE-TRIAL
MOTIONS TO SUPPRESS
STATEMENTS AND EVIDENCE

CHRISTOPHER PENCE, declares and affirms the following under penalty of perjury, pursuant to 28 U.S.C. § 1746, that:

1. I am the defendant in the above-captioned action. I am familiar with the facts and circumstances set forth herein. I submit this affidavit in support of my pre-trial motions.

2. I reside at 2929 South 6500, West Cedar City, Utah with my wife, Michelle Pence, thirteen of my children, and my parents, Shannon and Robyn Pence.

3. On October 27, 2021, twenty-one FBI agents stormed my home to enforce a search warrant.

4. The agents entered my home dressed in full riot gear, most of the agents carried AR-15 assault style weapons.

5. My children, wife, and my parents were in the home at the time.

6. Agents patted me down for weapons and instructed me to have the other adults in the home come downstairs.

7. When I started up the stairs to get the adults, I was stopped and told that I could not go upstairs. I was then told by an officer to "yell at them and bring them down!," which I did. My wife, my parents, and our three-year-old son came downstairs at that point, which only left our one-year-old infant and our four-year-old son still sleeping upstairs. Once my wife was downstairs,

1

the armed agents asked her if everyone was now down. To which she replied that two children were not downstairs yet.

8. While two armed agents allowed my wife to accompany them to retrieve our one-year-old infant from our bedroom, they would not allow her to retrieve our four-year-old son, or to accompany the armed agents to retrieve our four-year-old son, like they had allowed her to do with our one-year-old infant. Instead, two fully armed agents in full riot gear went upstairs to retrieve our four-year-old son and brought him downstairs. When the agents finally brought our four-year-old son downstairs, he was visibly shaking, and asking if those two men were going to kill him.

9. I could see agents guarding every visible staircase and door in my home, my sunken living room, and my front door. The agents told my children to go into the family room, out of my sight, and did not permit me to accompany them, instead a dozen or so fully armed agents accompanied the children. This transpired prior to my wife even making it downstairs to be with our children. I could see armed agents guarding each of my vehicles through the windows. Most agents carried assault rifles and wore body armor.

10. After I was patted down, I was told to come outside to speak with agents. I was not wearing shoes. I told the agents I had to get my shoes from upstairs. Again, the agents refused to allow me to move freely in my own home, and instead an agent with an AR-15 followed me upstairs. The agent told me to move slowly and that if I made any quick movements that I would be shot.

11. After the agent and I and the agent retrieved my shoes, I was brought outside for questioning. When I walked out of my front door, I could see many unmarked Chevrolet Tahoe SUVs and other police vehicles, all with emergency lights flashing in my driveway. The law

enforcement vehicles were parked in such a fashion as to completely block my driveway, making it clear no vehicle was driving in or out of the house.

12. I was taken to one of the FBI Tahoes and placed in the rear seat. At this time my wife, our children, and my parents were not allowed to even look out of any of the windows. From where I was sitting in the Tahoe, I never once saw my family come to check on me through the living room windows. Two agents – Agent Brian DeCarr and Agent Chris Anderson joined me in the vehicle.

13. Agent Anderson sat directly behind me in the third row of the SUV. Agent DeCarr sat directly next to me in the second row of the SUV, on my right side. Due to my seating position in the vehicle, while looking at Agent DeCarr, I had a clear view of my home and could continuously see agents storming my home, the fully armed agent in riot gear standing in the living room between me and my family, and the armed agents with AR-15's constantly walking between the front door of the home and the vehicles, where I was.

14. Agent DeCarr and Agent Anderson were dressed in riot gear. They made a point to remove said gear when they got in the car with me. One of the agents removed his gear and displayed it on the front seat of the vehicle. Both agents were armed with handguns that were visible. Agent Andersons service handgun was still clearly visible on his right hip to me once his riot gear was removed.

15. After I was placed in the FBI SUV, I was told by Agent DeCarr that I was not under arrest. This distinction was meaningless to me when my house was clearly overrun with armed and armored FBI Agents. I was not told that I did not have to talk to him or that I could end the questioning at any time or that I could consult with an attorney prior to talking to him.

