**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

*******************************************

UNITED STATES OF AMERICA,

                                   Case No.:      1:21-CR-393 (DNH)

     v.

CHRISTOPHER PENCE,

                   Defendant.

*******************************************

**GOVERNMENT'S RESPONSE TO DEFENDANT'S**
**MOTION TO SUPRESS STATEMENTS AND EVIDENCE**

Dated:    January 24, 2023              Respectfully submitted,

                                            CARLA B. FREEDMAN
                                          United States Attorney

                By:       */s/ Emmet J. O'Hanlon*
                                          Emmet J. O'Hanlon
                                          Assistant United States Attorney
                                          Bar Roll No. 519779

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  FACTUAL BACKGROUND................................................................................ 4

   A.  Execution of the Search Warrant at 2929 South 6500 West Cedar City, Utah ................. 4

   B.  Interview with the Defendant in an SUV Outside his Residence ...................................... 7

III. LEGAL ARGUMENT ......................................................................................... 9

   A.  A *Miranda* Advisement is Only Required Where a Reasonable Person in the
       Defendant's Position Would Believe They Were in Custody (i.e. Had Their Freedom
       Curtailed to a Degree Associated with Formal Arrest)........................................................ 9

   B.  The Objective Circumstances of the Defendant's Interview Do Not Support a Finding
       that a Reasonable Person Would Believe Their Freedom Had Been Curtailed to a Degree
       Associated with Formal Arrest ......................................................................................... 10

   C.  Even if the Defendant Was "in Custody" During the Interview, the *Miranda* Advisement
       He Received was Sufficient and Was Not Part of a "Two-Step" Interrogation ............... 11

   D.  The Defendant's Reliance on *Lee* (1982) and *Guarino* (1986) is Misplaced……. …….. 19

IV.  THE DEFENDANT's REQUEST FOR A HEARING TO DETERMINE THE
     ADMISSIBILITY OF THE DEFENDANT'S STATEMENTS ........................................... 15

V.   CONCLUSION ................................................................................................. 20

## I.      INTRODUCTION

On November 9, 2021, a federal grand jury sitting in Albany, New York, indicted defendant Christopher Pence on one count of using a facility of interstate commerce in connection with murder-for-hire from July 16, 2021, through August 9, 2021, in violation on 18 U.S.C. § 1958(a).

Two months earlier, a confidential source had provided Federal Bureau of Investigation (FBI) investigators with copies of communications on the message board of a Darknet website accessible via The Onion Router (TOR) network depicting a user of the website paying approximately $16,000 worth of the cryptocurrency Bitcoin in exchange for the killing of a married couple residing in Hoosick Falls, New York.  After linking the communications to the defendant and his family – based on interviews with the intended victims, and connecting the Bitcoin paid to the purported hitman to the defendant's financial and Internet accounts – FBI Special Agent ("SA") Brian DeCarr obtained a search warrant for the defendant's residence in Cedar City, Utah, to search for further evidence of the murder-for-hire scheme.

The warrant was executed on October 27, 2021.  While the search of the residence was taking place, the defendant agreed to be interviewed outside of his residence in an FBI vehicle. During that interview, the defendant admitted *inter alia*: (1) that he was the user of the Darknet website depicted in the provided communications; (2) that he accessed the Darknet website using a computer and cellphone connected to the Internet for the purpose of soliciting the killing of the intended victims; (3) that he used the photographs of the intended victims that he retrieved from a "baby book" provided to his family when they adopted several of the intended victims' biological children; and (4) that he had arranged the payment of approximately $16,000 in Bitcoin to the

1

Darknet site via a bank account, cryptocurrency exchange and wallet previously identified by the FBI.

By the instant Motion to Suppress Statements and Evidence (Dkt. 21) (hereinafter, the "Motion"), the defendant seeks to suppress the statements he made to SAs DeCarr and Andersen during the above-referenced non-custodial interview.  The gravamen of the Motion is that the actions of law enforcement agents carrying out a standard residential warrant made him feel as though he was in "custody" when he was interviewed – falsely asserting in his affidavit *inter alia* that investigators "stormed" his residence in "full riot gear," that he was "placed in a vehicle," and that he was "not told that [he] did not have to talk to [the agents]" – thus somehow converting a voluntary, non-custodial interview into a custodial one requiring that he be advised of his *Miranda* rights.  Simply put, the defendant cannot meet his burden of establishing that he was subjected to a "custodial interrogation" in this case.

