# EXHIBIT 2

Andersen Declaration

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

*****************************************

UNITED STATES OF AMERICA,

Case No.:    1:21-CR-393 (DNH)

v.

CHRISTOPHER PENCE,

Defendant.

*****************************************

## DECLARATION OF CHRIS ANDERSEN

Pursuant to 28 U.S.C. § 1746 and under penalties of perjury, CHRIS ANDERSEN declares as follows:

1)   I, Chris Andersen, am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed for approximately 15 years. I am currently assigned to the FBI Salt Lake City Division, St. George Resident Agency (RA), and assigned to investigate terrorism cases and criminal violations. I have investigated hundreds of cases, and have interviewed hundreds of people related to those cases. I have participated in the execution of over a hundred residential search warrants, and been the lead agent on many of them.

2)   On October 27, 2021, I was part of the team that executed a federal search warrant at the defendant CHRISTOPHER PENCE's residence located at 2929 South 6500 West, Cedar City, Utah. My primary assignment was to locate and accompany the defendant while he was inside the

1

residence, and to participate in any interview of the defendant as part of the investigation of a murder-for-hire.

3) As the team of approximately 14 law enforcement agents wearing body armor under their agency-issued jackets entered the residence, the agents held their weapons – a combination of handguns and rifles – in the "low-ready" position, pursuant to their training and based on information that the defendant possessed weapons in the residence. No S.W.A.T. members participated in the search and, aside from between one and three agents wearing ballistic helmets, none of the agents were equipped with any other tactical riot gear (*e.g.* full-body protection, riot helmets with visors, fixed-length batons, shields, or gas masks).

4) After entering the residence, the team of agents spread out through the large house to ensure there were no safety hazards to the agents and no destruction of evidence taking place. The defendant's family, including his wife, parents and children, were escorted from their various locations around the residence to the first floor living room. At no point were any firearms pointed at the defendant or members of his family. Once the residence was cleared, all of the agents holstered their handguns or shouldered and/or stowed their rifles in their vehicles. The agents then set about their assigned tasks, which included interviewing the residents, seizing and previewing electronic devices, as authorized by the warrant, and photographing the residence.

5) While the residence was being secured, the defendant remained with myself in the foyer of the residence. At one point, the defendant went halfway up the main stairs, indicating that he would bring some more children downstairs, but was asked to stop and call for them to come downstairs instead. None of the adults or children were visibly upset during this process. Furthermore, at no point was the defendant prevented from speaking with any of his family

members as they made their way to the living room. At no point did I observe any resident placed in handcuffs.

6) Towards the end of the process of securing the residence, SA DeCarr asked the defendant if he was willing to speak with us either in his residence or in our vehicle outside the residence. The defendant, appearing relaxed and agreeable, readily agreed to speak with us in the vehicle. Without attempting to speak with his family, the defendant indicated that he needed to retrieve his shoes from his upstairs bedroom, and he went up the stairs quickly. I followed the defendant halfway up the stairs to his room. At no point did I hear any agent threaten to shoot the defendant. Rather, I recall someone asked him to slow down.

7) After retrieving his shoes, the defendant put on a jacket, exited the residence, approached the vehicle – a Chevrolet Tahoe seven-seat SUV – on his own, opened a passenger door, and got in. No other agents were anywhere near the vehicle at this time, except for SA DeCarr and me.

8) At no point during the interview did anyone yell or threaten the defendant, nor were weapons purposefully displayed or brandished. Furthermore, the doors to the vehicle were never locked during the interview, the driveway to the residence was not blocked by law enforcement vehicles, and no agents were posted outside the vehicle until after the defendant was placed under arrest.

///
///
///
///
///
///
///

3

9) Because this affidavit is being submitted for the limited purpose of responding to a motion to suppress evidence, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to respond to factual allegations contained in the defendant's motion to suppress statements and evidence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:   January 24, 2023

St. George, Utah