3

16. During the next five hours, multiple agents sporting assault weapons stood outside the vehicle in my plain view. From the back seat of the vehicle, I could see agents wielding assault weapons in my home with my family. I could see agents all around the vehicle I was held in, all wielding assault weapons. At least one agent I was with in the vehicle was armed. My driveway was blocked by multiple police vehicles, all of which had their emergency lights on. I had been told if made any fast moves I would be shot. Was not *Mirandized* at the start of my questioning. In fact, the word *Miranda* was never said to me at all in the five hours I was held and questioned.

17. I was then interrogated for over five hours. I was asked detailed questions about an alleged murder-for-hire plot. I was initially told by Agent DeCarr that the agents were only there to try to "figure things out." I was told the FBI had taken over a murder-for-hire website. I was told the FBI investigation uncovered communications on that website which pointed to my IP address. I was then asked to explain my involvement in the murder-for-hire website. I was not *Mirandized* before being asked these questions. Agent DeCarr did tell me told to be honest though.

18. Agent DeCarr interrogated me while I was in the back of the FBI vehicle watching other agents brandish assault weapons at my family and throughout my property for approximately two hours.

19. After I answered all of Agent DeCarr's questions I was then read my *Miranda* what I now know is a standard *Miranda* warning.

20. After I was read a *Miranda* warning, Agent DeCarr and other agents spent nearly three more hours rehashing what I had told them prior to my being read my *Miranda* rights. I was held in the same location in the FBI vehicle with the same agents for the entire five-hour period with no break or change in location or any other circumstance.

*Christopher Pence*
Christopher Pence

Sworn to before me this
___ day of December 2022.

*[signature]*
Notary Public – State of New York

Angela L. Hernandez
Notary Public, State of New York
Reg. No. 02WE6371773
Qualified in Saratoga County
Commission Expires March 5, 2026

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-v-

CHRISTOPHER PENCE,

Defendant.

**AFFIDAVIT OF DEFENDANT CHRISTOPHER PENCE IN SUPPORT OF HIS PRE-TRIAL MOTIONS TO SUPPRESS STATEMENTS AND EVIDENCE**

CHRISTOPHER PENCE, declares and affirms the following under penalty of perjury, pursuant to 28 U.S.C. § 1746, that:

1. I am the defendant in the above-captioned action. I am familiar with the facts and circumstances set forth herein. I submit this affidavit in support of my pre-trial motions.

2. I reside at 2929 South 6500, West Cedar City, Utah with my wife, Michelle Pence, thirteen of my children, and my parents, Shannon and Robyn Pence.

3. On October 27, 2021, twenty-one FBI agents stormed my home to enforce a search warrant.

4. The agents entered my home dressed in full riot gear, most of the agents carried AR-15 assault style weapons.

5. My children, wife, and my parents were in the home at the time.

6. Agents patted me down for weapons and instructed me to have the other adults in the home come downstairs.

7. When I started up the stairs to get the adults, I was stopped and told that I could not go upstairs. I was then told by an officer to "yell at them and bring them down!," which I did. My wife, my parents, and our three-year-old son came downstairs at that point, which only left our one-year-old infant and our four-year-old son still sleeping upstairs. Once my wife was downstairs,

1

the armed agents asked her if everyone was now down. To which she replied that two children were not downstairs yet.

8.   While two armed agents allowed my wife to accompany them to retrieve our one-year-old infant from our bedroom, they would not allow her to retrieve our four-year-old son, or to accompany the armed agents to retrieve our four-year-old son, like they had allowed her to do with our one-year-old infant. Instead, two fully armed agents in full riot gear went upstairs to retrieve our four-year-old son and brought him downstairs. When the agents finally brought our four-year-old son downstairs, he was visibly shaking, and asking if those two men were going to kill him.

9.   I could see agents guarding every visible staircase and door in my home, my sunken living room, and my front door. The agents told my children to go into the family room, out of my sight, and did not permit me to accompany them, instead a dozen or so fully armed agents accompanied the children. This transpired prior to my wife even making it downstairs to be with our children. I could see armed agents guarding each of my vehicles through the windows. Most agents carried assault rifles and wore body armor.