That is because a review of the uncontroverted facts makes it clear that that a reasonable person in the defendant's position – based on the totality of the circumstances – would have understood they were not "in custody" (i.e. had their freedom curtailed to a degree associated with a formal arrest) while being interviewed by the agents in this case.  Specifically, the facts that the defendant: (1) never had a firearm pointed at him; (2) was never placed in handcuffs; (3) was asked whether he would agree to speak with the agents either inside the residence or outside in a vehicle; (4) readily and voluntarily agreed to go with SAs DeCarr and Andersen to the unlocked SUV in his driveway, which he entered on his own accord; (5) was advised, at the outset of the interview, that he was not under arrest and that he did not have to speak with the investigators; (6) was interviewed for less than two hours before he made confessions that led to his formal arrest and subsequent *Miranda* advisement; (7) was never yelled at or threatened by investigators; and (8)

never asked to end the interview or leave the vehicle, taken together, make it clear that a reasonable person could not have considered their freedom to have been constricted to the same extent as a "formal arrest."

On these facts, a finding by this Court that the defendant was not subjected to a custodial interview – and that therefore his inculpatory statements to investigators should not be suppressed for lack of a *Miranda* advisement – would be in accordance with the most recent relevant and controlling Second Circuit caselaw holding that, "in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave." *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992) (reversing district court where in-home interview was "cooperative" and there was no speech or action that could reasonably be taken as intimidating, coercive, or restricting defendant's freedom of action); *see also United States v. Faux*, 828 F.3d 130, 139 (2d Cir. 2016) (holding admissible statements given during a two-hour interview of a suspect while agents "swarmed about her home" because she was never told she was not free to leave, the tone of the questioning was conversational, and no weapons were displayed.)

Furthermore, the facts simply do not support the defense's alternative theory that the agents employed a deliberate, "two-step" process calculated to undermine the defendant's *Miranda* rights, given that, by initiating a voluntary, non-coercive, non-custodial interview of the defendant, they were following the evidence where it led them, and only advised the defendant of his *Miranda* rights at the point wherein he identified himself as the perpetrator of the murder-for-hire scheme, at which time he was notified that he would be taken before a judge (and was therefore "in custody").

3

Nevertheless, given that there are significant differences in the facts relied upon by the parties, the government agrees that an evidentiary hearing for the Court to hear directly from witnesses and make its own factual determinations, is appropriate, before denying the Motion.

## II.     FACTUAL BACKGROUND

### A.     Execution of the Search Warrant at 2929 South 6500 West Cedar City, Utah

On October 27, 2021, a team of law enforcement agents from the FBI, HSI, U.S. Marshalls Service and the Iron County Sheriff's Office executed a federal search warrant on the defendant's residence located at 2929 South 6500 West, Cedar City, Utah. *See* Declaration of FBI Special Agent Brian DeCarr, hereinafter "DeCarr Decl.," attached as Exhibit 1, ¶ 3; *see* also Declaration of FBI Special Agent Chris Andersen, hereinafter "Andersen Decl.," attached as Exhibit 2, ¶ 2.   A copy of the residential warrant and its application are attached as Exhibit 4.  The residence, located on a 20-acre property in the desert of southwest Utah, is a tan-colored, three-story, single family, 7-bedroom, approximately 5,800 square foot house approximately 500 feet east of South 6500 West, accessed by a gravel driveway leading from South 6500 West. (DeCarr Decl. ¶ 3.)

At approximately 6:30 a.m., with the temperature in the 30s Fahrenheit, SA DeCarr approached the door to the residence and knocked. (DeCarr Decl. ¶ 4.)  The defendant answered the door. *Id*. SA DeCarr introduced himself and notified the defendant that he had a search warrant for the residence. *Id*.  The defendant then allowed the investigators – consisting of approximately 14 law enforcement agents wearing bullet-proof vests under their agency-issued jackets – into the residence. (DeCarr Decl. ¶ 4; Andersen Decl. ¶ 3.).  No S.W.A.T. members participated in the search and, aside from between one and three agents wearing ballistic helmets, none of the agents was equipped with any tactical riot gear (*e.g.*, full-body protection, riot helmets with visors, fixed-length batons, shields, or gas masks). *Id*.

As the team entered the residence, the agents held their weapons – a combination of handguns and rifles – in the "low-ready" position, pursuant to their training and based on information that the defendant possessed weapons in the residence.[1] (DeCarr Decl. ¶ 5; Andersen Decl. ¶ 3; Lydon Decl. ¶ 3.)