10.   After I was patted down, I was told to come outside to speak with agents. I was not wearing shoes. I told the agents I had to get my shoes from upstairs. Again, the agents refused to allow me to move freely in my own home, and instead an agent with an AR-15 followed me upstairs. The agent told me to move slowly and that if I made any quick movements that I would be shot.

11.   After the agent and I and the agent retrieved my shoes, I was brought outside for questioning.  When I walked out of my front door, I could see many unmarked Chevrolet Tahoe SUVs and other police vehicles, all with emergency lights flashing in my driveway.  The law

enforcement vehicles were parked in such a fashion as to completely block my driveway, making it clear no vehicle was driving in or out of the house.

12. I was taken to one of the FBI Tahoes and placed in the rear seat. At this time my wife, our children, and my parents were not allowed to even look out of any of the windows. From where I was sitting in the Tahoe, I never once saw my family come to check on me through the living room windows. Two agents – Agent Brian DeCarr and Agent Chris Anderson joined me in the vehicle.

13. Agent Anderson sat directly behind me in the third row of the SUV. Agent DeCarr sat directly next to me in the second row of the SUV, on my right side. Due to my seating position in the vehicle, while looking at Agent DeCarr, I had a clear view of my home and could continuously see agents storming my home, the fully armed agent in riot gear standing in the living room between me and my family, and the armed agents with AR-15's constantly walking between the front door of the home and the vehicles, where I was.

14. Agent DeCarr and Agent Anderson were dressed in riot gear. They made a point to remove said gear when they got in the car with me. One of the agents removed his gear and displayed it on the front seat of the vehicle. Both agents were armed with handguns that were visible. Agent Andersons service handgun was still clearly visible on his right hip to me once his riot gear was removed.

15. After I was placed in the FBI SUV, I was told by Agent DeCarr that I was not under arrest. This distinction was meaningless to me when my house was clearly overrun with armed and armored FBI Agents. I was not told that I did not have to talk to him or that I could end the questioning at any time or that I could consult with an attorney prior to talking to him.

16.     During the next five hours, multiple agents sporting assault weapons stood outside the vehicle in my plain view. From the back seat of the vehicle, I could see agents wielding assault weapons in my home with my family. I could see agents all around the vehicle I was held in, all wielding assault weapons. At least one agent I was with in the vehicle was armed. My driveway was blocked by multiple police vehicles, all of which had their emergency lights on. I had been told if made any fast moves I would be shot. Was not *Mirandized* at the start of my questioning. In fact, the word *Miranda* was never said to me at all in the five hours I was held and questioned.

17.     I was then interrogated for over five hours. I was asked detailed questions about an alleged murder-for-hire plot. I was initially told by Agent DeCarr that the agents were only there to try to "figure things out." I was told the FBI had taken over a murder-for-hire website. I was told the FBI investigation uncovered communications on that website which pointed to my IP address. I was then asked to explain my involvement in the murder-for-hire website. I was not *Mirandized* before being asked these questions. Agent DeCarr did tell me told to be honest though.

18.     Agent DeCarr interrogated me while I was in the back of the FBI vehicle watching other agents brandish assault weapons at my family and throughout my property for approximately two hours.

19.     After I answered all of Agent DeCarr's questions I was then read my *Miranda* what I now know is a standard *Miranda* warning.

4

20. After I was read a *Miranda* warning, Agent DeCarr and other agents spent nearly three more hours rehashing what I had told them prior to my being read my *Miranda* rights. I was held in the same location in the FBI vehicle with the same agents for the entire five-hour period with no break or change in location or any other circumstance.

*/s/ Christopher Pence*
Christopher Pence

Sworn to before me this
9th day of December 2022.

*/s/ Angela Hernandez*
Notary Public – State of New York

Angela L. Hernandez
Notary Public, State of New York
Reg. No. 02WE6371773
Qualified in Saratoga County
Commission Expires March 5, 2026

5