After entering the residence, the team of agents spread out through the large house to ensure there were no safety hazards to the agents and no destruction of evidence taking place. (DeCarr Decl. ¶ 6; Andersen Decl. ¶ 4; Lydon Decl. ¶ 4.)   The defendant's family, including his wife, parents and children, were escorted from their various locations around the residence to the first floor living room. *Id.*   At no point were any firearms pointed at the defendant or members of his family. *Id.*  Once the residence was cleared, all of the agents holstered their handguns or shouldered and/or stowed their rifles in their vehicles. *Id.*  The agents then set about their assigned tasks, which included interviewing the residents, seizing evidence and previewing electronic devices, as authorized by the warrant, and photographing the residence. *Id.*

While the residence was being secured, the defendant remained with SA Andersen in the foyer of the residence. (Andersen Decl. ¶ 5.)  At one point, the defendant went halfway up the main stairs, indicating that he would bring some more children downstairs, but was asked to stop and call for them to come downstairs instead. *Id.*  Contrary to the assertion made by the defendant in his affidavit in support of his Motion (Doc. 21-3, ¶ 8), none of the children (or adults) were visibly upset during this process. (DeCarr Decl. ¶ 7; Andersen Decl. ¶ 5; Lydon Decl. ¶ 5.) Furthermore, at no point was the defendant prevented from speaking with any of his family members as they made their way to the living room. *Id.*

---

[1] A shotgun was, in fact, encountered in the defendant's home office.

Towards the end of the process of securing the residence, SA DeCarr asked the defendant if he was willing to speak with the agents either in the residence or in their vehicle outside the residence. (DeCarr Decl. ¶ 8; Andersen Decl. ¶ 6.)   The defendant, appearing relaxed and agreeable, readily suggested speaking with the agents in their vehicle. *Id*.   Without attempting to speak with his family, the defendant indicated that he needed to retrieve his shoes from his upstairs bedroom, and he went up the stairs quickly. *Id*.   The defendant was followed upstairs by SA Andersen. Andersen Decl. ¶ 6.)   Contrary to the assertion made by the defendant in his affidavit in support of his Motion (Doc. 21-3, ¶ 10), at no point did any agent threaten to shoot the defendant. Rather, he was asked to slow down. *Id*.

After retrieving his shoes, the defendant put on a jacket, exited the residence, approached the vehicle – a Chevrolet Tahoe seven-seat SUV – on his own, opened a passenger door, and got in. (DeCarr Decl. ¶ 10; Andersen Decl. ¶ 7.)   No other agents were anywhere near the vehicle at this time, except for SAs DeCarr and Andersen. *Id*.

At no point were the residents prevented from looking out the windows of the residence, or from moving about the residence once the search had been completed.[2]   *See* Declaration of FBI Special Agent Patrick Lydon, hereinafter "Lydon Decl.," attached as Exhibit 3, ¶ 7.   At no point was the defendant, or any other resident, ever placed in handcuffs. (DeCarr Decl. ¶ 7; Andersen Decl. ¶ 5; Lydon Decl. ¶ 7.)   Rather, while the defendant was being interviewed, the defendant's wife, parents and children went about their normal activities in the house.   Lydon Decl. ¶ 7; *see*

---

[2] *Cf. United States v. Schaffer*, 851 F.3d 166, 174 (2d Cir. 2017) (noting that, during the execution of a search warrant, a reasonable person would understand the agent's limited restriction on his freedom of movement as a necessary precaution to protect the integrity of the ongoing search).

*also* photographs of the defendant's family and agents while the warrant was being executed and the defendant interviewed, attached to Lydon Decl.

### B.    Interview with the Defendant in an SUV Outside his Residence

As the defendant and SAs DeCarr and Andersen were getting settled into the vehicle at approximately 7:06 a.m., SA DeCarr advised the defendant:

> <u>You are not under arrest, at all</u>.  That's not what we're doing.  We're just- we're here to talk.  <u>You're under no obligation to talk to us</u>, we- we would appreciate your help, okay?  In- in just trying to figure out - 'cause obviously we're here for a reason, right?

Transcript of Interview (Doc. 21-6, p. 3) (emphasis added).  Contrary to the assertion made by the defendant in his sworn affidavit in support of his Motion (Doc. 21-3, ¶ 15), he was, in fact, advised that he did not have to talk to the agents.

As set forth in the above-referenced Transcript, the interview began with a discussion of the defendant and his family's background, their relationship to the intended victims whose biological children the defendant's family had legally adopted, the defendant's job as a security architect for Microsoft, and the passcodes for his electronic devices. *See* Transcript (Doc. 21-6), pp. 1-112.  Notably, at no point does the defendant ask the agents what they are searching for in his residence or whether he's being arrested.

After approximately an hour-and-a-half, SA DeCarr begins informing the defendant about the evidence that the FBI has developed in the case (*i.e.*, the Darknet website communications, the Coinbase account used to deliver the Bitcoin, the IP address used in connection with the payments, and the photographs from the "baby book" used in connection with the murder-for-hire), and the defendant confirms the accuracy, in turn, of all of the evidence. *Id.* at pp. 112-117.  At approximately the 1:45:00 mark in the interview, and for the next half-hour, the defendant explains

why he attempted to order the killing of the intended victims, apologizes for initially lying to the investigators, and proceeds to respond in detail to the agents' questions regarding how he accessed the Darknet site to arrange the murder-for-hire. *Id.* at pp. 117-145.  At the approximate 2:10:00 mark, SA DeCarr informs the defendant that he will be taken before a judge, and proceeds to advise the defendant of his *Miranda* rights now that he is formally in custody (*i.e.,* he is under arrest and no longer free to leave.) *Id.* at pp. 146-147.  SA DeCarr advised the defendant, as transcribed below:

> SA DeCarr: Before we ask you anymore questions, you must understand your rights, alright?  You have the right to remain silent, anything you say can be used against you in court.  You have the right to talk to a lawyer for advisement before we ask you anymore questions.  You have the right to have a lawyer with you during the questioning.  If you cannot afford a lawyer, one will be appointed for you before any question if you wish.  If you decide to answer questions now, without a lawyer present, you have the right to stop answering at any time.  So, all I'm looking for now, is that you understand your rights.  That's what I'm looking for, okay? So this consent here says, I have read the statement of my rights, and I understand what my rights are.  At this time I am willing to answer questions- in this case, any more questions- without a lawyer present. Is that something you're willing to talk to about further?
>
> Pence: Yeah.

*Id*. at 147.  The defendant proceeded to sign a form acknowledging his rights, and consenting to continue speaking with the agents without a lawyer present. *See* Exhibit 5.

For the remainder of the interview, the defendant provided some additional details about the technological aspects of the murder-for-hire scheme, and verified the accuracy of the communications originally provided to the FBI from the confidential source.  *Id.* at pp. 147-271.

However, the balance of the remaining two-and-a-half hours of recorded interview mostly comprised "small talk" with the agents about topics other than the investigation while the search of the residence concluded. *Id*.  Notably, as the defendant was about to be transported to the Washington County jail, he declines the opportunity to speak with his wife. *Id.* at p. 265.

At no point during the interview do the agents yell or threaten the defendant, nor are weapons purposefully displayed or brandished. (DeCarr Decl. ¶ 11; Andersen Decl. ¶ 8.)  At no point is he told he is not free to leave. *See* Transcript (Doc. 21-6).  Nor does the defendant ever ask to leave the vehicle. *Id*.  The doors to the vehicle were never locked during the interview, and no agents were posted outside the vehicle until after the defendant was placed under arrest. (DeCarr Decl. ¶ 11; Andersen Decl. ¶ 8.)   The defendant is offered water at least six times. *See* Transcript (Doc. 21-6), pp. 2, 113, 153, 164, 185 and 209.   And, again, contrary to the assertion made by the defendant in his affidavit in support of his Motion (Doc. 21-3, ¶ 8) the driveway to the residence was not blocked by law enforcement vehicles, nor could it have been, given the open nature of the desert terrain surrounding the residence on all sides. (DeCarr Decl. ¶ 11; Andersen Decl. ¶ 8); *see also* attachments to DeCarr Decl..

III.    **LEGAL ARGUMENT**

A.    **A *Miranda* Advisement is Only Required Where a Reasonable Person in the Defendant's Position Would Believe They Were in "Custody" (*i.e.*, Had Their Freedom Curtailed to a Degree Associated with Formal Arrest)**

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any case to be a witness against himself." U.S. Const. amend. V.  In the context of custodial interrogations, the Supreme Court created procedural safeguards to protect the individual's Fifth Amendment right against self-incrimination, commonly known as "*Miranda* rights." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *see also Illinois v. Perkins*, 496 U.S. 292, 297 (1990) ("It is the premise of

9

*Miranda* that the danger of coercion results from the interaction of custody and official interrogation.")  Therefore, "the Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior [*Miranda*] warning." *Perkins*, 496 U.S. at 296.   "As *Miranda* itself recognized, however, '[v]olunteered statements of any kind are not barred by the Fifth Amendment' and, thus, do not require preliminary advice of rights." *United States v. Rommy*, 506 F.3d 108, 132 (2d Cir. 2007) (quoting *Miranda*, 384 U.S. at 478); *accord Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).

To determine whether an individual is "in custody" for the purposes of *Miranda*, a court looks at the totality of the circumstances and asks "how a reasonable man in the suspect's position would have understood his situation." *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 [1984]).  This test is an objective one, and begins with "whether a reasonable person would have thought he was free to leave the police encounter at issue." *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004); *see also Howes v. Fields*, 565 U.S. 499 (2012) ("Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of *Miranda*.").

If the answer to the above question is "no," then the court must ask a second question, specifically, "whether a reasonable person would have understood his or her freedom of action to have been <u>curtailed to a degree associated with formal arrest</u>." *Newton*, 369 F.3d at 672; *see also Faux*, 828 F.3d at 135 (emphasis added) (explaining that "the second inquiry is the ultimate inquiry because a free-to-leave inquiry reveals only whether the person questioned was seized . . . [and] [n]ot all seizures amount to custody" [internal quotation omitted]); *accord, California v. Beheler*, 463 U.S. 1121, 1125 (1983).  "Only if the answer to this second question is yes was the person in

custody for practical purposes and entitled to the full panoply of protections prescribed by *Miranda*." *Newton*, 369 F.3d at 672 (quoting *Berkemer*, 468 U.S. at 440) (internal citations omitted).

"[I]n the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave." *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992). The Supreme Court "has expressly refused to convert 'a non-custodial situation ... to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a coercive environment.'" *Newton*, 369 F.3d at 671 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)

"A criminal defendant bears the burden of establishing that he or she was subjected to custodial interrogation." *United States v. Ramos*, 2012 WL 1854747 *11 (D. Vt. May 21, 2012) (citations omitted); *see also United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989) (affirming district court's dismissal of the defendant's *Miranda* claim because the defendant "failed to demonstrate that he was subjected to custodial interrogation"); *United States v. Davis*, 792 F.2d 1299, 1309 (5th Cir. 1986) ("[Defendant] had the burden of proving that he was under arrest or in custody").

An individual's subjective belief does not bear on the custody analysis, nor do the subjective views of the interrogating officers. *Stansbury v. California*, 511 U.S. 318, 323 (1994); *accord Faux*, 828 F.3d at 135. Instead, a court considers various factors to determine whether the individual was in custody, including the following: (1) "the interrogation's duration; (2) its location; (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6)

whether officers told the suspect he was free to leave or under suspicion." *Faux*, 828 F.3d at 135 (quoting *United States v. FNU LNU*, 653 F.3d 144, 153 [2d Cir. 2011]) (internal citations omitted).

Moreover, it is black letter law that simply because an interview takes place during the course of the execution of the search warrant does not, without more, require a finding that the statements made by a defendant were the subject of a custodial interview. *United States v. Badmus*, 325 F.3d 133 (2d. Cir. 2003). Furthermore, "[d]ecisions in [the Second Circuit] have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is <u>not</u> free to leave." *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992) (emphasis added); *cf. United States v. Luchetti*, 2012 U.S. Dist. LEXIS 185293, at *18-19 (W.D.N.Y. Aug. 10, 2012) ("[T]he fact that the interview took place in an unmarked vehicle owned by Homeland Security is an insufficient basis to conclude that any discussion had therein was custodial.")

**B.      The Objective Circumstances of the Defendant's Interview Do Not Support a Finding that a Reasonable Person Would Believe Their Freedom Had Been Curtailed to a Degree Associated with Formal Arrest**

In this case, under the totality of the circumstances which existed during the search of the defendant's residence, a reasonable person in the defendant's position would have felt "free to leave," or at a minimum "would not have understood his restraint on freedom of action to be tantamount to that associated with a formal arrest," given that the defendant: (1) never had a firearm pointed at him; (2) was never placed in handcuffs; (3) was asked whether he would agree to speak with the agents either inside the residence or outside in a vehicle; (4) readily and voluntarily agreed to go with SAs DeCarr and Andersen to the unlocked SUV in his driveway, which he entered fully on his own accord; (5) was advised, at the outset of the interview, that he was not under arrest and that he did not have to speak with the investigators; (6) was interviewed

12

for less than two hours before he made confessions that led to his formal arrest and *Miranda* advisement; (7) was never yelled at or threatened by investigators; and (8) never asked to end the interview or leave the vehicle.

Moreover, the defendant did not act the way someone would if they believed they were under formal arrest. It stands to reason that a reasonable person, whose liberty had been restrained to a degree associated with formal arrest, would not believe he or she would be allowed to choose whether or not to speak with agents, and then exit their residence with no restraints, walk over to an FBI vehicle, and enter it on their own accord, as the defendant did in this case.

Furthermore, a review of the Second Circuit's ruling denying suppression in *United States v. Faux*, 828 F.3d 130 (2d Cir. 2016), is instructive. In that case, approximately ten to fifteen agents executed the search warrant at the defendant's home at around sunrise. *See Faux*, 828 F.3d at 132. The defendant was questioned during a two-hour interview in the dining room, apart from her husband, and was not allowed to move freely about her home during the interview. *Id*. at 133. An agent escorted the defendant to the bathroom, where the agent stood outside, and to her bedroom so that she could get a sweater. *Id*. The agents never told her that her participation was voluntary or that she was free to leave. *See id*. at 134. Approximately twenty minutes into the interview, agents told the defendant that she was not under arrest. *Id*. The agents also seized the defendant's cell phone. *Id*. at 133. The Second Circuit concluded as follows:

> On this record, and given our precedents, it must be concluded that [the defendant] was <u>not</u> in custody. True, the two-hour interview was conducted while officers swarmed about her home. But she was told 20 minutes into the interview that she was not under arrest; she was never told that she was *not* free to leave; she did not seek to end the encounter, or to leave the house, or to join her husband; the tone of the questioning was largely conversational; there is no indication that the agents raised their voices, showed firearms, or made threats. Her movements were

13

monitored but not restricted, certainly not to the degree of a person under formal

arrest.  She was thus never "completely at the mercy of" the agents in her home.

*Id.* at 138-39 (emphasis added).

Here, approximately fourteen agents were involved in executing the warrant of the

residence, similar to *Faux*.  The defendant was interviewed by only two officers immediately

outside the home, and was told before beginning the interview that he was not under arrest, and

that he was not required to answer their questions.  The length of the un*Mirandized* portion of the

defendant's interview was approximately two hours, also similar to *Faux*.  As noted above, the

Second Circuit in *Faux* held that where a defendant was never told that she was not free to leave,

and never sought to end the interview, the defendant was not in custody. *See Faux*, 828 F.3d at

132.  Here, the defendant was told at the *outset* of the conversation that he was not under arrest

and that he did not have to answer any questions.

Considering all of the circumstances of this case in light of controlling Second Circuit

precedent, no reasonable person would have thought their freedom of action to have been curtailed

to a degree associated with formal arrest.  By the time the defendant was interviewed, all weapons

had been holstered, there were no raised voices, he was not handcuffed, and he readily agreed to

speak with agents of his own volition without a hint of coercion.  Moreover, the evidence

demonstrates that after the agents had completed securing the residence, further interaction with

Defendant was preceded by clear communication that he was not under arrest and could refuse to

talk to them.  Accordingly, it cannot be maintained that the defendant was in custody when

interviewed in the SUV outside his residence, and his statements should not be suppressed.

**C.    Even if the Defendant Was "in Custody" During the Interview, the *Miranda* Advisement He Received was Sufficient and Was Not Part of a "Two-Step" Interrogation**

In order to prove the valid waiver of a defendant's *Miranda* rights , the government must show that the defendant's relinquishment of his rights was: (1) knowing, meaning that it "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it"; and (2) voluntary, meaning that "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)); *see also Miranda*, 384 U.S. at 444 ("The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.").  This determination depends upon the totality of the circumstances surrounding the alleged waiver and any subsequent statements. *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) (citing *Oregon v. Elstad*, 470 U.S. 298, 309 (1985)).

In *Oregon v. Elstad*, 470 U.S. 298 (1985), the Supreme Court addressed whether the initial failure of law enforcement officers to administer *Miranda* warnings during a custodial interrogation taints a subsequent admission made by a suspect in a second round of custodial interrogation after being fully advised of his *Miranda* rights.  After reviewing the interplay of the Fourth Amendment's exclusionary rule with the Fifth Amendment and *Miranda* warnings, the Court determined that the relevant inquiry is whether the second, *Mirandized* statement was voluntarily made. *Elstad*, 470 U.S. at 318.  If so, the statement is admissible. *Id*.

However, in *Missouri v. Seibert*, 542 U.S. 600 (2004) (plurality opinion), the Supreme Court addressed a police protocol that developed in the wake of *Elstad*, where police would deliberately withhold *Miranda* warnings during the first custodial interrogation, obtain a

confession from a suspect, and then offer *Miranda* warnings and have the suspect repeat his or her confession. In holding that this deliberate, two-step interrogation renders the subsequent, warned statements inadmissible, the plurality offered a defendant-oriented, five-factor inquiry to determine whether delayed *Miranda* warnings could be considered effective. *Seibert*, 542 U.S. at 615 (plurality opinion). Those factors are as follows:

> [1] [T]he completeness and detail of the questions and answers in the first round of interrogation; [2] the overlapping content of the two statements; [3] the timing and setting of the first and the second [interrogation]; [4] the continuity of police personnel; and [5] the degree to which the interrogator's questions treated the second round as continuous with the first.

*Seibert*, 542 U.S. at 615 (plurality opinion).

Justice Kennedy wrote a concurring opinion in *Seibert*, explaining his belief that "the plurality's 'objective inquiry from the perspective of the suspect'–which 'applies in the case of both intentional and unintentional two-stage interrogations'–cut too broadly." *United States v. Williams*, 681 F.3d 35, 40 (2d Cir. 2012) (quoting *Seibert*, 542 U.S. at 621 [Kennedy, J., concurring]). Justice Kennedy offered a narrower test for the "infrequent case" where a two-step interrogation technique was designed to "undermine the Miranda warning" and no curative measures were taken. *Williams*, 681 F.3d at 40. "In the absence of a finding of deliberateness, Justice Kennedy believed, the admissibility of any subsequent statement should continue to be governed by the principles of *Oregon v. Elstad*, which looks solely to whether the statements were knowingly and voluntarily made." *Id*. at 41.

Subsequently, the Second Circuit has adopted Justice Kennedy's concurring opinion as controlling, explaining as follows:

In *United States v. Carter*, 489 F.3d 528 (2d Cir. 2007), we joined our sister circuits in regarding Justice Kennedy's concurrence in *Seibert* as controlling. We concluded that *Seibert* lays out an <u>exception</u> to *Elstad* for cases in which a deliberate, two-step strategy was used to obtain the postwarning confession. [*Carter*, 489 F.3d at 546]. In [*United States v. Capers*, 627 F.3d 470 (2d Cir. 2010)], we further joined our sister circuits in concluding that a court should review "the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness." 627 F.3d at 479. Finally, we held that the Government bears the burden of disproving by a preponderance of the evidence that it employed a deliberate two-step strategy. *Id.* at 480.

*Williams*, 681 F.3d 35, 41 (2d Cir. 2012).

In this light, the Second Circuit has articulated a straightforward analysis. *See, e.g.*, *United States v. Moore*, 670 F.3d 222, 229-30 (2d Cir. 2012).  A court must first ask if "the initial statement, though voluntary, [was] obtained in violation of the defendant's *Miranda* rights?  If not, there is no need to go further." *Moore*, 670 F.3d at 229. "If the initial statement *was* obtained in violation of the defendant's *Miranda* rights," the court must then ask a second question, "has the government demonstrated by a preponderance of the evidence, and in light of the totality of the objective and subjective evidence, that it did *not* engage in a deliberate two-step process calculated to undermine the defendant's *Miranda* rights?" *Id.* at 229-30. "If so, the defendant's post-warning statement is admissible so long as it, too, was voluntary." *Id.* at 230. "If not, the post-warning statement must be suppressed unless curative measures . . . were taken before the defendant's post-warning statement." *Id.*

With respect to objective factors, courts are to be guided by, but not limited to, the five factors outlined by the *Seibert* plurality to determine if the government deliberately intended to undermine the defendant's *Miranda* rights. *Williams*, 681 F.3d at 41.  As to subjective evidence of

17

intent, a court considers the officer's rationale for failing to give *Miranda* warnings, as well as the credibility of that testimony. *Moore*, 670 F.3d at 229.

In this case, the initial interview of the defendant at his residence – as discussed above – did not violate his *Miranda* rights because he was not in "custody," and thus there was no "two-step interrogation."  But even if, *arguendo*, the defendant was "in custody" (i.e. had his freedom curtailed to a degree associated with a formal arrest) when he was interviewed in the SUV, the Court should credit SA DeCarr's stated rationale for not giving the *Miranda* advisement immediately upon entering the vehicle with the defendant.

Specifically, SA DeCarr explained in his declaration that – at the beginning of the interview, and before any of the evidence at the residence could be analyzed – he did not have an arrest warrant for the defendant, nor did he believe that he had sufficient evidence to arrest the defendant on probable cause, given that – although he strongly suspected that the defendant was, in fact, responsible for the Darknet communications and Bitcoin payments in connection with the murder-for-hire – it remained possible that someone else in the residence (*e.g.,* his wife and/or his parents) who had access to the defendant's electronic devices and/or financial accounts could have been responsible. (DeCarr Decl. ¶ 9.)

The agents had to wait until approximately the 1:45:00 mark in the interview before the defendant began to explain why he attempted to order the killing of the intended victims, apologized for initially lying to the investigators, and proceeded to respond in detail to the agents' questions regarding how he accessed the Darknet site to arrange the murder-for-hire. *See* Transcript (Doc. 21-6) at pp. 117-145.  But once those admissions were obtained – and provided the agents with probable cause to arrest the defendant – SA DeCarr informed the defendant that

he would be taken in front of a judge (i.e. that he was now in custody), and advised the defendant of his *Miranda* rights.

On these facts, there is simply no evidence that the agents engaged in a deliberate two-step process calculated to undermine the defendant's *Miranda* rights, as opposed to following the evidence where it led them, and only advising the defendant of his *Miranda* rights when he was actually being taken into custody. *See e.g. Moore*, 670 F.3d at 229-30.

### D.    The Defendant's Reliance on *Lee* (1982) and *Guarino* (1986) is Misplaced

Ignoring the most recent controlling Second Circuit caselaw on the question of what amounts to a "custodial" interrogation, the defendant analogizes the instant case to the Ninth Circuit's opinion in *United States v. Lee*, 699 F.2d 466 (9th Cir. 1982), as well as a District of Connecticut case *United States v. Guarino*, 629 F. Supp. 320 (D. Conn. 1986), which appears to be the only Second Circuit case that cites *Lee,* based on some similarities in the underlying facts of the cases.

*Guarino* can be easily dispensed with as useful to the analysis in this case, given that the defendant in *Guarino*, prior to his interview in a police vehicle, was the subject of a warrantless search of his residence that resulted in him being handcuffed and forced into his house from outside, and having a gun pointed at him and being threatened with bodily harm by the police agents prior to the "voluntary" interview.  Aside from an un*Mirandized* interview occurring in a vehicle, there is little to connect *Guarino* to the instant case.

Regarding *Lee*, although it also involves an un*Mirandized* interview in a vehicle, the full factual basis of the defendant's encounter with investigators is not contained in the short opinion, save for a brief summary describing the defendant voluntarily entering a police car with two agents who confronted him with evidence over the course of an hour, after which he made certain

19

inculpatory statements.   Given the plethora of factors identified in subsequent caselaw that contribute to a reasonable person's understanding of whether their freedom was curtailed to a degree associated with a formal arrest, the *Lee* opinion is not useful due to both the lack of factual detail or explanation of how the court analyzed the "totality of the circumstances" to arrive at its conclusion.

Moreover, the Eighth Circuit Court of Appeals, in *United States v. Czichray*, 378 F.3d 822, 826 (2004) – in observing the powerful effect of a suspect being told they do not have to speak with investigators – identified *Lee* as a unique outlier among Supreme Court and Courts of Appeals cases, in its holding that that a person was in police custody after being clearly advised of their freedom to leave or terminate questioning.  The *Czichray* panel further noted that that standard of review employed by the Ninth Circuit in *Lee* was "outmoded." *Id*.

## IV.   THE DEFENDANT'S REQUEST FOR A HEARING TO DETERMINE THE ADMISSIBILITY OF THE DEFENDANT'S STATEMENTS

Given that there are questions of facts in dispute, the government joins in the defendant's request for an evidentiary hearing to determine the admissibility of the statements made by the defendant to SAs DeCarr and Andersen on October 27, 2021.  The government requests that the hearing be set for a date that is amenable to the Court and to the witnesses for both parties.

## V.   CONCLUSION

The Court, except as consented to herein, and once it has made its factual determinations following a hearing, should deny the defendant's Motion.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

*******************************************

UNITED STATES OF AMERICA,

Case No.:      1:21-CR-393 (DNH)

v.

CHRISTOPHER PENCE,

Defendant.

*******************************************

**CERTIFICATE OF SERVICE**

I hereby certify that on January 24, 2023 the foregoing was electronically filed with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the counsel of record for the defendant.

_/s/ Emmet J. O'Hanlon_____
Emmet J. O'Hanlon
Assistant U.S. Attorney