UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
UNITED STATES OF AMERICA,

                           Plaintiff,

vs.                       Case No. 1:21cr393

CHRISTOPHER PENCE,

                           Defendant.
-------------------------------------------x

     Transcript of a Suppression Hearing held on

June 8, 2023, at the Alexander Pirnie Federal

Building, 10 Broad Street, Utica, New York, the

HONORABLE DAVID N. HURD, United States District

Judge, Presiding.


                 A P P E A R A N C E S

For Plaintiff:     UNITED STATES ATTORNEY'S OFFICE
                 James T. Foley U.S. Courthouse
                 Room 231
                 445 Broadway
                 Albany, New York  12207-2924
                   BY:  EMMET J. O'HANLON, ESQ.
                       Assistant United States Attorney

For Defendant:     SCHILLINGER & ASSOCIATES, PLLC
                 11 North Pearl Street
                 Suite 1700
                 Albany, New York 12207
                   BY:  ERIC K. SCHILLINGER, ESQ.

Also Present:      Brian DeCarr, FBI Special Agent

                 *Lisa M. Mazzei, RPR*
         *Official United States Court Reporter*
                   *10 Broad Street*
               *Utica, New York  13501*
                  *(315) 266-1176*

2

1                    I N D E X   O F   T E S T I M O N Y

2    Government's
     Witnesses          Direct      Cross      Redirect      Recross

3

4    Brian DeCarr            5         29          63

5    Chris Andersen        65         77          97

6    Patrick Lydon         98        106

7

8    Defendant's
     Witnesses          Direct      Cross      Redirect      Recross

9

10   Michelle Pence       113        122

11   Christopher Pence    128        141

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    (Open court, 10:01 a.m.)

2            THE CLERK:  United States vs. Christopher Pence,

3     21-CR-393.

4            Attorneys, please note your appearance for this

5     record.

6            MR. O'HANLON:  Good morning, your Honor.

7     Assistant U.S. Attorney Emmet O'Hanlon for the government.

8     Seated to my right or rather standing to my right is FBI

9     Special Agent Brian DeCarr, who is the case agent in this

10    case.

11           MR. SCHILLINGER:  Good morning, your Honor.

12    Eric Schillinger for the defendant Christopher Pence.

13           THE COURT:  Okay.  Be seated.  We are here for an

14    evidentiary hearing.

15           First of all, I want the record to show that I have

16    reviewed all of the submissions, including the affidavits by

17    the defendant and both agents.

18           Also, we have reviewed the memorandums of law and I

19    understand that the parties are prepared to submit to the

20    admission of the proposed exhibits by both sides.  Is that

21    correct?

22           MR. O'HANLON:  That is correct, your Honor.

23           MR. SCHILLINGER:  Yes, Judge.

24           THE COURT:  Okay.  The defendant's exhibits are

25    received and the government's exhibits are received.  I

4

1   understand that there are two witnesses for the government;

2   correct?

3             MR. O'HANLON:  There will be three, your Honor.

4   The three agents.

5             THE COURT:  The three agents, correct.  And there

6   will be two witnesses on behalf of the defense.

7             We will hear the testimony; direct, cross, recross,

8   redirect and recross for each witness.  Two opportunities to

9   examine each witness.

10             After we conclude the testimony -- and as I said, I

11   have reviewed the affidavits of all of the witnesses and they

12   are part of the record.  So keep that in mind when you have

13   your witness on the stand.

14             And, Mr. O'Hanlon, you may call your first witness.

15             MR. O'HANLON:  Thank you, your Honor.  The

16   government will call Special Agent Brian DeCarr.  And I'll

17   just make a note for the record that he is the case agent in

18   this case and pursuant to Rule of Evidence 615(b), after his

19   testimony, he is going to stay at counsel table.

20             THE COURT:  So noted.

21             THE CLERK:  Sir.  Good morning, sir.

22             Sir, can you please state your full name.  Spell

23   your last name for this record.

24             THE WITNESS:  Yes.  My name is Brian DeCarr.  Last

25   name is D-E-C-A-R-R.

                           DeCarr - Direct                          5

 1              THE CLERK:  Thank you, sir.

 2              B R I A N   D E C A R R, called as a

 3    witness and being duly sworn, testifies as follows:

 4              THE COURT:  You may proceed.

 5    DIRECT EXAMINATION BY MR. O'HANLON:

 6    Q     Good morning, Special Agent.

 7    A     Good morning.

 8    Q     What is your current occupation and assignment?

 9    A     I am a special agent with the FBI in Albany.  I

10    currently work counter intelligence matters.

11    Q     How long have you been with the bureau?

12    A     I've been with the bureau since January of 2020.

13    Q     Did you have any prior law enforcement experience

14    before joining the FBI?

15    A     Yes, I did.  Before joining the FBI, I was a New York

16    State Trooper.  And before that I was a police officer with

17    the Pentagon Force Protection Agency.

18    Q     Going back to September of 2021, how were you assigned

19    with the FBI at that time?

20    A     At that time, I was assigned to the Capital District

21    Safe Streets Task Force where I worked transnational

22    organized crime, violent crime, and gangs.

23    Q     What were your duties in that capacity specifically

24    with regard to a murder-for-hire investigation in September

25    of 2021?

DeCarr - Direct                    6

1    A      In September of 2021, we received information from FBI

2    Knoxville that there was a murder-for-hire scheme to kill two

3    people in Hoosick Falls, New York.

4    Q      Who what was the source of the information that FBI

5    Knoxville was working off of?

6    A      FBI Knoxville had a source with access to a

7    murder-for-hire site on the dark web.

8    Q      What is the dark web?

9    A      The dark web is a portion of the Internet that is only

10   accessible through special authorization systems or

11   configurations.

12   Q      And what was the content of the information that FBI

13   Knoxville had received?

14   A      The information FBI Knoxville received was

15   communications between the administrator of a murder-for-hire

16   site and a customer who were negotiating the murder of

17   Francisco Cordero and Christina Cordero in exchange for

18   approximately $16,000 in Bitcoin.

19   Q      What is Bitcoin?

20   A      Bitcoin is a form of cryptocurrency.

21   Q      In those communications you previously referenced, did

22   they depict the actual transfer of approximately $16,000 in

23   Bitcoin?

24   A      They did.  The communication -- in the communications

25   they agreed upon a price for the job and the money was

DeCarr - Direct                    7

1    transferred.

2    Q     What did the FBI do upon receiving that information?

3    A     The FBI conducted financial and blocked chain analysis

4    that led us to a Coinbase account for the customer in that

5    transaction, and a further analysis showed that Coinbase

6    account belonged to the defendant.

7    Q     What is Coinbase?

8    A     Coinbase is a cryptocurrency exchange platform.

9    Q     And were there IP addresses that were associated with

10   the Coinbase account that were relevant to the investigation?

11   A     Yes, there were.

12   Q     And what did they depict?

13   A     The IP addresses -- the analysis on the IP addresses

14   showed an account belonging to the defendant registered to

15   the defendant's home address.

16   Q     And was that residence -- or that address, rather, 2929

17   South 6500 West, Cedar City, Utah?

18   A     That's correct.

19   Q     Where is Cedar City, Utah?

20   A     It's in Southwest Utah.

21   Q     Did you obtain a search warrant for that residence?

22   A     Yes, I did.

23   Q     How did you go about obtaining that warrant?

24   A     I swore out the warrant with U.S. Magistrate

25   Judge Paul Kohler out of Saint George, Utah.

DeCarr - Direct                                    8

1    Q     And what did that warrant authorize you to search for?

2    A     That warrant authorized me to search for evidence of

3    the crime, including electronic devices at the defendant's

4    residence and on the people at the residence as well.

5    Q     When you say "evidence for a crime," which crime was

6    specifically you were searching for evidence of?

7    A     Would be the federal crime for murder-for-hire.

8    Q     How would you describe the residence?

9    A     The residence is a 5800 square foot, seven-bedroom

10   house sitting on a 20-acre plot of land.

11   Q     I'm going to show you what's been previously admitted

12   into evidence as Government Exhibit 2.

13         Do you recognize what is depicted in Government Exhibit

14   2?

15   A     Yes, I do.

16   Q     How do you recognize it?

17   A     That's the defendant's residence in Southwest Utah.

18   Q     How were those photographs taken?

19   A     Those photos were taken by an FBI airplane.

20   Q     And the search warrant was executed on October 27th of

21   2021?

22   A     That's correct.

23   Q     Were you part of the team that executed the search

24   warrant?

25   A     Yes, I was.

DeCarr - Direct                                    9

1   Q      Approximately, what time do you have as the execution

2   of the search warrant?

3   A      I knocked on the door at approximately 6:48 a.m.

4   Q      Who was with you at the door at that time?

5   A      Other members of law enforcement.

6   Q      Was it all federal law enforcement?

7   A      No.

8   Q      Fair to say it was agents from FBI, other federal

9   agencies and some local law enforcement agents as well?

10  A      That's correct.

11  Q      Approximately how many of those agents were with you at

12  the door at that time?

13  A      I would say it was approximately 14, including myself

14  at the door at that time.

15  Q      What were the other members of the team wearing?

16  A      Members of the team wore their bulletproof vests and

17  their agency-issued jackets.  It was cold that morning, so

18  many people had jackets or sweatshirts as well.

19  Q      Fair to say every member of the team was armed with

20  some kind of firearm?

21  A      For the individuals at that door at the time, yes.

22  Q      What kinds of firearms did the agents have in their

23  possession?

24  A      A combination of handguns or pistols and long guns.

25  Q      How were you equipped at that time?

DeCarr - Direct                                          10

1    A      I had a pistol.

2    Q      Was anyone wearing riot gear, to your understanding?

3    A      No.

4    Q      What is your understanding as far as what riot gear

5    consists of?

6    A      Riot gear would consist of helmets with visors,

7    shields, fixed batons, possibly gas masks.  Other tools used

8    to control large, usually unruly crowds.

9    Q      Fair to say that's a whole nother level of protection

10   compared to what --

11          THE COURT:  Move the mic a little closer; would

12   you?

13   Q      Fair to say that's a level of protection exceeding what

14   the individuals at the door with you are wearing?

15   A      That's correct.

16   Q      What happened after you knocked on the door of the

17   residence?

18   A      After I knocked on the door at the residence, the

19   defendant came to the door, he answered the door.  I

20   identified myself and informed him we had a search warrant

21   for the residence.

22   Q      Was the door breached at any point before the defendant

23   answered it?

24   A      No.

25   Q      What was the defendant's demeanor when he opened the

DeCarr - Direct                    11

1    door and answered it?

2    A      Calm, composed.

3    Q      Just for the record, do you see the defendant currently

4    in court right now?

5    A      Yes, I do.

6    Q      Can you just identify where he is seated and what he is

7    wearing?

8    A      Yes.  The defendant is sitting at the table over there

9    wearing orange.

10           MR. O'HANLON:  Identifying the defendant for the

11   record.

12           THE COURT:  So noted.

13   Q      What happened next after you announced yourself and

14   told the defendant that you had a warrant to search the

15   house?

16   A      The defendant stepped aside and members of my team,

17   including myself, entered the house.

18   Q      With regard to the weapons that were possessed by the

19   members of the team, how were the members of the team

20   handling those weapons based on your observation?

21   A      Based upon my observations, the weapons were being

22   handled in a term that we use as low ready.

23   Q      What does low ready mean?

24   A      Low ready is when you have your weapon in your hand but

25   it's not pointed at anybody.  It's pointed typically towards

DeCarr - Direct                          12

1   the ground about 30- to 45-degree angle.

2   Q      At any point did you see a gun actually pointed at any

3   person in the house?

4   A      No.

5   Q      Was there any shouting that accompanied the agents'

6   entrance into the house?

7   A      No.  None.

8   Q      Would you agree that you stormed the house?

9   A      No.

10  Q      In fact, how did the members of the team actually make

11  entry into the house based on your observation?

12  A      Walked.

13  Q      What is the first step in executing a residential

14  search warrant?

15  A      The first step in executing the warrant would be to

16  secure the residence that we are planning to search.

17  Q      And what does securing mean?

18  A      Securing would mean that members of the entry team, the

19  team that goes into the house to secure it will break off

20  into smaller groups and essentially what they are looking for

21  is people and to create -- what they are trying to accomplish

22  is making the space safe by looking for people and preventing

23  destruction of evidence.

24  Q      And towards that goal, were all the inhabitants of the

25  residence brought to a central location?

DeCarr - Direct                                    13

1    A     Yes, they were.

2    Q     Fair to say there were, you know, over 10 children and

3    at least four adults in the house?

4    A     That's correct.

5    Q     And all of them, aside from the defendant, were brought

6    to that central location that you previously referenced?

7    A     That's correct.

8    Q     Was that the living room of the residence?

9    A     Yes.

10   Q     I'm going to show you what's been previously marked and

11   admitted into evidence, Government Exhibit 3.  Do you

12   recognize Government Exhibit 3?

13   A     Yes.

14   Q     How do you recognize it?

15   A     Looks like a sketch of the defendant's first floor.

16   Q     Okay.  Can you identify, just for the record, where

17   the -- the front door that you entered along with the team is

18   on Government Exhibit 3?

19   A     Bottom center.

20   Q     Is it labeled "front door"?

21   A     Yes, it is.

22   Q     And when you referenced the living room, where is that

23   on Government Exhibit 3?

24   A     That would be in the upper right-hand corner.  Room F.

25   Q     Once the residence was secured, what did the members of

DeCarr - Direct                                    14

1    the entry team do with their firearms that you observed?

2    A    Once the residence was secured, all the law enforcement

3    officers I observed had their weapons holstered, they put

4    them in their car.  Or if they had a rifle and they hadn't

5    put it away yet, they had it just considered slum, which

6    means it's usually just laying against their chest.  They

7    don't even have their hand on the pistol grip.

8    Q    In other words, they were no longer handling the

9    weapons at the low ready position; correct?

10   A    Correct.

11   Q    What happened next from your perspective?

12   A    What happened next was during the course of securing

13   the residence, I walked into the living room and I wanted --

14   I asked if all children, people were accounted for.  At that

15   time I was told that they were not and that there were still

16   some children upstairs.  So I went upstairs to inform the

17   individuals that were searching that there could be some

18   children still in their beds.  After that was done, those

19   children were located, they were brought down to their family

20   in the living room.  After I made sure everybody was in the

21   living room, I then went to the defendant and I asked him if

22   he had anywhere he would like to talk or if he would like to

23   talk to us at all.

24   Q    And where was the defendant at that point?

25   A    The defendant was standing near the front door still.

DeCarr - Direct                                    15

1    Q     What were the other agents or other members of the

2    entry team doing at that point?

3    A     At that point, once the residence was secure, people

4    had other responsibilities, which they went about doing or

5    preparing to do, which some of that would have been

6    searching, taking photographs, preparing for any interviews

7    that need to be conducted, and various other tasks, like,

8    conducting the sketch.

9    Q     I want to show you what's been marked as Government --

10   admitted into evidence as Government Exhibit 1.

11             MR. O'HANLON:  Permission to approach, your Honor?

12             THE COURT:  You may.

13   Q     Special Agent, do you recognize what I handed to you as

14   Government Exhibit 1?

15   A     Yes, I do.

16   Q     How do you recognize it?

17   A     This is a copy of the DVR footage from the defendant's

18   residence that we seized.

19   Q     And please explain for the Court what is the DVR

20   footage?

21   A     The defendant had a number of cameras secured around

22   his residence.  The DVR captured eight of those cameras as it

23   recorded over a period of time.

24   Q     And have you reviewed the contents of that drive,

25   Government Exhibit 1?

DeCarr - Direct                                        16

1    A     Yes.

2    Q     And are they accurate copies of what was taken off of

3    the residence's DVR, based on your review?

4    A     Yes.

5    Q     Thank you.  I'm going to play what is marked as

6    Government Exhibit 1B, which is, I'll represent to the Court,

7    Channel 6, which depicts the living room of the residence.

8    It's playing from the 6:52:32 mark.

9          While it plays, Special Agent, can you just describe

10   what you are currently seeing depicted on the video?

11   A     This is the living room at the defendant's residence.

12   Q     Can you tell who is currently depicted at the top of

13   the frame?

14   A     I can't be sure, but it's members of law enforcement

15   and it looks like a member of the family at the residence.

16   Q     And at the 6:52 mark, how much time has elapsed

17   approximately since you entered the house at this point?

18   A     Approximately four minutes.

19   Q     Now what do you see depicted?

20   A     The residence, at least in this space, at the very

21   least was secured.  These members appear to be conducting a

22   search of the space so that we can give the space back to the

23   family so they can come sit.  It was too cold outside to have

24   people outside.

25   Q     In terms of weapons that you can observe, what do you

DeCarr - Direct                              17

1  observe?

2  A    Combination of long guns and handguns.  But I observed

3  no hand guns in anyone's hand and no one is handling their

4  long gun.  It's just slung across their chest.

5  Q    We are at the 6:54 mark.  What's happening now?

6  A    Members of the family are re-entering the living space.

7  Q    Is it specifically the defendant's children?

8  A    That's correct.

9  Q    Are there any guns being pointed at them?

10 A    No.

11 Q    For the record, are you able to observe the demeanor of

12 the children?

13 A    I can, yes.

14       MR. SCHILLINGER:  Objection, Judge.  It's calling

15 for speculation as to what the children are thinking or

16 doing.

17       THE COURT:  Sustained.  Move on.

18 Q    What is happening at the -- this is now the 6:55 minute

19 mark.

20 A    Members of the family are sitting down.  I just walked

21 into the room.

22 Q    And what are you doing at this point?

23 A    I am trying to account for all the people in the house.

24 Q    And is there a little girl asking you a question at

25 this point?

DeCarr - Direct                    18

1   A     Yes, there is.

2   Q     What was she asking about, if you recall?

3   A     I do not recall what she asked me.

4   Q     Do you observe the defendant's wife at this point?

5   A     Yes.

6   Q     What is she doing in the video and how is she dressed?

7   A     She seems to be dressed in what I would describe as

8   pajamas and she appears to be accounting for all the family

9   members as well.

10  Q     And I will pause it at the 6:55:47 mark.

11        Let's get back to what you previously testified to

12  which was approaching the defendant and asking to speak with

13  you.  Can you describe in detail how you -- where the

14  defendant was and how you conveyed that request?

15  A     Yes.  The defendant was still by the front door.  As

16  you enter the front door, he would have been off to the left.

17  I approached the defendant after all the people were

18  accounted for and everything was secure and I asked him if he

19  would be willing to speak with us, to which he said that he

20  would.  I asked him if he would have anywhere comfortable in

21  the house or anywhere that he would like to talk.  And if

22  not, we have a vehicle outside we can go sit in.

23  Q     And how did the defendant react to that?

24  A     He was calm and composed.  He said he would go sit in

25  the car and talk to us.

DeCarr - Direct                                    19

1    Q    At any point, did the defendant attempt to speak with

2    his family before leaving the residence?

3    A    No.

4    Q    Was the defendant able to leave the residence

5    immediately with you at that point?

6    A    No.

7    Q    What had to happen first?

8    A    The defendant wasn't wearing any shoes.  He needed to

9    get some shoes.

10   Q    And so what did he do?

11   A    He went up and got shoes.

12   Q    And then what happened?

13   A    Well, while he was going to get shoes, I went out to

14   the vehicle I had offered for us to speak in, and I took off

15   my gear, I started the recording, and then I came back into

16   the house.

17   Q    Did you have a vehicle that was prepared for the -- in

18   the eventuality that the defendant would agree to speak with

19   you?

20   A    We did.  We had a vehicle in mind, yes.

21   Q    What kind of vehicle was it?

22   A    It was a Chevy Tahoe we rented from the Las Vegas area.

23   Q    How big is that vehicle?

24   A    It's a -- I would consider it a large SUV.  It's three

25   rows with plenty of room.

DeCarr - Direct                                    20

1    Q    Was it an FBI designated vehicle with markings and
2    such?
3    A    No.  It was a rental.
4    Q    Can you describe how the defendant entered the vehicle
5    to speak with you?
6    A    Yes.  When I came back into the house and told him we
7    could go out to the vehicle to speak, he agreed.  So I walked
8    out first, he walked out behind me, we approached the vehicle
9    from the front.  The vehicle was parked off to the left.  So
10   we approached it from the front, said he can go ahead and get
11   in.  He walked up to the driver's side second door, so the
12   middle row, and opened the door and got in.
13   Q    Did you put hands on him at any point while you were
14   traveling from the house to the car?
15   A    No.
16   Q    Was he in handcuffs?
17   A    No.
18   Q    Did you follow behind him to make sure that he got into
19   the car?
20   A    No.  I went to the other side of the vehicle.
21   Q    So you didn't open the door for him?
22   A    No.
23   Q    Did you place him in the vehicle in any fashion?
24   A    No.
25   Q    Did the doors lock behind the defendant?

DeCarr - Direct                    21

1   A     No.  The doors were not locked.

2   Q     Did you threaten him in any way to ensure that he got

3   into the vehicle?

4   A     No.

5   Q     Were there any agents guarding the vehicle, like

6   stationed outside it on either side?

7   A     No.

8   Q     At any point during the ensuing interview with the

9   defendant, were there agents stationed outside the vehicle?

10  A     No.

11  Q     I just want to direct you real quickly to what's

12  currently depicted, which is Government Exhibit 3.

13        When you say the foyer of the residence, where is that

14  on Government Exhibit 3?

15  A     I would consider the foyer area to be just inside

16  the -- it would be the space utilized just inside the front

17  door.

18  Q     Okay.  Fair to say it was the area between what's

19  marked as front door and basement stairway?

20  A     Yes.  It's not depicted here, but there is a hallway on

21  that -- passing between what appears to be, like, the laundry

22  room area and the basement stairway.  That hallway leads into

23  the kitchen.  So, like, there's -- it's not a pass-through

24  space.

25  Q     All right.  Getting back to the interview, after the

DeCarr - Direct                                    22

1    defendant gets into the vehicle, what happens next?

2    A      After the defendant gets into the vehicle, I got into

3    the vehicle shortly after that and we -- and then shortly

4    after that, Chris Andersen got into the vehicle.

5    Q      And Chris Andersen is another special agent?

6    A      Yes.

7    Q      When you first started speaking with the defendant, did

8    you tell him that he was not under arrest?

9    A      That's correct.

10   Q      And did you tell him that he was not required to speak

11   to you?

12   A      That's right.  I said he had no obligation to speak

13   with us.

14   Q      Did you offer him anything?

15   A      Offered him some water.

16   Q      How would you characterize the first hour and a half of

17   the interview that took place in the vehicle with yourself,

18   Chris Andersen and the defendant?

19   A      The first hour and a half had some direct questions as

20   far as Internet usage and devices, but the vast majority of

21   that first hour and a half is what I would describe as

22   rapport-building or small talk.

23   Q      Did you confront the defendant at any point during that

24   initial hour and a half with the evidence you had against

25   him?

DeCarr - Direct                                    23

1    A      No.

2    Q      When did you first confront the defendant with the

3    evidence that you had in the case?

4    A      Approximately one hour and 38 minutes into the

5    interview.

6    Q      And what form did that take?

7    A      I'm sorry.  Can you repeat the question?

8    Q      Sure.  How did you confront him?  What evidence did you

9    confront him with?

10   A      I confronted him with a number of exhibits that I had

11   prepared from our investigation to show him the evidence that

12   we currently had.

13   Q      And does that include the communications from the

14   darknet site?

15   A      That was one of them, yes.

16   Q      How soon thereafter, in other words, after you showed

17   him the evidence that you had, did he admit his involvement

18   in the murder-for-hire scheme?

19   A      It took me approximately six minutes or so to present

20   all of the evidence we had and the defendant confessed almost

21   immediately.

22   Q      Given the evidence that you had, was there a reason why

23   you didn't arrest the defendant immediately upon meeting him

24   at his door?

25   A      Yes.  We didn't have probable cause to believe that the

DeCarr - Direct                                        24

1   defendant was the perpetrator.

2   Q     Did you have an arrest warrant for a defendant at that

3   point?

4   A     No.

5   Q     Were there other individuals who might have had access

6   to the electronic devices in the residence based on what you

7   knew at that point?

8   A     When we knocked on the door, we knew there to be three

9   other adults that could have had access to those devices and

10  that Internet.

11  Q     Is there a reason why you didn't Mirandize the

12  defendant immediately when he got into the car?  I should

13  just say the Chevy Tahoe.

14  A     He was not in my custody.  He willingly and -- walked

15  to the vehicle to talk to us.  He seemed curious.  He wanted

16  to talk to us.  He said he wanted to know what was going on

17  and told him he was not under arrest, had no obligation to

18  talk to us.  He wasn't in our custody.

19  Q     And you had not arrested him at that time; correct?

20  A     Correct.

21  Q     Did you eventually Mirandize him after approximately

22  two hours of interview?

23  A     Yes.

24  Q     Okay.  And why did you Mirandize him at that point?

25  A     At that point in the interview, the defendant had

DeCarr - Direct                          25

1    confessed to a federal crime.  Further, we had explained to

2    him that he would need to go before a judge.  So at that

3    point, it was the right thing to do to Mirandize him.

4    Q     At that point, did you believe he was in your custody?

5    A     Yes.  Should he try to leave that interaction at that

6    point, I would have detained him.

7    Q     You previously testified about the DVR footage which

8    has been admitted in whole as Government Exhibit 1 and a

9    portion of it has been played already.

10         Did you have a chance to review all of the eight

11   channels of footage from that morning?

12   A     Yes, I did.

13   Q     Did that include reviewing footage of that camera that

14   you previously -- Channel 6 that was previously testified to

15   depicting the living room?

16   A     Yes.

17   Q     At any point in your review of that footage, do you see

18   an armed agent standing in front of any of the living room

19   windows?

20   A     No.

21   Q     Were any children prevented from looking out the

22   windows by a law enforcement agent?

23   A     No.  Not that I saw.

24   Q     Did you ever see a gun brandished or pointed at any of

25   the residents on that camera?

DeCarr - Direct                                          26

1  A      No.

2  Q      Did you observe any upset children in the video?

3  A      I did.  I observed one.

4  Q      Approximately at what point did you observe that?

5  A      It was around when law enforcement first entered the

6  house the first few minutes, there was a child that appeared

7  to be upset and was consoled by another member of the family

8  at the kitchen table.

9  Q      Do you remember the gender of the child or the

10 approximate age that you observed?

11 A      Appeared to be a male child, young.  A few years old,

12 maybe.

13 Q      What are the residents who are depicted in the living

14 room on the video that you observed or that you reviewed,

15 generally speaking, what are they doing during the several

16 hours of footage that you reviewed?

17 A      They appeared to be carrying on about their day albeit

18 in a space smaller than they are probably used to.  But they

19 were carrying on about their day; reading, getting up, moving

20 around, getting some drinks of water.  Whatever they needed

21 to do about their day.  Continue with school.

22 Q      Did you also review one of the channels which depicted

23 the driveway of the residence?

24 A      Yes.

25 Q      At any point, does that video depict the driveway being

DeCarr - Direct                                27

1    entirely blocked by law enforcement vehicles?

2    A    No.

3    Q    If someone had wanted to, would they have been able to

4    drive a vehicle away from the house and off the property?

5    A    Yes.

6              MR. SCHILLINGER:  Objection, Judge.  It's

7    speculation, again.  If someone wanted to.

8              THE COURT:  Yeah.  Sustained.  Answer may be

9    stricken.  Next question.

10   Q    If you had to drive the vehicle and leave the residence

11   for some reason, would you have been able to do so?

12   A    Yes.

13   Q    Did the driveway camera depict the Chevy Tahoe where

14   the interview was taking place?

15   A    It did.

16   Q    To what extent are law enforcement members depicted in

17   that video around the -- in the driveway area while the

18   interview was taking place?

19   A    They are not.

20   Q    What were the other members of law enforcement doing

21   who were not part of the initial entry team during the

22   execution of the search warrant?

23   A    Can you repeat the question, please?

24   Q    Were there members of law enforcement present at the

25   residence who were not part of the initial entry team?

DeCarr - Direct                                    28

1    A      That's correct, yes.

2    Q      What was their role in the execution of the search

3    warrant?

4    A      We had a team that was going to do forensic reviewing

5    of various electronic devices we expected to find.  We also

6    had a couple of victim specialists, and we had an operational

7    support technician.

8    Q      And are they -- do they have any reason to be going

9    back and forth to their vehicles while the search warrant was

10   being executed and the defendant was being interviewed?

11   A      It may have.

12   Q      What were some of those reasons why they would be going

13   back and forth?

14   A      Could be a number of reasons.  But mostly just to get

15   whatever they may need to do their job.

16   Q      Were electronic devices seized from the residence?

17   A      Yes.

18   Q      And were they then taken outside of the residence --

19   A      Yes.

20   Q      -- and collected?

21   A      Yes.

22          MR. O'HANLON:  I have no further questions,

23   your Honor.

24          THE COURT:  All right.  Mr. Schillinger, you may

25   examine.

DeCarr - Cross                                    29

1          MR. SCHILLINGER:  Thank you, Judge.  Could I have

2   one minute to organize my exhibits.

3          THE COURT:  You may examine from the podium, if you

4   wish.

5   CROSS-EXAMINATION BY MR. SCHILLINGER:

6   Q    Hi, Agent DeCarr.  Agent, I'm Eric Schillinger.  Nice

7   to meet you.

8   A    Good morning.

9   Q    I represent Mr. Pence.  I do have some questions for

10  you about the events at Mr. Pence's home in Utah on that day

11  in October of 2021.

12         Since it's up on the screen, I'll just start with

13  what's in evidence as Government Exhibit G-3.  Can you see

14  that on the screen?

15  A    Yes.

16  Q    And just, if you know, it indicates there is a living

17  room and a breakfast nook, and it's a general diagram of the

18  first floor of the house.  That's right?

19  A    Yes.

20  Q    Okay.  And the living room that's indicated here, it's

21  Room F; is that right?

22  A    Yes.

23  Q    If you know, is that the location that that camera --

24  that footage was acquired from?

25  A    Yes.

DeCarr - Cross                    30

 1   Q    Okay.  And then Room G, is that a different room?

 2   A    I believe it's separated by some walls.

 3   Q    If you are looking in the camera footage, that's the

 4   room that's through the door sort of to the -- on the left

 5   side of the camera footage; is that right?

 6   A    Yes.

 7   Q    Okay.  Now can you tell me -- there was an agent with a

 8   firearm stationed in Room G.  That's true?

 9   A    I don't know if that's exactly true.  You said

10   stationed?

11   Q    Was there an agent with a firearm in Room G?

12   A    At some time there was --

13          MR. O'HANLON:  Objection.  Overly broad.

14          THE COURT:  Stand up.

15          MR. O'HANLON:  Vague as to time, overly broad.

16          THE COURT:  Yeah.  Be more specific.

17   Q    Agent, when you first arrived at the property after you

18   gained entry, between 7:48 and 7:30 a.m., was there an agent

19   stationed in Room G?

20   A    Between 6:48 a.m. and 7:30 a.m?

21   Q    Yes.

22   A    We didn't have agents stationed in rooms.  Agents went

23   through rooms.

24   Q    Okay.  Did you ultimately place anyone at the bottom of

25   the stairway, for example, guarding the area?

DeCarr - Cross                                    31

1    A      I did not, no.

2    Q      Okay.  Was there anyone at the bottom of the stairway?

3    A      We don't guard doorways and stairways necessarily.

4    Q      Okay.  There were a total of 21 agents who came to the

5    property that day.  Is that right?

6    A      No.

7    Q      No?  How many agents came to the property?

8    A      I would say approximately 16.

9    Q      And in addition to FBI agents, was there anybody else

10   there?

11   A      Well, it wasn't 16 FBI agents.  It would have been 16

12   law enforcement officers of various agencies, federal and

13   state or local.

14   Q      Okay.  So your testimony is that there was a total of

15   16 law enforcement people there?

16   A      Yes.

17   Q      Okay.  Do you remember executing a report on

18   November 1, 2021, that would be a search warrant return.  Do

19   you remember doing that?

20   A      I would have to be refreshed.

21          MR. SCHILLINGER:  Judge, can I approach the

22   witness?

23          THE COURT:  You may.

24   Q      Agent, I am going to show you what's been admitted into

25   evidence as Defendant's Exhibit B.  Can you take a look at

DeCarr - Cross                                        32

1    that and tell me if you recognize it?

2    A      Yes, I do.

3    Q      What is that?

4    A      Well, it's not my document.  This was created by

5    someone named Kevin Mortensen.  And this is a document to

6    which Kevin Mortensen lists the people that arrived.  It

7    says, "The following individuals were present in various

8    capacities for the execution of search warrant."

9    Q      Okay.  And you're the case agent on this case; right?

10   A      Yes.

11   Q      That means you are in charge of managing the case

12   generally?

13   A      The case, yes.

14   Q      And this is a document that you would have seen before

15   today's testimony?

16   A      Oh, yes.  I've seen this.

17   Q      Does that indicate how many people were at the

18   residence?

19   A      Twenty-one.

20   Q      Twenty-one.  Okay.  Could I have that back.  Thank you.

21          So now I'll ask you again.  Your testimony a few

22   minutes ago was that there was maybe 16 people.  There was

23   more people than that, though; wasn't there?

24   A      There were 16 law enforcement officers and 5 civilians.

25   Q      Okay.  So a total of 21 people came to the residence

DeCarr - Cross                                        33

1    that day for the execution of the search warrant?

2    A     At some point or another, 21 people arrived at the

3    residence.  Not all law enforcement.  Some were civilians

4    operating in non-law enforcement capacities.

5    Q     Now, your testimony is that you arrived at

6    approximately 6:48 a.m., is I think when you gained entry

7    into the house; is that right?

8    A     It's when I knocked on the door, yes.

9    Q     Obviously, you arrive at the property maybe only a few

10   minutes before that; is that right?

11   A     Yes.

12   Q     How many vehicles were driven to the property; do you

13   know?

14   A     I don't.

15   Q     Okay.  Was it more than 10?

16   A     I can't be sure.  It sounds like it would probably be

17   more than 10.

18   Q     Do you think it was more than 15?

19   A     I can't be sure.

20   Q     Okay.  And these vehicles were a combination of

21   FBI-owned vehicles, rented vehicles and maybe local law

22   enforcement vehicles?

23   A     Yes.

24   Q     And many of them had, you know, flashing, you know, law

25   enforcement-style alert lights and things?

DeCarr - Cross                                    34

1    A      Not many, no.  One or two.

2    Q      Okay.  Now, it was your testimony you drew some

3    distinction between riot gear and the equipment that was used

4    in this search warrant execution during your direct

5    testimony.  That's true?

6    A      Yes.

7    Q      In your direct testimony, you mentioned -- did you have

8    some experience in the military?  Did I catch that?

9    A      No.  No.  I was a police officer at the Pentagon.

10   Q      I'm sorry.  It was a civilian police officer role at

11   the Pentagon?

12   A      That's right.

13   Q      Okay.  I misunderstood that as military police.  Excuse

14   me.  And you also worked for state police?

15   A      I did.

16   Q      And then now the FBI?

17   A      Yes.

18   Q      You have some substantial training with respect to this

19   type of equipment?

20   A      Not specifically to riot gear, but I was trained on a

21   low level for that.

22   Q      It sounds like you have some training to be able to

23   identify the difference between riot gear and what -- the

24   equipment you used.  That's correct?

25   A      Yes.  That's correct.

DeCarr - Cross                                    35

1    Q      And you testified that there wasn't any riot shield or

2    anything like that.  Is that true?

3    A      That's correct.

4           MR. SCHILLINGER:  Okay.  Can I approach the

5    witness, Judge?

6           THE COURT:  You may.

7    Q      I am going to show you what is in evidence as

8    Defendant's Exhibit H.  Can you take a look at that.  It's a

9    screenshot from the video that you had testified on direct

10   that you have reviewed the whole thing.

11   A      Yes.

12   Q      Okay.  And I am going to direct your attention to the

13   center top portion of that screenshot.  On that image, is

14   there an individual carrying a riot shield?

15   A      Yes.  No.  Correction.  Sorry.  There's a shield.  It's

16   not a riot shield.

17   Q      Okay.  It's a shield.  What's the difference between a

18   riot shield and a shield?

19   A      So this particular shield is actually a bulletproof

20   shield.  It's used -- we bring up breaching tools to the

21   front porch of any house or any door we are going to access.

22   Should someone decide to have a confrontation at the door,

23   typically what we would have is the shield to protect us.

24   Q      And there is other safety equipment you would also wear

25   at the door when you may be breaching into a residence.  Is

DeCarr - Cross                                        36

1    that true?

2    A    This wasn't being used at the door.  I knocked on the

3    door with no shield.  It was set on the porch.

4    Q    Is it your testimony that that door -- that that shield

5    was never brought to the front of the door?

6    A    No.  That shield and breaching tools were brought to

7    the front door.  If you watch the video, you can see

8    breaching tools being carried up as well.  We bring those up,

9    we set them near the door in case we need them, but we did

10   not need them.

11   Q    And when the door was opened, those tools were there at

12   the front door.  Set near the door, perhaps, but there at the

13   front door.

14   A    They were not set near the front door because I was

15   standing near the front door.  I can't testify as to where

16   they were set by whoever set them down.

17   Q    They would have been visible to anyone opening the

18   door.  Is that true?

19   A    I can't speak to that.  I had my back turned to the

20   people behind me.  I was the first person in line.

21   Q    Your testimony was that no one was wearing helmets.  Is

22   that correct?

23   A    That's correct.

24   Q    In addition to your affidavit, have you reviewed the

25   other agents' affidavits in this case?

DeCarr - Cross                                              37

1   A      I did.

2   Q      And you understand that there was testimony that in the

3   affidavits that at least one to three other agents were

4   wearing helmets.  Do you remember that?

5   A      No.

6              MR. O'HANLON:  Objection.  Relevance.  Asking about

7   the testimony of other witnesses.

8              THE COURT:  Overruled.  Go ahead.  He can answer.

9   A      No, I don't remember that.

10   Q      Okay.  Now, you personally, you were wearing a

11   bulletproof vest?

12   A      Can you repeat that?

13   Q      You personally, you were wearing a bulletproof vest --

14   A      Yes.

15   Q      -- at the time that you breached the door?  And you

16   testified that everyone was armed.  That's right?

17   A      The people at the door were armed, yes, at the time

18   that we knocked.

19   Q      I think you said there was 14 agents who were at the

20   door?

21   A      Approximately.

22   Q      And each one of them was carrying a firearm?

23   A      Yes.

24   Q      You testified about the low ready position.  Can you

25   describe again what the low ready position is?

DeCarr - Cross                                           38

1    A     The low ready position, it's not an exact thing but

2    what it is is essentially members at their discretion will

3    have their weapon out and they would have the weapon not down

4    by their side, but it's not pointed at anybody.  So it's

5    moistly pointed at the ground.  I would say it's about a 30-

6    to 45-degree angle from the ground.

7    Q     And the purpose of having it in the low ready position

8    versus slung or holstered, I think those were other terms you

9    used, right?

10   A     That's correct.

11   Q     Slung, what does that mean?

12   A     That would be a way to describe a rifle that someone is

13   carrying that they are not handling with their hands.

14   Q     Yeah.  It's like a strap and they've got it around

15   their neck or something, right?

16   A     That's right.

17   Q     And obviously a holster, that's like where your pistol

18   goes on your hip, right?

19   A     That's correct.

20   Q     Not in your hands.  So low ready, that means it's in

21   your hand?

22   A     Yes.

23   Q     And low ready means that you can -- well, let me ask

24   you.  What is the purpose of having it in the low ready

25   position versus being holstered or slung?

DeCarr - Cross                                    39

1    A     The purpose of it, it's just a little bit quicker in

2    case you need it.

3    Q     If you need to do what with it?

4    A     Use it.

5    Q     And by using it, you mean fire it; correct?

6    A     You don't always fire, but, yes.  In case I need to

7    pull my weapon out, it's faster.  It's already in my hand.

8    Q     So during the initial interaction with the Pence

9    family, everyone had their guns in their hands ready to use

10   them.  That's your testimony; right?

11   A     I can't speak to everyone having their gun in their

12   hand.  I was in the front of the line.

13   Q     You had your gun in the low ready position.

14   A     I did not have my gun in the low ready position.  I had

15   my gun at my side.

16   Q     And your testimony just now was that the other agents

17   who were involved in the initial breach of the door, they had

18   their weapons in the low ready position.  That was right?

19   A     They would have.  Should they have chosen to holster up

20   sooner or change it to a different position, I couldn't have

21   been aware of that.

22   Q     Now, you mentioned breaching tools.  Could a breaching

23   tool be a sledge hammer?  Is that what you mean by that?

24   A     It could be.

25   Q     Do you remember a sledge hammer being brought to this

DeCarr - Cross                                         40

1    residence?

2    A     Not specifically.

3    Q     Okay.  You testified that you came into contact with

4    Mr. Pence.  Just immediately he opened the door.  That's

5    right?

6    A     Yes.

7    Q     And when you gained entry, you were able to go in.  He

8    didn't resist you entering the building.  That's right?

9    A     That's correct.

10   Q     And you addressed with Mr. Pence that you had interest

11   in speaking with him.  That's true?

12   A     Not immediately.  But eventually, yes.

13   Q     Well, how much time lapsed between when you entered the

14   residence and when you asked him if he would speak with you?

15   A     Few minutes.

16   Q     Just minutes.  It wasn't hours and hours?

17   A     No.

18   Q     Okay.  And you testified on your direct that he didn't

19   have his shoes on.  That's right?

20   A     That's correct.

21   Q     And you said he had to go upstairs to get his shoes?

22   A     He did.

23   Q     He did not go upstairs unaccompanied; did he?

24   A     I don't believe so, no.

25   Q     Agents went with him, right?

                              DeCarr - Cross                        41

1    A     I believe so.

2    Q     And those agents were armed.  That's correct?

3    A     Yes.

4    Q     Now, your testimony is that 14 agents came into the

5    property, right?  They were able to gain access?

6    A     Approximately.

7    Q     And those agents then would have fanned out around the

8    house, right, to secure it?

9    A     They would have broken off into smaller groups to

10   secure the residence, yes.

11   Q     I'm just going to show you what's been --

12         MR. SCHILLINGER:  If I can approach, Judge?

13         THE COURT:  You may.

14   Q     -- what's been admitted as Defendant's Exhibit I.

15         Could you take a look at that?

16   A     Yes.

17   Q     That is a screenshot from the security footage.  And

18   that's also from Channel 6 in what's been admitted into

19   evidence as Defendant's -- or, excuse me, Government's

20   Exhibit 1.  Are you in that image?

21   A     Yes.

22   Q     And how many law enforcement agents are in that image

23   with you?

24   A     I can see what appears to be three others.

25   Q     And that is in the living room area in the Pences'

DeCarr - Cross                                    42

1   house.  That's true?

2   A     There is two others in the area and it looks like there

3   may be one more in the kitchen.

4   Q     And at this stage, what you are doing is you are

5   securing the residence and you are -- I'm sorry, for lack of

6   a better word, corralling the rather large family and getting

7   them all into the same room.  That's true?

8   A     We are accounting for all the people in the house.

9   Q     And, generally speaking, for a myriad of reasons, you

10  would want all the people to then be in one room or be under

11  your control while you are executing the search warrant.

12  That's right?

13  A     Not exactly.  Not exactly under our control.  We would

14  have them in a controlled space, but we are not controlling

15  the people within that space.

16  Q     Well, your testimony on direct was that you engaged in

17  a search of this living room area that's depicted in the

18  image.  That's right?

19  A     Yes.

20  Q     And that was to secure that area and make sure it was

21  safe, right?

22  A     Safe and also that there was no evidence, like phones

23  or other items that we were looking to seize before we

24  allowed people to re-enter.

25  Q     So you are sort of doing two things.  You are looking

DeCarr - Cross                              43

1   for evidence that you may seize based on the warrant, right?

2   A      Do you have another thing?

3          MR. SCHILLINGER:  Let me -- I'm sorry.  Let me

4   rephrase that question, Judge.

5   Q      So during that search that was depicted on the video in

6   the living room, the first thing you are doing is you are

7   checking for safety.  You are making sure that there is no

8   weapons or anything dangerous in that particular room.

9   That's right?

10  A      Yes.  It's not in this image, but prior to this, there

11  are law enforcement officers who go through this room to make

12  sure there are no people or destruction of evidence occurring

13  and then they moved on.  And then after that, to provide a

14  space for the family within the home where it's warm, a small

15  team went through and searched for what we would consider to

16  be evidence in this crime, and when we didn't -- when that

17  was completed, we allowed the family to re-enter the space.

18  Q      Right.  And there is two purposes for that:  One is to

19  look for evidence.  And, two, make sure it's safe.  Make sure

20  that there are no weapons or anything, right?

21  A      There's separate processes.

22  Q      Yep.

23  A      Right?  One is securing the residence to make sure it's

24  safe, and then executing the actual warrant, searching for

25  evidence of the crime is a secondary step.  So reversing

DeCarr - Cross                                          44

1    those.

2    Q    Sure.  And you engaged in that process and then you

3    collected Mr. Pence's children and his -- and I say

4    "collected."  I don't mean to be technical about it.  I mean,

5    just that the family was allowed back in that room

6    ultimately, right?

7    A    Yes.

8    Q    And then they were -- they were in that room for a

9    length of time.  That's correct?

10   A    Yes.

11   Q    They weren't given access to the rest of the house

12   immediately after they were brought in here.  They were kept

13   there for many hours.  That's true?

14   A    I can't know what they were told they can and can't do.

15   It was shortly after this that I left the house and didn't

16   come back in for a while.

17   Q    Okay.  I'm going to show you --

18            MR. SCHILLINGER:  If I can approach, Judge?

19            THE COURT:  Yes.

20   Q    I'm going to show you what's in evidence as Defendant's

21   Exhibit G.  Can you take a look at that?  I will take those

22   other ones back.

23   A    Sure.

24   Q    Thank you.

25   A    You're welcome.

DeCarr - Cross                                45

1   Q    That's another screenshot from the Government's Exhibit
2   1 from the video.  That's a channel that is an exterior
3   channel.  Do you recognize that video?
4   A    Yes.
5   Q    And that's just minutes before you actually arrived at
6   the property.  Is that true?
7   A    Yes.
8   Q    Okay.  And what's going on in that video?
9   A    That appears to be our vehicles driving to the
10  residence.
11  Q    Okay.  And the lights that are there, it's a dark
12  image, right?
13  A    Yes.
14  Q    And then you see -- it looks like vehicle headlights.
15  Is that correct?
16  A    It does.
17  Q    Okay.  And that would have been like your vehicle and
18  the other vehicles from the agents who were coming to execute
19  the search warrant?
20  A    Yes.
21  Q    And that's probably on the main road just as you turn
22  into the driveway.  Is that right?
23  A    Yeah, it's -- I would say that at least that first
24  vehicle looks like it's turned up the driveway.
25  Q    How many vehicles appear in that image?

DeCarr - Cross                                    46

1   A     Would you like me to count them?

2   Q     Yeah, if you can.

3   A     I can try.  Twelve or so.

4   Q     In the caravan of vehicles depicted in that exhibit,

5   Defendant's G, are there any vehicles that are not involved

6   in the execution of the search warrant?

7   A     I can't be sure, but I don't recall seeing any other

8   traffic on the road at that time.

9   Q     Okay.  And this is in rural Utah?

10  A     Yes.

11  Q     And when you drove to the residence, you drove together

12  as a team.  Is that fair to say?

13  A     Yes.  We exited our, what we call a staging location at

14  the same time.

15        MR. SCHILLINGER:  Judge, if I can approach again.

16        THE COURT:  Yes.

17  Q     Agent, I am going to show you Defendant's Exhibit L

18  that's in evidence also.  Take a look at that.  That's

19  another screenshot.

20        Can you tell me if you recognize that?

21  A     I do.

22  Q     That is a screenshot from government's first exhibit.

23  That's correct?

24  A     Yes.

25  Q     Same camera.  It's Channel 5?

DeCarr - Cross                                    47

1    A    Yes.

2    Q    And it's just later in the day.  Is that correct?

3    A    Yes.

4    Q    What is the time on that one?

5    A    7:32.

6    Q    And now the sun has come up, right?

7    A    It appears so, yes.

8    Q    And it's just depicting the vehicles that are parked in

9    the driveway, some of them.  That's correct?

10   A    Yes.

11   Q    And some of them probably are not in the frame, right?

12   Some of them are stationed around the house in other

13   locations?

14   A    I think that's fair to say, yes.  There is actually --

15   there's for sure another vehicle not in this frame.

16   Q    One of the vehicles drove actually right behind the

17   house, on the dirt.  Is that right?

18   A    I do not know exactly where another -- I remember

19   seeing another vehicle on the DVR camera that was parked.  I

20   don't know how it was situated on the house.

21   Q    There are tracks -- only if you know, actually.  There

22   are tracks in that image.  Those tracks were made by a

23   government vehicle.  Do you remember seeing that in the

24   video?

25   A    It was dark.  I remember seeing lights in the camera.

DeCarr - Cross                                                48

1    Q     And vehicles did drive around the house, generally

2    speaking.  They encircled the house.  Is that true?

3    A     I don't know.

4    Q     Okay.  I'll take that back from you.  Thank you.

5    A     Sure.

6    Q     Let's go back inside, Agent.  When you arrived, there

7    was approximately 14 people who were involved in gaining

8    entry to the house.  That's true?

9    A     Approximately.  That's correct, yes.

10   Q     Now, it's a very large house, right?

11   A     It is.

12   Q     Seven bedrooms or something?

13   A     Yeah, 5800 square foot.

14   Q     And then by chance, there is only one camera that

15   captured what was going on in the house.  It's the camera in

16   that one room.  That's right?

17   A     I don't know if it's by chance.  It's how the defendant

18   had the camera situated.

19   Q     Fair.  The channels, the video that you were able to

20   review, there is only one interior camera that captured

21   anything on the first floor of the house.  That's right?

22   A     On the first floor?

23   Q     Yes.

24   A     I think that's fair to say, yes.

25   Q     And then on the second floor and the third floor, there

DeCarr - Cross                                    49

1   weren't any interior cameras.  That's correct?

2   A    I recall observing cameras in the defendant's office,

3   but they did not come back on the DVR and I did not have any

4   footage of cameras that I could review on the second floor.

5   Q    Okay.  Now, that Channel 6 that we watched during your

6   direct testimony and we have used screenshots here during

7   your cross, in the living room, that depicts a few agents in

8   the living room and sort of the kitchen area.  It's an open

9   area, right?

10  A    At what point?  It depicts a few agents in the --

11  Q    During the video that we watched, during your direct

12  testimony.

13  A    Yes.

14  Q    You saw four or five agents?

15  A    I can't remember the exact number at this point, but,

16  yes, there were a number of agents that had moved through

17  that space.

18  Q    So there was easily eight or nine other agents who were

19  at other positions in the house.  That's right?

20  A    There was approximately 14 individuals in the house, as

21  I said before.

22  Q    Now, you have some training with respect to executing a

23  search warrant.  That's the case, isn't it?

24  A    Yes.

25  Q    Probably training through the FBI, right?

DeCarr - Cross                                          50

1    A      Yes.

2    Q      And then probably some training with state police

3    before that, right?

4    A      Yes.

5    Q      And maintaining a secure location is part of the

6    process of executing a search warrant.  That's right?

7    A      You would have to be more specific.

8    Q      Well, you want to make sure that the location you are

9    searching is a safe location.  That's correct?

10   A      Safe, yes.

11   Q      You wouldn't want to have anyone surprise you, act

12   violently or dispose of evidence or anything like that?

13   A      Correct.

14   Q      And part of keeping that location safe would be to have

15   agents or officers stationed around the area to make sure

16   that nothing is inappropriate that happens.  That's correct?

17   A      Not necessarily, no.

18   Q      Okay.  So what do you mean by not necessarily?

19   A      So we don't post agents -- there is no template.  There

20   is no policy for posting an agent in spaces that no one is in

21   to make sure that no one comes in and does anything to it.

22   Sometimes there are no people in the house.

23   Q      I understand that.  Nonetheless, say, in the stairwell.

24   You might want to keep an eye on the stairwell to make sure

25   nobody comes down the stairwell with a weapon.  Is that fair

DeCarr - Cross                                      51

1    to say?

2              MR. O'HANLON:  Objection.  Calls for speculation.

3              THE COURT:  Sustained.  Next question.

4    Q    Agent, how long did it take you to secure the residence

5    from the time you knocked on the door to the time you felt it

6    was secure?

7    A    Well, it is a large house and there was approximately

8    14 agents securing the residence.  So I don't know the amount

9    of time exactly that it took for the entire residence to be

10   secured.  It was at least five minutes, maybe a few minutes

11   more.  It's hard to be sure.

12   Q    Okay.  And once it was secure, that was when you had a

13   conversation with Mr. Pence about speaking with him about

14   your need to talk to him.  That's right?

15   A    My initiation, my first conversation with the defendant

16   wasn't based on whether or not the house was secure.  I

17   wasn't actually in charge of the operation that day.  The

18   operation is handled by the local field office.  I'm there

19   more or less as a guest to conduct my investigation.

20   Q    There was a time, and it was only a few minutes after

21   you had gained entry to the house, that you spoke with

22   Mr. Pence about the need to have a more detailed conversation

23   with him.  That's correct?

24   A    I asked if he was willing to speak with us, yes.

25   Q    And when you asked him that, it was while there was 14

DeCarr - Cross                                          52

1    agents fanned out throughout his house?

2    A     I think that's fair to say, yes.

3    Q     And it was while his family was being directed to

4    corral themselves in the one room in the house?

5    A     They were moving to the same space, yes.

6    Q     And during this period of time, the agents were with

7    his family and also throughout his house with weapons in the

8    low ready position?

9    A     I reviewed the DVR footage and it appeared that I

10   didn't actually see anybody with their weapon in the low

11   ready position on the DVR.  So I don't think that they were

12   still moving -- once we accounted for all the people, I don't

13   recall seeing anyone with their gun out at that point.

14   Q     We agree the DVR only captures one room in the house.

15   Is that true?

16   A     That's correct.

17   Q     And the DVR, it depicts only a handful of the agents

18   that were involved in executing the search warrant.  That's

19   true?

20   A     Yes.

21   Q     There were many agents who were in the house who were

22   not depicted in the DVR.  That's correct?

23   A     That's correct.

24   Q     And it was your testimony on direct and during cross

25   that when the agents entered the house, their weapons were in

DeCarr - Cross                                                    53

1    the low ready position.

2    A      By our policy.

3    Q      And it was your testimony that you didn't actually see

4    what other agents did.  You know that by policy they would

5    have their weapons in the low ready position.  That's true?

6    A      To clarify, it wasn't my policy.  It's by our training

7    that we would have our weapons in the low ready position.

8    That's a distinction I want to make.  But, yeah, they would

9    have in the beginning and then it's discretionary how every

10   individual chooses to understand the situation and move

11   forward with that.  Whether or not they holster immediately

12   or they keep their gun out, it's their discretion.

13   Q      Now, you testified that Mr. Pence was accompanied

14   upstairs by agents to get his shoes, right?

15   A      Yes, he did.

16   Q      And you were not one of the agents who accompanied him.

17   That's true?

18   A      That's true.

19   Q      So you don't have any personal knowledge of what was

20   said to him or what happened while he went up the stairs or

21   was upstairs?

22   A      No, I don't.

23   Q      You testified during your direct that -- that you had a

24   vehicle in mind that you would engage in your interrogation

25   of Mr. Pence.  That's correct?

DeCarr - Cross                                        54

1   A     Yes.

2   Q     And that was a state -- well, I'm sorry.  It actually

3   turned out it was a rented Tahoe.  That's correct?

4   A     That's correct.

5   Q     I just learned that during your direct.  It wasn't

6   actually an FBI vehicle.

7   A     No, it was not.

8   Q     It's the style of a vehicle, though, that is used by

9   law enforcement commonly around the country.  That's true?

10  A     The Chevrolet Tahoe?

11  Q     Yes.

12  A     Yes.

13  Q     It was -- did you make a decision to rent a Tahoe

14  specifically?

15  A     Not specifically a Tahoe, but a large SUV.

16  Q     I mean, it would have been a more interesting effort to

17  engage in the interrogation if it was done in a little

18  economy car, right?

19  A     Yeah.  That's not comfortable.

20  Q     Now, the Tahoe, just to be clear, it's a vehicle that

21  is used by law enforcement.  It's a vehicle that we associate

22  with law enforcement.  That's true?

23  A     I can't speak to what other people associate with law

24  enforcement.

25  Q     Have you ever seen a New York -- well, let me ask you,

DeCarr - Cross                                    55

1    you were a New York State Trooper?  That's right?

2    A      Yes.

3    Q      And New York State Police, for example, operate Chevy

4    Tahoes as police cruisers.  That's correct?

5    A      Very few.

6    Q      And the FBI uses Tahoes as vehicles.  That's correct?

7            MR. O'HANLON:  Objection.  Relevance.

8            THE COURT:  Overruled.  He may answer.

9    A      Can you repeat the question?

10   Q      The FBI uses Tahoes as law enforcement vehicles,

11   generally speaking; do they not?

12   A      One of many vehicles that we use.  There is very few

13   vehicles we don't use.

14   Q      You testified that you went out to the vehicle and you

15   took off your gear.  What do you mean by your gear?

16   A      Took off my vest, and that was about it.  And then just

17   pulled my sweatshirt down over my weapon and my belt and that

18   was it.

19   Q      So your weapon was exposed when you asked Mr. Pence if

20   he would speak with you.  But then when he said, yes, you

21   took off your bulletproof vest and you pulled your sweatshirt

22   down over the gun so it wouldn't be visible.  That's right?

23   A      I asked if he would be willing to speak with us when we

24   were in the house.  I was still wearing my gear at the time.

25   And he had said, yes.  And he had said he wanted to speak in

DeCarr - Cross                                          56

1    the vehicle.  So I went out to the vehicle to take my gear

2    off.  I pulled my sweatshirt over my gun, as I would do any

3    time, and started the recording.

4    Q      Now where did you put your gear?

5    A      I believe I put mine in the trunk of the Tahoe.

6    Q      And the trunk of the Tahoe, it's like an open vehicle.

7    It's an SUV.  So it's a not like it's a closed-off area?

8    A      It's open, sure.  But you can't see the trunk from just

9    sitting in the vehicle.

10   Q      Now, Agent, you executed an affidavit in the papers

11   that were filed in response to our motion.  You already

12   talked about that a little bit.  That's right?

13   A      Yes.

14   Q      And in that affidavit, you had indicated that Mr. Pence

15   walked out of his house and walked to the car and voluntarily

16   had gotten in it.  That's right?

17   A      It's missing some context.  But, generally, that's

18   right.  I went back to him and told him he can go back out to

19   the vehicle and if you still want to talk with us.  We walked

20   outside, I walked first, he walked behind me.

21   Q      So you led him to the vehicle.

22   A      Yeah.  He didn't know what vehicle we were going to.

23   Q      Right.  He wouldn't.  Right.  Now, in your affidavit it

24   indicates that he walked out and just got in a vehicle very

25   voluntarily.  That's correct?

DeCarr - Cross                                    57

1    A    I think it's -- that's accurate, yes.

2    Q    Okay.  But, in fact, he wouldn't have known what

3    vehicle to go to.  You led him to the vehicle and you got in

4    the vehicle, right?

5    A    I walked to the vehicle, he followed me.  I showed him

6    what vehicle we were getting in and he got in.

7    Q    He didn't get to pick the vehicle.  That's right?

8    A    Well, he got to pick where he wanted to talk.  If he

9    had told me he didn't want to talk in there, we would have

10   found another vehicle.  We had plenty of vehicles.

11   Q    Agent, you were in the vehicle with Mr. Pence for a

12   total of a little bit over five hours.  That's correct?

13   A    No.  I was -- he was in the vehicle for about five

14   hours.  I was not in the vehicle the whole time.

15   Q    Thank you.  Actually, that's correct.  Mr. Pence was in

16   the vehicle for five hours, right?

17   A    Other than the one time that he did get out.

18   Q    And when he got out, what happened?

19   A    He got -- well, it was over four hours.  It was after

20   he confessed.  He had been Mirandized.  And his dogs came

21   outside and they were -- he felt responsible.  He got out of

22   the car and was doing whatever a good owner of a dog would do

23   with his dogs.  They are not my dogs, I don't know.  And I

24   just asked him to sit tight.

25   Q    And he got back in the car?

DeCarr - Cross                                    58

1    A      He did.

2    Q      Now, for the first hour and a half of the questioning,

3    you described it as rapport building?

4    A      Generally speaking, yes.

5    Q      And the purpose of building a rapport with the

6    defendant was so that he would speak to you and you were --

7    hopefully, he would ultimately make admissions.  That's

8    correct?

9    A      The goal is to develop a relationship with someone that

10   you don't really know.

11   Q      And the reason for that is because you are

12   investigating what you suspect is criminal conduct and you

13   are trying to obtain an admission.  Is that true?

14   A      Can you repeat that?

15   Q      The purpose of building that rapport is because you are

16   investigating potential criminal conduct and you are

17   hopefully going to obtain an admission.  Is that true?

18   A      That was the purpose of the conversation in general.

19   Rapport is part of that conversation.

20   Q      So it's a first step in an interrogation process.

21   That's correct?

22   A      It's a recommended step.

23   Q      And it's a step that you engaged in?

24   A      Yes.

25   Q      And after you built that rapport, but before Mr. Pence

DeCarr - Cross                                        59

1   was Mirandized, you did confront him about the conduct you

2   believed he had engaged in.  Is that true?

3   A     That's true.

4   Q     And what happened at that point?

5   A     When I confronted him with the evidence you are asking?

6   Q     Yes.

7   A     It was about approximately hour and 38 minutes into the

8   conversation we were having and I confronted him with a

9   number of pieces of evidence and to which he confessed almost

10  immediately.

11  Q     And when he did that, he was in the Chevy Tahoe that

12  this had been rented for FBI use.  That's right?

13  A     Yes.

14  Q     And he had been in that car at that point for nearly

15  two hours?

16  A     Approximately an hour and 38 minutes.  After I had

17  finished presenting the information for six minutes, it was

18  about an hour and 44 minutes when he decided to start

19  confessing.

20  Q     And that confession was obtained while there was maybe

21  a dozen FBI agents and other police force entity officers at

22  his house?

23  A     Yes.

24  Q     And many of them were armed and they were in his

25  residence.  That's correct?

DeCarr - Cross                                                          60

1    A      Yes.

2    Q      And when you initially arrived there, it was dark,

3    right?  You arrived very early in the morning?

4    A      That's right.

5    Q      And during this period of time, Mrs. Pence was not

6    allowed to speak with Mr. Pence.  That's right?

7    A      Nobody prevented either of them from speaking to each

8    other.

9    Q      Do you know that or you just know that you didn't

10   prevent them?

11   A      That's correct.  I did not prevent them from speaking

12   to each other.

13   Q      Okay.  Did Mr. Pence have any access to his family?

14   A      He didn't ask for access.

15   Q      Agent, just a couple more questions.  And I think it

16   goes without saying, but so I can be sure I check it off my

17   list, obviously this was contact, you and Mr. Pence, that was

18   police-initiated.  You went to his house.  You had the

19   intention to have the search warrant and speak with him,

20   right?

21   A      Can you repeat that?

22   Q      This was police-initiated or law enforcement-initiated

23   contact with Mr. Pence.  That's right?

24   A      Correct.  We went to him.  He didn't come to us.

25   Q      He didn't call up and say, "Hey, I want to talk to you

DeCarr - Cross                                    61

1   guys.  I'm coming down to the station"?

2   A      Correct.

3   Q      And with respect to the five-hour block of time in the

4   Tahoe, the information you obtained from Mr. Pence, the

5   relevant admission, it was gleaned before he was Mirandized.

6   That's correct?

7   A      What do you mean by "gleaned"?

8   Q      He told you he confessed before he was Mirandized.

9   A      Yes.

10  Q      Okay.  And the conversation you had after he was

11  Mirandized, in large part, it bolstered the information that

12  you gleaned beforehand.  But the key information was obtained

13  before he was Mirandized.  That's true?

14  A      Can you rephrase that or repeat that?

15  Q      The key information you obtained during that five-hour

16  block was obtained before he was Mirandized?

17  A      Yes.

18  Q      The admissions were all before Miranda.  That's right?

19  A      Not all.  But, yes, some of them.

20  Q      And in fact after he was Mirandized, you didn't

21  immediately cuff him and bring him down to the station and

22  book him.  He actually stayed in the car for a few more hours

23  and continued to be questioned.  That's correct?

24  A      He was not questioned for the full five hours, but he

25  did continue to stay in the vehicle.

DeCarr - Cross                                    62

1  Q     And was questioned throughout that time.  Maybe not

2  five hours, but minute-by-minute questioning, but...

3  A     Yeah.  I would categorize the vast majority -- not the

4  vast majority, but the majority of the five hours as not --

5  as rapport building or small talk even after the confession.

6  Q     Now, during the five hours, you were in and out of the

7  vehicle but you were there with him with a large degree of

8  continuity.  It wasn't you were there for a minute and then

9  you came back three hours later.

10 A     I would say I spent -- of the people that spent time

11 with him that day, the majority of the time was me.

12 Q     And the other agents who were involved, again, there

13 was some continuity there.  I think the agent that was

14 assisting, he was in the vehicle for many hours with him,

15 also, right?

16 A     Yes.

17 Q     And that whole conversation, that's one continuous

18 five-hour block, right?

19 A     You will have to be more specific.  What do you mean by

20 continuous?

21 Q     You didn't start the conversation, then end it, and

22 then two weeks later, reach out to Mr. Pence and have another

23 conversation with him.

24 A     All of our conversations occurred in a five-hour

25 window.

DeCarr - Redirect                                63

1    Q      Would you agree with me that the pre-Miranda

2    conversation was the one that was the necessary one with

3    respect to getting the information you needed to charge

4    Mr. Pence?

5    A      Yes.

6    Q      That was -- that was essentially the complete

7    confession.  Is that right?

8    A      Yes.

9    Q      And that was where you got all the details you needed

10   to decide to actually charge him.  Is that correct?

11   A      It brought us to the level of probable cause at that

12   point, yes.

13          MR. SCHILLINGER:  Judge, if I could have just one

14   second, please.

15                 (Pause in proceedings.)

16          MR. SCHILLINGER:  Judge, thank you.  I don't have

17   any further questions.

18          THE COURT:  Redirect, if any.

19          MR. O'HANLON:  Very briefly, your Honor.

20   REDIRECT EXAMINATION BY MR. O'HANLON:

21   Q      Agent DeCarr, during the entire interview with the

22   defendant, did you ever yell at him?

23   A      No.

24   Q      Did you ever threaten him?

25   A      No.

DeCarr - Redirect                                    64

1   Q     Did he ever ask to leave the vehicle?

2   A     No.

3              MR. O'HANLON:  I have no further questions.

4              THE COURT:  All right.  You may be excused.

5              THE WITNESS:  Thank you, your Honor.

6              THE COURT:  We are going to take a 15-minute break

7   and we will come back with the next witness.

8              THE CLERK:  Court stands for a 15-minute break and

9   short recess.

10                  (Recess, 11:15 a.m.)

11                  (Open court, 11:28 a.m.)

12             THE COURT:  Next government witness.

13             MR. O'HANLON:  The government will call

14  Special Agent Chris Andersen.

15             THE CLERK:  Good morning, sir.  Can you please

16  state your full name for this record.

17             THE WITNESS:  Chris Orson Andersen.

18             THE CLERK:  Thank you, sir.  Please spell your last

19  name for the record, please.

20             THE WITNESS:  A-N-D-E-R-S-E-N.

21             THE CLERK:  Thank you, sir.

22             C H R I S  A N D E R S E N, called as a

23  witness and being duly sworn, testifies as follows:

24  Witness was sworn under oath.

25             THE COURT:  Mr. O'Hanlon, you may proceed.

Andersen - Direct                                65

1    DIRECT EXAMINATION BY MR. O'HANLON:

2    Q     Good morning, Special Agent Andersen.

3    A     Good morning.

4    Q     What is your current occupation and assignment?

5    A     I'm a Special Agent for the FBI, and I have been

6    assigned to the St. George office of the Salt Lake City

7    division.

8    Q     Where is St. George?

9    A     St. George is 8 miles north of the Utah-Arizona border.

10   So the very southern part of the western -- western part of

11   Utah.

12   Q     Approximately how far is that from Cedar City?

13   A     Approximately 35, 40 miles.  Probably 40 miles.

14   Q     How long have you been with the bureau?

15   A     Just over 15 years.

16   Q     Taking you back to October of 2021, was that your

17   assignment as well?

18   A     Yes, it was.

19   Q     And what are your duties while you were assigned to the

20   St. George resident agency?

21   A     In the St. George resident agency, we don't have the

22   luxury of specializing, so we work all criminal violations.

23   Everything from terrorism and fraud to violent crimes and

24   complex financial investigations.

25   Q     In October of 2021, were you asked to assist with an

Andersen - Direct                                      66

1    investigation that was being undertaken by the Albany FBI

2    division?

3    A     Yes.

4    Q     And was that an investigation of a murder-for-hire

5    scheme?

6    A     It was.

7    Q     And what role did you play in the investigation going

8    forward from that point?

9    A     I was the operational planning agent and I was also

10   assigned a specific role during that operation where I

11   assisted in interviewing Mr. Pence.

12   Q     What was your prior experience when it comes to

13   executing and planning search warrants?

14   A     I participated in over a hundred search warrants and

15   led dozens of search warrants and other court-ordered --

16   court orders.

17   Q     What about interviewing subjects, either targets or

18   subjects in the course of investigations?

19   A     Hundreds of interviews of both victims, witnesses and

20   subjects.

21   Q     As an operational planner for the execution of a search

22   warrant in this case, the residence involved was 2929 South

23   6500 West, Cedar City, Utah, correct?

24   A     That is correct.

25   Q     What did the operation planning involve for this

Andersen - Direct                                    67

1   particular search warrant?

2   A     The operational planning agent, which is the role I

3   served, was primarily responsible for organizing the

4   operation.  So everything from making sure that we had the

5   needed resources as well as the physical equipment, any sort

6   of expertise, and just making sure that we had a strategy or

7   a plan that was approved and something that was actually

8   could be safely executed and approved by management.

9   Q     When you were planning the execution of this particular

10  search warrant, did you take into account the possibility

11  that a resident might have been armed inside the residence?

12  A     We did.

13  Q     Do you recall what the basis for that was?

14  A     Yes.  We had information from one of the

15  witnesses/victims that Mr. Pence likely had a firearm in the

16  home.

17  Q     And did that play any role in your planning or

18  organizing of the search warrant execution?

19  A     It did.

20  Q     What, if any, affect did it have in terms of your

21  planning?

22  A     As an operation planning agent, it's very important to

23  make sure that I do whatever I can to make sure that the team

24  executing the warrant is safe and that we have the ability to

25  keep all persons from any sort of hazard that could exist at

Andersen - Direct                                68

1    a home.  So absolutely we plan to, if there is potential

2    conflict or possibility for violence and we try to do our

3    very best at planning for that and try to mitigate any sort

4    of risk.

5    Q    Fair to say you made sure the members of the team were

6    aware of that particular fact?

7    A    Yes.

8    Q    Did law enforcement stage before traveling to the

9    residence?

10   A    We did.

11   Q    And was that at a location in Cedar City?

12   A    Yes.  I believe it was -- it may have technically been

13   county property but south of Cedar City.  A rural area, just

14   off the side of Old Highway 91.

15   Q    And you traveled in a convoy, fair to say, to the

16   actual residence?

17   A    Yes.  For simplicity, making sure everybody arrives at

18   the right place.  Normally, in this case we did travel in

19   convoy, observing normal speeds, highway and road speeds, to

20   arrive at the residence.

21   Q    At any point, was the -- did you ensure that the

22   driveway to the residence was blocked?

23   A    No.  That wasn't part of the plan.

24   Q    Did you ensure at any point that there were vehicles

25   stationed around the residence?

Andersen - Direct                                    69

1    A     No.  Other than possibly one single unit that was

2    trying to observe activity on the back side of the house, I

3    believe all other vehicles were -- their goal was just to

4    find a place to park.

5    Q     Was there any reconnaissance done regarding the outer

6    areas of the property?

7    A     Yes.  Beforehand we had an airplane do -- take

8    photographs and video of the residence overhead.

9    Q     And after you arrived to the property, did any members

10   of the team do a separate reconnaissance around the house?

11   A     Other than just securing any of the outbuildings, no.

12   I mean, their goal was just to secure and make sure that that

13   place was safe.

14   Q     Were you present with the group of law enforcement

15   agents who were outside the door when entry was initially

16   made?

17   A     Yes.

18   Q     Do you recall where you were in that group of

19   approximately 14 officers?

20   A     I was one of the first two or three people in that

21   line.

22   Q     What was your perception of how entry was gained into

23   the residence?

24   A     It was done with basically just knocking and

25   announcing.  We were able to knock on the door and Mr. Pence

Andersen - Direct                                      70

1    came to the door.  He understood that we were there for a

2    court order.  And before we entered in, he had knowledge of

3    that and so we calmly and were able to peacefully go in

4    without any sort of disruption or property damage.

5    Q     Fair to say that the members of the team who were doing

6    the initial entry were wearing body armor underneath their

7    agency-issued jackets when they entered the residence?

8    A     Yes.  They either were wearing a jacket with

9    identifying information or just their body armor with

10   identifiers on it.  But, yes, that's what we wore.  That's

11   correct.

12   Q     Was anybody wearing riot gear, to your understanding?

13   A     Nobody was wearing riot gear.

14   Q     What is your understanding of what riot gear is?

15   A     Riot gear is full body protection.  We are talking

16   hardened protection on the knees and the thighs and on the

17   shins, forearms, shoulders, shields.  You know, full helmets

18   and shields on their face, full-length batons, gas masks.

19   There was nobody in our operational group that was wearing

20   any riot gear.

21   Q     Based on your observation, how did the members of the

22   team enter the residence once the defendant opened the door

23   and the team entered?

24   A     We walked into the residence and began to secure the

25   property one room at a time.

Andersen - Direct                                    71

1    Q     From what you could observe, how were the members of

2    the team carrying their firearms at that point?

3    A     They either had them holstered, if it was a sidearm.

4    There may have been a few agents who had them unholstered in

5    the down position.  There were -- the majority of the

6    officers had sidearms, a few of them had rifles, and they

7    were in the down -- down -- or what we call low ready

8    position.

9    Q     At any point, did you see agents pointing guns at any

10   person in the residence?

11   A     No.

12   Q     What was your -- what did you do as soon as the team

13   started to secure the residence?

14   A     I stayed with Mr. Pence in the main foyer area of the

15   home.  I began communicating and just talking with him in the

16   foyer, trying to give some explanation of what the court --

17   or what we were ordered by the court to do.  And so I just

18   stayed in the main front area.

19   Q     Is it fair to say you stayed with Mr. -- well, with the

20   defendant for more or less the entire time between when the

21   team entered the residence to when Mr. Pence left to

22   accompany you to a vehicle?

23   A     More or less, yes.

24   Q     At any point did you see if law enforcement brandished

25   weapons at the defendant?

Andersen - Direct                                                72

1   A      No.

2   Q      At any point, did you see law enforcement yell at the

3   defendant?

4   A      No.

5   Q      Let me ask you about other members of the household.

6          Did you personally observe any adults or children

7   within the residence crying?

8   A      I did not personally observe any of that.

9   Q      Was anyone in the residence handcuffed?

10  A      No.

11  Q      At some point did the defendant attempt to go up the

12  stairs while the house was being secured?

13  A      Yes.

14  Q      Can you describe how that unfolded?

15  A      I believe he was trying to retrieve some of his

16  children from upstairs and we asked that he just call them

17  down versus entering into an area that was unsecure for

18  officers.  We asked that he just call the children down

19  versus putting himself in that position to where officers

20  were trying to clear; not add more chaos to the areas that

21  were still not cleared yet.

22  Q      All right.  Was there a particular concern that

23  animated that choice on your part to ask him to call down the

24  children as opposed to allowing him to go up the stairs to

25  get them himself?

Andersen - Direct                                                73

1   A      Repeat your question.

2   Q      What was your rationale for making that decision?

3   A      During our training, we try to minimize any sort of

4   additional people or potential risks into areas where

5   officers are trying to clear.  So it was a situation where

6   for his safety and for the officers' safety it made sense to

7   just call people down versus bringing additional persons into

8   an uncleared area.

9   Q      Is it also to prevent the hypothetical destruction of

10  evidence?

11  A      Absolutely.

12  Q      While you were with him, at any point did the defendant

13  ask to or attempt to speak with members of his family?

14  A      No.

15  Q      At some point, did Special Agent DeCarr ask the

16  defendant if he would be willing to speak with the two of you

17  in a vehicle?

18  A      Yes.

19  Q      Can you describe for the Court, from your perspective,

20  how did Special Agent DeCarr ask him or make that request?

21  A      He just notified him that we wanted to speak to him.

22  And when I say "we," Special Agent DeCarr and I wanted to

23  speak to him and that we could do that anywhere but that

24  there was a vehicle that was available for us to be able to

25  speak to him.  He was agreeable.  Never had any sort of

Andersen - Direct                                    74

1    concern with doing that.

2              MR. SCHILLINGER:  Objection to the characterization

3    of whether he had a concern or not.

4              THE COURT:  Sustained.  That may be stricken.  Next

5    question.

6    Q     Did Special Agent DeCarr tell the defendant that he had

7    to come out to the car and speak with you?

8    A     No.

9    Q     What was the defendant's demeanor as you personally

10   observed it while Agent DeCarr was speaking to him?

11   A     Respectful and calm.

12   Q     So what happened next after the defendant agreed to

13   speak with you and Agent DeCarr in the vehicle?

14   A     Because it was still morning hours and it was still

15   cold, he asked to put on some shoes and so we -- I allowed

16   him to go upstairs to get some shoes.  And so he went up and

17   got some shoes on before we went out to the car and spoke to

18   him out in the car.

19   Q     Did you perceive anybody -- any member of the team

20   following the defendant up the stairs?

21   A     Yes.  I followed him partway up the stairs.  And at a

22   certain point up the stairs, another agent assisted and

23   facilitated him going into his room to get his shoes.

24   Q     Is it fair to say that the master bedroom was

25   immediately at the top of the stairs on the second floor of

Andersen - Direct                              75

1    the residence?

2    A      I know it was on the second floor, but I don't know the

3    layout of the master bedroom on that second story.

4    Q      Were you able to hear the agent who was upstairs with

5    the defendant say anything to the defendant at that time?

6    A      No.  On the way up the stairs, somebody asked him to

7    slow down.  But that's the extent of what I heard.

8    Q      Do you recall -- was it you who asked him to slow down?

9    A      No.  I don't believe it was me.  But I remember

10   somebody telling him to slow down rather than move so

11   quickly.

12   Q      Is there a concern for individuals moving quickly

13   through a house that's -- for which, you know, where a search

14   warrant is being executed?

15   A      Yes.  It's the same as far as being a hazard or a risk

16   and the potential for evidence destruction.

17   Q      At any point, did you hear someone threaten to shoot

18   the defendant?

19   A      No.  Never heard that.

20   Q      What happened after the defendant retrieved his shoes

21   from the bedroom?

22   A      He came back downstairs and we walked out together.

23   Agent DeCarr and myself and Mr. Pence walked out to the

24   vehicle.

25   Q      Can you describe how the defendant got into the

Andersen - Direct                                          76

1    Chevy Tahoe, which was the vehicle?

2    A      So the Chevy Tahoe was positioned such that the

3    passenger's side was closest to the house, and that's the

4    side that Special Agent DeCarr and I got into.  He walked

5    around to the other side of the vehicle and got into the rear

6    driver's side door.

7    Q      Did either you or Agent DeCarr tell him that that was

8    the door he had to get into?

9    A      I don't recall.

10   Q      Did anyone open the door for the defendant --

11   A      No.

12   Q      -- so as to allow him into the vehicle?

13   A      No.

14   Q      Did either you or Agent DeCarr close the door behind

15   the defendant?

16   A      No.

17   Q      At any point, did you handcuff the defendant?

18   A      No.

19   Q      Did the doors lock on the defendant after he entered?

20   A      No.

21   Q      At any point during the interview, which, fair to say,

22   lasted almost five hours, correct?

23   A      Yes.

24   Q      And you were present through the vast majority of that

25   time inside the vehicle, correct?

Andersen - Cross                                      77

1    A      That's correct.

2    Q      At any point did you observe -- did you observe any

3    agents stationed outside the vehicle?

4    A      No.  I mean, for what purpose?

5    Q      I'll rephrase it.  Were there any agents outside the

6    vehicle brandishing weapons and guarding the vehicle?

7    A      No.  That was not part of the operational plan, either.

8    Q      If you did observe members of the investigation team

9    outside the vehicle, what were they engaged in?

10   A      Either going to their vehicles to obtain their

11   equipment or to bring evidence to -- we had a van there that

12   was previewing digital devices.  So they were bringing

13   evidence and devices down to the van.  But there was nobody

14   positioned there for any amount of time or for any specific

15   purpose as far as guarding or providing security of some

16   sort.

17              MR. O'HANLON:  I have no further questions, your

18   Honor.

19              THE COURT:  Okay.  You may cross-examine.

20              MR. SCHILLINGER:  Thank you, Judge.

21   CROSS-EXAMINATION BY MR. SCHILLINGER:

22   Q      Good morning, Agent Andersen.

23   A      Good morning.

24   Q      I'm Eric Schillinger.  I'm Mr. Pence's attorney.

25   Thanks for coming up to New York to meet with us today.

Andersen - Cross                              78

1    A     Sure.

2    Q     I'm just going to ask you some questions about that

3    October day when you were involved in the search warrant

4    execution of Mr. Pence's house; okay?

5    A     Sure.

6    Q     First of all, you were the agent who was responsible

7    for developing the sort of tactical plan for the day.  Is

8    that fair to say?

9    A     That's correct.

10   Q     And you testified during your direct testimony that

11   safety is a paramount concern when you are engaging in this

12   type of activity, of course?

13   A     Of course, yes.

14   Q     And how many years have you worked for the FBI?

15   A     Just over 15.

16   Q     And I'm sorry.  Just let me know if you can't hear me

17   if I step away from this microphone or if I don't speak loud

18   enough.

19         During that time you had some training on how to

20   develop a tactical plan based on what would be safe, given

21   any investigative information that you have?

22   A     Yes.

23   Q     Okay.  Are there instances where you may execute a

24   search warrant with just maybe one or two agents involved?

25   A     I'm trying to think if we have ever done that.

Andersen - Cross                                    79

1       Potentially, if it was a consensual search.  So, again,

2  in that circumstance, possibly, yes.

3  Q     Depending on the circumstance, you draw an analysis and

4  you determine what level of force is necessary to engage and

5  to execute a search warrant.  Is that correct?

6  A     Level of force, what do you mean by that?

7  Q     About how many agents would be, you know, dedicated to

8  that particular execution of a warrant?

9  A     Yes.  Based off of the information that we would obtain

10  through the investigation, we would make a decision about

11  needed resources, manpower, so to speak.

12  Q     So in addition to manpower -- and that would probably

13  be the first question, right?  How many agents do we need to

14  go with us, right?

15  A     Sure.  That's one of the early questions that we ask.

16  Q     And then on top of that, there is also analysis as to

17  what equipment to use.  That's true?

18  A     Sure.

19  Q     And are there instances where you might execute a

20  warrant and maybe just, let's go and do it with maybe just

21  your sidearm.  Is that something you could do?

22  A     Potentially, yes.

23  Q     And sometimes you might just -- you wear a bulletproof

24  vest, of course, for safety but maybe there is only a handful

25  of officers.  Maybe four or five guys?

Andersen - Cross                          80

1    A      It would be rare where we would do four or five

2    individuals.  Again, it would have to be something that

3    dictates a very low level of concern.

4    Q      Okay.  And if you have a higher level of concern, you

5    are going to engage in more safety planning.  So more

6    officers, right?

7    A      You asked two questions there.  Which one do you want

8    me to answer first?

9    Q      So if you had a higher level of concern, you would

10   engage in more safety-related planning.  Is that right?

11   A      Yes.

12   Q      And part of that would be increasing the number of

13   officers that you bring to execute the warrant, right?

14   A      Not always.  But frequently, yes, that would be a

15   consideration to bring more officers.

16   Q      And it would also be an analysis as to what equipment

17   you would bring with you.  Is that true?

18   A      Yes.

19   Q      And, you know, there is a range of equipment that the

20   FBI has available, too.  Is that fair to say?

21   A      Yes.

22   Q      And now in your training and in your experience there

23   are some technical terms that we might use.  So riot gear

24   would mean one thing.  Is that true?

25   A      Yes.

Andersen - Cross                                    81

1    Q     And then maybe just protective equipment, that's maybe

2    something lower than riot gear.  Is that true?

3    A     Yes.

4    Q     Okay.  Now, are those terms that you are familiar with

5    through your training?

6    A     Which terms?  Riot gear?

7    Q     Riot gear and protective gear generally.

8    A     Yes.

9    Q     And are those distinctions that civilians typically

10   make, do you know?

11              MR. O'HANLON:  Objection.  Calls for speculation.

12              THE COURT:  Overruled.  You may answer.

13   A     I am not sure what typical civilians would consider

14   riot gear versus tactical gear.

15   Q     Let me direct your attention to the day in question.

16         When you arrived at the residence, there was a total

17   of -- is it 21 different law enforcement agents who were

18   involved?

19   A     For the entirety of the operation, both the securing

20   and search, yes, I believe it was approximately 21.

21   Q     And it's 14; is that right?  So two-thirds of those

22   people who were involved in the initial entry?

23   A     Approximately, 14.  Now, you mean 14 individuals who

24   secured the residence?  What portion are you asking about?

25   Q     From the time that you arrived at the residence until

Andersen - Cross                                     82

1    you lined up the door and gained entry, how many FBI agents

2    were involved in the initial step of gaining entry?

3    A    So the reason for my hesitation is because we had other

4    agents -- agencies there, not just the FBI.  So I think there

5    was probably five or six FBI agents that were present.

6    Q    Okay.  Thank you for clarifying that, actually.  So out

7    of the people who were involved in gaining entry, a certain

8    percentage of them were FBI agents and a certain percentage

9    were either other agencies, Homeland Security or local

10   sheriff's deputies or similar that were assisting?

11   A    Yes.  There was three or four different agencies that

12   assisted us that day.

13   Q    Okay.  And the total number of people is 14 that went

14   through the door.  Is that right?

15   A    Approximately.

16   Q    Okay.  Now you testified during your direct testimony

17   that you traveled to the property in a caravan.  Is that

18   true?

19   A    Yes.

20           MR. SCHILLINGER:  Judge, if I can, I'm going to ask

21   the witness to observe a video that is the Government's

22   Exhibit G-1.  And I'm going to direct -- so for the record to

23   reflect, it's Channel 5, and it's going to be the video that

24   ends with the identification number ID13002.

25           Your Honor, so the Court is aware, I apologize for

Andersen - Cross                        83

1   the delay in the machine loading it.  It's the mechanism of

2   how, I think, the secure -- I can't copy it onto my machine

3   directly.  It won't play if I do that.  It has to come off of

4   the drive that was provided.  I tried to do it with --

5   directly on the machine and it wouldn't play.  I'm just going

6   to pause it for one second.

7   Q    Agent Andersen, can you see the video screen?

8   A    I can, yes.

9   Q    Have you ever seen this video before?

10  A    Yes.

11  Q    Okay.  Great.  And there's a date stamp and a time

12  stamp.  It's October 27, 2021, at just about 6:45 in the

13  morning, right?

14  A    Yes.

15  Q    I'm just going to ask you to watch it and I'll pause it

16  when I have a question for you.

17          MR. O'HANLON:  I apologize.  For some reason, it's

18  not playing at the government's table, so I'll just watch it

19  from here.

20          MR. SCHILLINGER:  I'm sorry.  Your Honor, is it

21  playing on your screen and is it playing on the other

22  screens?

23          THE CLERK:  Yeah.  We're good.

24          MR. SCHILLINGER:  It's playing on my screen.

25          I'll just pause it there for one second, Judge.  So

Andersen - Cross                                    84

1    the record reflects, I paused it at the time stamp 6:46:13.

2    Q    Agent Andersen, does this video depict the caravan of

3    vehicles traveling to Mr. Pence's home?

4    A    It appears to.

5    Q    Okay.  And just at this stage where I paused it, the

6    vehicles are still driving on the main road of the

7    property -- or, excuse me, the main road to the property.  Is

8    that true?

9    A    Yes.

10             MR. SCHILLINGER:  I'm going to play it again.

11             Okay.  I'm going to pause the video now at the time

12   stamp 6:48:05.

13   Q    And, Agent Andersen, first of all, that video depicts

14   the caravan of agents and local law enforcement traveling to

15   Mr. Pence's house.  That's right?

16   A    Yes, it does.

17   Q    And what we have just watched is roughly a dozen

18   vehicles travel up the main road and then drive up

19   Mr. Pence's driveway and pull into the driveway.  That's

20   true?

21   A    I don't know how many vehicles.  I wasn't counting.

22   But probably close to 12.

23   Q    If I told you it was 13, you would probably agree with

24   me, right?

25   A    I just don't know.  It was probably -- approximately

Andersen - Cross                        85

1    12.

2              MR. SCHILLINGER:  Judge, may I approach the

3    witness?

4              THE COURT:  You may.

5    Q    Agent, I'm just going to show you what's in evidence as

6    Government's Exhibit G-2.  Can you take a look at that?  Have

7    you seen those images before?

8    A    I have.

9    Q    Those are the aerial images you were discussing, right?

10   A    Yes.

11   Q    On those images, there is a driveway that is depicted,

12   right?

13   A    Yes.

14   Q    That's Mr. Pence's driveway, right?

15   A    Correct.

16   Q    And there's a turnaround on that driveway, right?

17   A    Yes.

18   Q    The point that's depicted in the video, it's depicting

19   basically the fork in the driveway where the turnaround

20   starts.  That's correct?

21   A    So where it kind of Ys out?

22   Q    Yeah.  Where it Ys out.

23   A    Yeah.  That's observable, I think, maybe in the far

24   right part of the screen.

25   Q    Sure.  So just -- I'm really just trying to get sort of

Andersen - Cross                                    86

1    a spatial.  I haven't been there myself.

2    A     Sure.

3    Q     What we are seeing in the screen is this area where the

4    driveway comes in from the main road and then forks?

5    A     Yes.

6    Q     The images the government has provided in G-2 shows the

7    house and a portion of the driveway.  The driveway extends a

8    little bit down the road and attaches and connects to the

9    main road.  That's right?

10   A     Say that again.

11   Q     The image here --

12         MR. SCHILLINGER:  Actually, it shows it.  I'll just

13   withdraw the question.

14   Q     Okay.  Just in G-2, the area where Mr. Pence's vehicles

15   are parked, that's up the driveway from the main road where

16   the fork is.  That's right?

17   A     Yes.

18   Q     And --

19   A     On these images, yes.

20   Q     Do you recall at the time that you were at their house

21   the vehicles were parked in a similar or substantially the

22   same location.  That's true, right?

23   A     I believe that there was some vehicles there.  How many

24   or what type of vehicles, I'm not sure at the time.

25   Q     And now do you recall there weren't any vehicles that

Andersen - Cross                                    87

1    were owned by Mr. Pence or any other civilian vehicles.

2    There weren't any vehicles parked down the length of the

3    driveway between where the FBI vehicles stopped and the main

4    road?

5    A     Not that I remember, no.

6    Q     Agent, I stopped the video at 6:48:05.  And it was at

7    approximately 6:48 that you began to line up and attempt to

8    gain entry into the house.  Is that true?

9    A     That sounds right.

10            MR. SCHILLINGER:  Judge, I'm going to direct the

11   witness's attention to a video which is part of Government's

12   G-1.  It's Channel 3.  The identification number is 99 --

13   0 -- ID009937 for the record.  And this is the last video I'm

14   going to play.  So with respect to the loading, I apologize

15   for the delay.  But we'll play this one with this witness and

16   then we'll leave it at that for now.

17            I'm going to pause this at 6:48:12.

18   Q     And, Agent, have you seen this video before?

19   A     Yes.

20   Q     Okay.  And this depicts sort of the front walkway,

21   entryway to the Pences' residence.  Is that right?

22   A     Correct.

23   Q     And the vehicles, they are parked up here by the

24   residence.  You can see them in the video, right?

25   A     Correct.

Andersen - Cross                                              88

1   Q      And, if you know, can you tell us in relation to where

2   the video is depicting, where are the FBI vehicles that were

3   stopped?

4   A      To the upper right of the screen off -- they are off of

5   the screen from this viewpoint.

6   Q      And they would be between the house and the main part

7   of the road.  Is that true?

8   A      Yes.  That's correct.

9   Q      So if you were going to get in one of these vehicles

10  and drive away, you would have to navigate through where the

11  FBI vehicles were stopped.  Is that fair to say?

12  A      Yes.  You have to be mindful of the cars that were on

13  or near the driveway.

14         MR. SCHILLINGER:  Okay.  Judge, I'm going to play,

15  so the record reflects it, this ID9937 in Government's

16  Exhibit 1, and this is playing from 6:48:15.

17  Q      And, Agent, I'll just ask you to watch this and then

18  we'll go over what we see here in a minute.

19         Agent, I paused it and this is at 6 -- believe it's

20  6:48:34.  And just right there at the top of the image, can

21  you see -- it's a shadow and it looks like it's someone

22  carrying something.  Is that a shield?

23  A      I can't be certain based on this image, but I -- we

24  frequently do bring a shield on our search warrants.  So it

25  wouldn't surprise me at all if that is a shield.

Andersen - Cross                                     89

1    Q     Okay.  What I'm going to do is, I'm going to skip it

2    back 10 seconds.  I'll ask you to just watch that portion of

3    the video and you tell me if it is.

4              THE COURT:  What are you doing standing there?

5              MR. O'HANLON:  Judge, the monitor on counsel's

6    table doesn't work, so I have to look through here.

7              THE COURT:  Okay.

8    Q     Now, Agent, with me having given you a clue to look for

9    it, did you see the shield?

10   A     Yes.

11   Q     Okay.  And that's a device that would be positioned at

12   the front of the line of agents before you would open the

13   door.  Is that right?

14   A     It has various purposes, but protection at a door is

15   one of them.

16   Q     And that's what you would have it for in this instance.

17   That's right?

18   A     We bring a shield to use for many different purposes.

19   A shield is to protect from firearm fire.

20   Q     Okay.  And where would you anticipate the firearm fire

21   coming from?

22   A     I don't know the answer to your question or how to

23   answer your question because firearm can come from anywhere.

24   Q     In this instance, would your concern be primarily

25   coming from the front door?

Andersen - Cross                                        90

1   A      We train as if every single house -- if every single

2   door and every single room could potentially be a threat.  So

3   having a shield would be something that we would want to have

4   available to us as a tool to protect ourselves in any room in

5   any space inside of any sort of building.

6                MR. SCHILLINGER:  Okay.  I'm going to play the

7   video again from 6:48:36.

8   Q      Agent, while it's playing, let me ask you, the flashing

9   lights that we see, those are law enforcement alert lights,

10  right?

11  A      Yes.

12  Q      And we can see in the video at least a few of the

13  agents.  It appears that they are carrying assault weapons or

14  rifles, long guns?

15  A      There appears to be several agents that do have rifles

16  in this depiction.

17  Q      Agent, let me ask you, the last man in line here, he

18  has a sledge hammer in his hands, doesn't he?

19  A      I'm not sure if that's a sledge hammer or if it's what

20  we call a halogen tool, but it looks like some sort of a

21  breaching tool.

22                MR. SCHILLINGER:  I'm going to pause it at 6:50:01.

23  Q      Can you explain what that halogen tool is?

24  A      It's like a crowbar.

25  Q      Okay.  And breaching tools, they are used to gain entry

Andersen - Cross                                    91

1    to the property, obviously, if someone doesn't open the door?

2    A      That's correct.

3    Q      Okay.  Now, Agent, we've seen them all, the 14 men line

4    up at the door.  And now it looks like the video shows the

5    door is opened and you have been able to gain entry.  Is that

6    accurate?

7    A      Yes.  That does appear that we've gained entry at this

8    stage.

9    Q      And at this stage, maybe 10 or 12 of the 14 gentlemen

10   have gone in.  Is that accurate?

11   A      Yes, approximately.

12   Q      A couple kind of remain outside for safety purposes,

13   right?

14   A      Right.

15   Q      Okay.  I'm going to stop playing the Government's

16   Exhibit 1 at the 6:51:25 mark.  And I'm going to ask you some

17   questions, Agent, about that.

18          So once you gained entry to the property, you were able

19   to make contact with Mr. Pence basically right away.  He

20   opened the door, right?

21   A      Correct.

22   Q      And from when he saw you and he saw the shield and the

23   breaching tools, he let you right in.  He didn't resist.

24   That's right?

25              MR. O'HANLON:  Objection.  Calls for speculation.

Andersen - Cross                                    92

1          THE COURT:  Yeah.  Sustained.

2     Q    The shield and the breaching tools, they were up by the

3     front door.  That's right?

4     A    I'm not sure where they were located.  Usually, the

5     breaching tools would be further away from the beginning of

6     the line.

7     Q    Okay.  And the shield would be up at the front of the

8     line?

9     A    Usually towards the front.

10    Q    And so everybody lined up here on these steps and then

11    as the video progressed, everyone moved up right to the front

12    door.  That's right?

13    A    No.  I believe that there was individuals that stayed

14    back purposefully to allow reasonable conversation with

15    Mr. Pence.

16    Q    Does the video here depict those people standing back

17    on the steps or are they all up at the front door?

18    A    Right now?

19    Q    Yeah.

20    A    Right now it appears that they are all towards the

21    front of the house.  Or at least out of view of this angle.

22    Q    Okay.  Now, on direct, you testified that when you went

23    into the house, you and Agent DeCarr made initial contact

24    with Mr. Pence.  That's true?

25    A    That's true.

Andersen - Cross                                    93

1   Q       And you began to secure the residence.  That's right?

2   A       Correct.

3   Q       And in doing so you collected his family members and

4   asked them to wait in the living room area of the house?

5   A       Yes.  We asked them to congregate in a specific common

6   area in the home.

7   Q       And your testimony was that Mr. Pence was separately

8   with you in the foyer of the house.  He wasn't in the living

9   room.  That's right?

10  A       Yes.  Mr. Pence was in the foyer during that time

11  frame, yes.

12  Q       Just if you witnessed it, did you see Mr. Pence have an

13  opportunity to speak with his wife?

14  A       I did not see Mr. Pence speak with his wife.

15  Q       Now some of the agents who -- who were with you for

16  safety purposes or they were wearing helmets and other safety

17  gear, bulletproof vests, similar things like that?

18  A       I don't recall helmets.  It's possible.  We have a

19  couple officers that may have helmets that they brought.  But

20  for sure, body armor.

21  Q       Do you recall giving an affidavit in this case?

22  A       Yes.

23  Q       If I showed you the affidavit, would it remind you as

24  to what your testimony was with respect to the use of

25  helmets?

Andersen - Cross                                    94

1    A      Sure.

2           MR. SCHILLINGER:  Judge, I'm going to show the

3    witness -- if I can approach, please.

4           THE COURT:  You may.

5           MR. SCHILLINGER:  Judge, I'm going to show the

6    witness what is Exhibit 2 to the government's responsive

7    papers here.  It's Mr. Andersen's affidavit.  I'll direct his

8    attention to paragraph 3 there.

9    Q      Why don't you take a look at that and then once you

10   have read it, look up to me.  And if it refreshes your

11   recollection, you can tell me.

12   A      Okay.

13   Q      Okay.  Thank you.  So now I will just ask you the

14   question again.  Do you recall were there agents who were

15   wearing helmets when you made that entry into the property?

16   A      Yes.  Possibly between one and three.

17   Q      Now, there may be some technical distinctions between a

18   riot helmet and a helmet that might be worn for safety

19   without a shield.  But helmet -- same thing.  A helmet is a

20   helmet, right?

21   A      A helmet is not a helmet.  There's helmets that are

22   used for ballistic protection and there is also helmets that

23   are used for ballistic protection and also blunt objects and

24   protection from the orifices on your face from sprays, gases

25   and those kinds of things which you typically find in a riot

Andersen - Cross                                   95

1    gear set.

2    Q     Okay.  And that is -- I'll agree with you.  That type

3    of helmet would be a more elevated type of helmet than the

4    one that was worn in this situation.  Is that fair to say?

5    A     Sure.  Yes.

6    Q     Is that a distinction that you believe a civilian would

7    commonly make?

8              MR. O'HANLON:  Objection.  Calls for speculation.

9              THE COURT:  Overruled.  He may answer.

10   A     I'm not sure.  My opinion is, is that most people

11   recognize riot gear as something with an actual face shield

12   that provides protection to the face.

13   Q     Okay.  Thank you.

14             MR. SCHILLINGER:  Judge, can I approach the witness

15   again?

16   Q     Agent, I'm going to show you what's in evidence as

17   Defendant's Exhibit L.  It's a screenshot from Government's

18   Exhibit 1.  Can you take a look at that?  That is that same

19   camera angle that we were watching the vehicles pulling up.

20   It's about a half an hour later.  Is that right?

21   A     Yes, sir.

22   Q     And does that accurately depict where the vehicles were

23   parked after you had made your initial arrival at Mr. Pence's

24   residence?

25   A     Yes.

Andersen - Cross                                     96

1    Q    Okay.  I'll just take that away from you.  Thank you.

2         Agent, you testified on direct that you had the

3    opportunity to accompany Mr. Pence partway up the stairs in

4    his house when he was getting shoes for where he would go out

5    to the vehicle to be questioned.  Is that right?

6    A    Yes.

7    Q    And you said you only went about halfway up and then

8    another agent accompanied him up the rest of the way, right?

9    A    Right.

10   Q    Do you know who that agent was?

11   A    I do not.

12   Q    And you didn't hear personally any conversation between

13   Mr. Pence and whoever that agent was.  That's true?

14   A    I did hear somebody tell him to slow down.

15   Q    And that was when they were going up the stairs?

16   A    Yes.

17   Q    And then your testimony on direct was you couldn't see

18   them once they went into Mr. Pence's bedroom.  That's true?

19   A    I could not see them when they went into Mr. Pence's

20   bedroom.

21   Q    Your testimony was that you are not familiar with the

22   upstairs layout of the house.  That's true?

23   A    That's correct.

24   Q    So once they went up the stairs, you don't know

25   precisely where they went to?

Andersen - Redirect                              97

1    A     I do not, no.

2    Q     You don't know if you would be able to even hear a

3    conversation if one happened.  That's right?

4    A     I'm not sure if I could or not.

5              THE COURT:  Anything further with this witness?

6              MR. SCHILLINGER:  Judge, just one second.

7                   (Pause in proceedings.)

8              MR. SCHILLINGER:  No.  Thank you, Judge.

9              THE COURT:  Redirect, if any?

10             MR. O'HANLON:  Very brief, your Honor.

11   REDIRECT EXAMINATION BY MR. O'HANLON:

12   Q     Directing your attention --

13             MR. O'HANLON:  Permission to approach, your Honor?

14             THE COURT:  You may.

15   Q     Special Agent Andersen, directing your attention to

16   Defense Exhibit L, the depiction of the driveway, what is the

17   time stamp on Exhibit L?

18   A     7:32.

19   Q     So at this point, you were interviewing the defendant

20   in the Chevy Tahoe, correct?

21   A     That's correct.

22   Q     Can you see the Chevy Tahoe in Exhibit L?

23   A     Yes.

24   Q     Is there anyone guarding the outside of the

25   Chevy Tahoe?

Lydon - Direct                                    98

1    A    No.

2    Q    Is there anyone walking around brandishing a firearm?

3    A    No.

4         MR. O'HANLON:  Thank you.  Nothing further.

5         THE COURT:  Anything further with this witness?

6         MR. SCHILLINGER:  No, Judge.  Thank you.

7         THE COURT:  Okay.  You may step down.  Do you have

8    anything else?

9         MR. O'HANLON:  The government has one more witness,

10   your Honor.

11        THE COURT:  Call him.

12        MR. O'HANLON:  The government will call Special

13   Agent Patrick Lydon.

14        THE CLERK:  Good afternoon, sir.  Sir, would you

15   please state your full name, spell your last name for this

16   record.

17        THE WITNESS:  My first name is Patrick.  My last

18   name is Lydon, spelled L-Y-D-O-N.

19        THE CLERK:  Thank you, sir.

20        P A T R I C K   L Y D O N, called as a

21   witness and being duly sworn, testifies as follows:

22        THE COURT:  Mr. O'Hanlon, you may proceed.

23   DIRECT EXAMINATION BY MR. O'HANLON:

24   Q    Good afternoon, Special Agent Lydon.  What is your

25   current occupation and assignment?

Lydon - Direct                                    99

1    A     I'm a special agent for the Federal Bureau of

2    Investigation assigned to the Albany division.

3    Q     And how long have you been with the bureau?

4    A     I was hired in January of 2020.

5    Q     How were you assigned back in October of 2021?

6    A     I was a member of the FBI Capital District Safe Streets

7    Gang Task Force.

8    Q     And in that capacity, did you become involved in the

9    investigation of a murder for hire in October of 2021?

10   A     Yes.

11   Q     What was your role in the investigation?

12   A     I aided Special Agent DeCarr with initial interviews

13   with the victims and I participated in the search warrant on

14   October 27, 2021.

15   Q     Were you part of the original team that performed the

16   entry on the residence?

17   A     Yes.

18   Q     Can you describe from your perspective how the entrance

19   to the residence was accomplished?

20   A     We went up to the front door of the residence and the

21   lead agents knocked on the door, had a conversation with

22   Mr. Pence, and then we entered the foyer area.

23   Q     How far back were you in that stack of agents?

24   A     A couple people, I think.

25   Q     Did you have a firearm on you at that time?

1    A      Yes.

2    Q      Okay.  And how were you handling it as you entered the

3    residence?

4    A      As we entered the -- at the time, I would have either

5    had it at the low ready or in my holster.

6    Q      Do you recall either way?

7    A      I don't recall either way.

8    Q      Okay.  In any event, how did you observe the other

9    agents in that initial group?  How were they handling their

10   weapons?

11   A      In the same manner.  Either at low ready or in their

12   holster.  Or if they had a rifle it was controlled in their

13   hands.

14   Q      How long did it take before the agents either holster

15   their sidearms or slung their long guns?

16   A      Not long.  Estimate once we had that initial

17   conversation in the foyer, there is a small team of agents

18   and law enforcement that conducted the initial clearing of

19   the residence and everyone else either -- everyone else

20   holstered or slung -- shouldered their weapons.

21   Q      And what did you do at that point after entrance was

22   made?

23   A      I went to the living room recreation area.

24   Q      And what did you do there?

25   A      I was just sitting there -- or standing there with

Lydon - Direct                                          101

1    the -- with the members of the family.  The occupants of the

2    house.

3    Q    Fair to say that all the residents of the house except

4    for the defendant were eventually led down into the living

5    room area?

6    A    Yes.

7    Q    How would you describe that process of them being led

8    to that area?

9    A    Everyone was calm.  You could tell that they were

10   confused as to why we were there.  But everyone just listened

11   to us and moved into the living room area.

12   Q    Did you observe any adults or children who were upset

13   at that point?

14   A    No.

15   Q    During the process of securing of the residence, did

16   you see law enforcement agents point guns at any of the

17   inhabitants?

18   A    No.

19   Q    Did you see them -- any agents yelling at the

20   inhabitants?

21   A    No.

22   Q    Were there any threats that were conveyed to the

23   inhabitants during the portion of time that you were present

24   for the securing of the residence?

25   A    No.

Lydon - Direct                                          102

1    Q      I am showing you what's been previously admitted as
2    Government Exhibit 3.  Do you recognize Government 3?
3    A      Yes.
4    Q      Okay.  So when you said you were present in the living
5    room, are you referring to Room F?
6    A      Yes.
7    Q      And how long do you think you were in Room F, roughly
8    speaking, from the time of the entrance into the residence
9    until you left that area?
10   A      Estimate 15 minutes before we -- before we went to the
11   master bedroom to interview Michelle Pence.
12   Q      And Michelle Pence is the defendant's spouse?
13   A      Yes.
14   Q      Can you describe how you went about asking Ms. Pence if
15   she was willing to speak with you?
16   A      Yes.  I went up to Mrs. Pence and I was, like, do
17   you -- would you like to talk to me?  Is there a good place
18   that we could talk?  And I think in talking to her we decided
19   the master bedroom would be a good, quiet place to talk.
20   Q      And do you recall where your gun was at that point when
21   you asked to speak with her?
22   A      It was in its holster.
23   Q      And you said you went up to the master bedroom,
24   correct?
25   A      Yes.

Lydon - Direct                                    103

1    Q      Making reference to Government 3, how did you and

2    Ms. Pence get to the master bedroom?

3    A      That staircase near the front door, it leads up to the

4    master bedroom.  You get up to the top of the stairs and then

5    you can kind of see the master bedroom right there at the

6    top.

7    Q      Okay.  And you are referring to the indication the

8    upstairs stairway that's sort of like a curve, on

9    Government 3?

10   A      Yes.

11   Q      Is it fair to say that the master bedroom is at the top

12   of the stairs?

13   A      Yes.

14   Q      Had the master bedroom been secured at that point?

15   A      I can't recall.  I believe so.

16   Q      During the roughly 15 minutes that you said you were in

17   the living room with the family members before interviewing

18   Ms. Pence, did you recall any of the family members trying to

19   speak with the defendant?

20   A      No.

21   Q      Where was the defendant at that time, if you know?

22   A      I couldn't see him.  I believe he was at the front door

23   speaking with the interview team.

24   Q      So when you were in the living room, you actually

25   weren't able to see the defendant in the foyer?

Lydon - Direct                                    104

1   A     No.  There's a wall.  If I wanted to see what was going

2   on in the foyer, I would have to, like, momentarily walk into

3   Room G on the exhibit just to see if we were ready to go up

4   there.

5   Q     Did you see any armed agents stationed by the windows

6   within the residence?

7   A     No.

8   Q     Did any of the agents that you observed prevent any

9   inhabitants or the residents of the house from looking out

10  the windows?

11  A     No.

12  Q     As the search -- or, sorry, as the warrant was

13  executed, was the family restricted to the living room or

14  were they able to enter other rooms in the house?

15  A     During the search warrant?  Well, most of the search

16  warrant was spent in the master bedroom.

17  Q     That's fair.  I want to show you what's been previously

18  marked as Government 4 and stipulated that it's in evidence.

19        Do you recognize the picture on top of Government 4?

20  A     Yes.

21  Q     What is depicted there?

22  A     It depicts the living room and the kitchen area in the

23  Pence residence.

24  Q     Okay.  Fair to say there are family members walking

25  around the kitchen?

Lydon - Direct                                      105

1    A      Yes.

2    Q      And there is a boy with a -- what appears to be a water

3    bottle?

4    A      Yes.

5    Q      And is the children's grandmother depicted in the nook,

6    the breakfast nook?

7    A      Yes.

8    Q      And is that you in the far back right?

9    A      Yes.

10   Q      What are you doing there?

11   A      I think I am just making small talk with members of the

12   Pence family.

13   Q      Was this after the interview of Ms. Pence had taken

14   place or before?

15   A      I think it's after.

16   Q      What are the other members of law enforcement doing as

17   depicted in Government 4?

18   A      At this point they would have been wrapping up with the

19   search warrant.

20   Q      And directing your attention to the photograph on the

21   bottom of Government 4, what is depicted there?

22   A      That's that recreation room that leads into the living

23   room in the photo on top.

24   Q      All right.  So that's a different room that is off of

25   the living room?

Lydon - Cross

1   A      Yes.

2   Q      And just briefly directing your attention back to

3   Government 3, when you say the recreation room, you are

4   talking about what's indicated as Room G?

5   A      Yes.

6   Q      And the breakfast room -- or the kitchen area is Room D

7   and Room E, correct?

8   A      Correct.

9           MR. O'HANLON:  No further questions.

10          THE COURT:  Mr. Schillinger, you may examine.

11  CROSS-EXAMINATION BY MR. SCHILLINGER:

12  Q      Hello, Agent.  I am Eric Schillinger.  I represent

13  Mr. Pence.  Couple of questions for you very quickly.

14          Actually, first of all, while the initial securing of

15  the residence and the search warrant was being executed, the

16  family members of Mr. Pence, they were kept in the living

17  room of the property.  That's correct?

18  A      We ushered them into the living room area, yes.

19  Q      And they weren't allowed to move about the house while

20  the warrant was being executed while the search was taking

21  place, were they?

22  A      I was in the master bedroom, so I wasn't able to

23  observe a lot of that.

24  Q      Just generally speaking, when a search is being

25  conducted, an area is secured to avoid the destruction of

Lydon - Cross                                        107

1   evidence.  That's right?

2   A     Yes.

3   Q     And the purpose of corralling Mr. Pence's family in the

4   living room was to secure the area for the search.  That's

5   right?

6   A     Yes.

7   Q     And you were actually in the master bedroom with

8   Ms. Pence during this period, so you didn't actually witness

9   what was happening.  That's true?

10  A     During the actual search?

11  Q     Yes.

12  A     Yes.  I was in the master bedroom.

13  Q     Now, approximately how long were you in the master

14  bedroom for?

15  A     Approximately three hours.

16  Q     And how long did the search take?

17  A     I think it would be anywhere between four and five

18  hours.

19  Q     So the search was ongoing for many hours during the

20  course of the morning.  That's right?

21  A     Yes.

22  Q     Now, you've arrived at the property just before 7 a.m.

23  That's correct?

24  A     Yes.

25  Q     And if you know, Mr. Pence was removed to the police

Lydon - Cross

1    vehicle for questioning just around 7 a.m.  That's right?

2    A     All I know is that when I left the room after to see if

3    they were still there, he was gone.  I didn't know exactly

4    where he had gone.

5    Q     Okay.  Now, you were in the master bedroom with

6    Ms. Pence for about three hours?

7    A     Yes.  With another agent.

8    Q     And your testimony is that in Government's Exhibit G-4,

9    which I will -- in Government's Exhibit G-4, you appear in

10   that image, in the corner of the image on the top of the

11   page.  That's true?

12   A     Yes.

13   Q     And there is a clock actually on the wall -- there is

14   two clocks on the wall in this image.  That's correct?

15   A     At least, yes.

16   Q     Can you tell what time that those clocks depict?

17   A     Looks like 10:35 about.

18   Q     So it's 10:35 and the sun is up.  It's 10:35 a.m.,

19   probably, right?

20   A     Yes.

21   Q     So this picture was taken something like three and a

22   half hours after Mr. Pence was removed to the vehicle.  Is

23   that right?

24   A     Or since execution of the warrant, yes.

25   Q     I'm sorry.  What do you mean by since execution of the

Lydon - Cross

1    warrant?

2    A     When we started.

3    Q     You got there about 7 o'clock?

4    A     Yes.

5    Q     This is three and a half hours later, right?

6    A     Yes.

7    Q     Okay.  And during the period that the warrant was being

8    executed, the family was kept in the living room to prevent

9    the destruction of evidence and keep the property secure.

10   That's right?

11   A     And the kitchen area and the recreation room.

12   Q     Did Ms. Pence ask you if she could speak with her

13   husband?

14   A     At any point?

15   Q     At any point.

16   A     Yes.

17   Q     And she was not allowed to.  That's correct?

18   A     She -- we didn't prevent her.  The defendant asked us

19   to -- or told us that he did not wish to talk to her.

20   Q     During your direct testimony, you described it as a

21   small team that conducted the clearing of the residence.  I

22   think that was your term.  Is that right?

23   A     Yes.

24   Q     And the small team, it was 14 individuals, correct?

25   A     So what I meant by that is, like, there was a lot of us

Lydon - Cross                              110

1    in the foyer area and then the actual team that went

2    throughout the house to do the law enforcement clearing was a

3    smaller group out of that approximately 14 individuals.

4    Q    So a total 14 people?

5    A    Approximately.

6    Q    And then during the course of the investigative period,

7    at least 7 more people were involved.  There's a total of 21

8    people at the house that day.  That's right?

9    A    That sounds right.

10              MR. SCHILLINGER:  Nothing else, Judge.  Thank you.

11              THE COURT:  Anything further with this witness?

12              MR. O'HANLON:  No further questions.

13              THE COURT:  All right.  You may step down.  Any

14   further additional evidence by the government?

15              MR. O'HANLON:  Subject to the acceptance into

16   evidence of all the stipulated items of evidence, your Honor,

17   nothing further for the government.

18              THE COURT:  Is the defense going to be presenting

19   any additional evidence for the record?

20              MR. SCHILLINGER:  Judge, yes, we do have witnesses

21   to call.

22              THE COURT:  We'll take a break till 1:30 and we'll

23   resume with the defense part of it, additional evidence.

24              THE CLERK:  Court stands for a short recess.

25   1 o'clock, folks -- or 1:30, everybody back in court.

Lydon - Cross                          111

1              (Recess, 12:41 p.m.)

2              (Open court, 1:44 p.m.)

3         MR. O'HANLON:  Your Honor, I believe the Court

4    has -- the government is recognizing the defendant has

5    handcuffs on.  I understand it's not a trial.  There is no

6    jury here.  This is sort of short -- you know, I wasn't able

7    to brief this or do a full research on it.  However, my

8    concern is that, you know, because he is testifying on his

9    own behalf and also because this is, you know, a proceeding

10   that's akin to trial, obviously, without a jury, I was just

11   going to ask -- I believe the Court needs to make a finding

12   that the defendant should be -- should remain shackled, if he

13   is to remain shackled, during this type of proceeding, is my

14   understanding.  I don't have a cite for the Court, though,

15   because I hadn't been able to research it.

16        THE COURT:  Well, is there a request to unshackle

17   him?

18        MR. SCHILLINGER:  Judge, earlier in the day I had

19   made a request with the marshals to allow him to wear street

20   clothes and be unshackled, and it was off the record, of

21   course.  It was indicated that was not an option at the time.

22   I do think that when he testifies, it's appropriate for him

23   to not be restrained.  So we would make that request.

24        THE COURT:  Well, as far as I'm -- do you

25   understand -- you are going to call him as a witness?

Lydon - Cross                                          112

1             MR. SCHILLINGER:  Yes, Judge.

2             THE COURT:  All right.  Well, stand up, Mr. Pence.

3    If I order the marshals to unshackle your hands, are you

4    giving me your word that you will behave yourself --

5             THE DEFENDANT:  Absolutely, sir.

6             THE COURT:  -- and not do anything at all?

7             THE DEFENDANT:  No, sir.

8             THE COURT:  All right.  And, of course, if you do,

9    it's not going to go well for you for the rest of the

10   proceedings.

11            THE DEFENDANT:  Understood.

12            THE COURT:  Do you understand?

13            THE DEFENDANT:  Yes, sir.

14            THE COURT:  All right.  I'm ordering that you

15   unshackle and call him as a witness, and you can --

16            MR. SCHILLINGER:  Judge, I'm going to call

17   Ms. Pence first.  I don't know if we want to take the cuffs

18   off now or -- it's up to the Court.

19            THE COURT:  All right.  Call your first witness.

20            MR. SCHILLINGER:  Judge, the defense calls

21   Michelle Pence.

22            THE CLERK:  Good afternoon, ma'am.  Can you please

23   state your full name and spell your last name for the record.

24            THE WITNESS:  Michelle Marie Pence.  P, as in

25   Peter, E-N-C-E.

M. Pence - Direct                                    113

1          THE CLERK:  Thank you, ma'am.  Please raise your

2    right hand.

3          M I C H E L L E  M.  P E N C E, called as

4    a witness and being duly sworn, testifies as

5    follows:

6          THE COURT:  You may proceed.

7          MR. SCHILLINGER:  Thank you, your Honor.

8    DIRECT EXAMINATION BY MR. SCHILLINGER:

9    Q    Hi, Ms. Pence.  Can you state your name and where you

10   live for the record?

11   A    Michelle Pence, 2929 South 6500 West, Cedar City, Utah

12   84720.

13   Q    Is the defendant, Mr. Pence, your husband?

14   A    Yes, sir.

15   Q    Can you tell us a little bit about your family?

16   A    My husband and I live in Utah with our children, and

17   his parents also reside with us.

18   Q    Okay.  And I'm going to direct your attention to the

19   day that is in question here, October 29, 2021.

20        Can you tell me what, if anything, happened that day?

21   A    Do you mean the 27th, sir?

22        THE COURT:  27th.

23   Q    I'm sorry.  October 27, 2021.  Thank you.

24   A    On that morning, it was early morning, I was nursing my

25   infant, when my husband urgently called me downstairs.  I got

1    up and went to the restroom.  And when I came back into my

2    bedroom, I saw search lights, big search lights on my bedroom

3    ceiling.  And I looked out the window and saw lights, like,

4    law enforcement vehicle lights.

5    Q    Okay.  Michelle --

6    A    I quickly went downstairs.

7    Q    Thank you.  What did you do when you saw those lights?

8    A    I went downstairs quickly.

9    Q    And when you got downstairs --

10   A    And my front room was filled with a bunch of law

11   enforcement agents and -- with big rifles and bulletproof

12   vests, and it looked to me at the time to be riot gear.

13   Q    Do you have any experience with law enforcement or

14   working in the military or anything like that?

15   A    No.

16   Q    So you used the words "riot gear."  That's maybe a

17   technical term, but to you that's what you perceived it to

18   be?

19   A    That is what it felt like to me, but I -- I have no

20   experience.

21   Q    Okay.  And when you went downstairs, did you see your

22   husband?

23   A    No.  No.  He was already gone.  I asked where he was --

24   Q    Ms. Pence, if you could just -- if you can respond to

25   my question and then I will ask you another question.

1    Thank you.

2          So do you know where he was, if you know?

3    A    I asked and I was told unavailable.  He was

4    unavailable.

5    Q    Okay.  And after you asked that, what was the next

6    thing that happened?

7    A    I was still coming down the stairs.  They asked if

8    anybody else was upstairs.  I had just left my infant

9    upstairs, so I knew she was there.  They escorted me upstairs

10   to go and get her.

11   Q    When you say they, who do you mean?

12   A    Agents.  They -- various things were written -- various

13   letters were written on their jackets.  Primarily, FBI, I

14   believe.

15   Q    You understood that these were law enforcement agents?

16   A    I did.

17   Q    And they were people from the FBI, was your

18   understanding?

19   A    Correct.

20   Q    You went upstairs to get your infant?

21   A    I was escorted upstairs to get my infant and I brought

22   her down.  My father-in-law was in the entryway, I passed her

23   off to him, and --

24   Q    When you were escorted, were the people who went

25   upstairs with you, were they armed?

M. Pence - Direct                                    116

1    A     Yes.  They had big assault rifles.

2    Q     And after you got your infant and you went back

3    downstairs, what was the next thing that happened?

4    A     The agents asked me if everybody was present.

5    Q     Was everybody present?

6    A     No.

7    Q     Who was still upstairs?

8    A     My four-year-old was still upstairs asleep.

9    Q     Okay.  Did you go back upstairs to get him?

10   A     I started to and was told, no, that I needed to sit

11   down and stay here.  I asked if I could please accompany them

12   to go and get him.

13   Q     And what happened?

14   A     They would not allow me to go.  They went up to get him

15   and brought him down.

16   Q     And when they went to get him, did you see if they were

17   armed?

18   A     They certainly were.

19   Q     And they escorted your four-year-old into the living

20   room.  That's right?

21   A     Yes, sir.

22   Q     And at that point, was everyone who lives in your house

23   all in the living room together?

24   A     Other than my husband, yes.  When they brought my

25   four-year-old in, he was terrified.  He ran over to me and

M. Pence - Direct                                               117

1    asked, "Are they here to kill me?"

2    Q    And what did you say to him?

3    A    I told him, "I don't think so."

4    Q    What happened after that?

5    A    We were told that we needed to stay here and I asked

6    what was going on.  They would not answer.  I asked to --

7    they said they had a search warrant.  I asked to see it.

8    They refused.  I asked to see my husband.  They refused.

9         Over the course of the next few hours, I asked multiple

10   times to see both of -- both my husband and the search

11   warrant and was denied.

12   Q    During that period of time, were you kept in the living

13   room area of your house?

14   A    Yes.

15   Q    And did you also have an interview with an agent in

16   your bedroom?

17   A    Yes, I did.  But no family member was allowed to leave

18   the living room area, including to go to the restroom in an

19   open floor concept without being escorted there.

20   Q    So you were with -- you were with a law enforcement

21   person in the living room or in the bedroom when you were

22   interviewed and the rest of your family was as well.  That's

23   right?

24   A    Correct.

25   Q    Were you allowed to move freely around the house or

M. Pence - Direct                            118

1   were you all kept in one room?

2   A    No, we were not.  Children asked to get reading books

3   and things that they wanted to be able to do.  They were

4   denied access to anywhere else in the house.

5             MR. SCHILLINGER:  Judge, can I approach the

6   witness?

7             THE COURT:  You may.

8   Q    Ms. Pence, I am going to show you what's in evidence as

9   Defendant's Exhibits J -- and, actually, I'll give you K also

10  right now.

11            Those are screenshots from a security camera that you

12  have in your house.  That's right?

13  A    Correct.

14  Q    Have you seen those images before?

15  A    Yes, I have.

16  Q    Do they accurately depict the general situation that

17  was going on in your house that morning?

18  A    As much as you can from that particular camera angle.

19  There -- in the front entry room of the house, there are a

20  whole lot more agents.  There is also more agents back

21  between the end of the kitchen and the garage door.

22  Q    So the image that you are holding there, there's a

23  living room and then it opens into the kitchen sort of at the

24  back of the image.  Is that true?  The top of the image, I

25  should say.

1    A     You can just see the edge of the kitchen, yeah.  You

2    can see the living room, dining room, and the edge of the

3    kitchen.

4    Q     And then there's a door on the left side of the image

5    and there's an agent sort of standing just adjacent to that

6    doorway.  That's right?

7    A     Correct.

8    Q     Was there anybody -- to your knowledge, was there

9    anybody in that door on the other side that's not visible in

10   the camera angle?

11   A     Can you restate the question for me, please.

12   Q     Sure, yeah.  Let me rephrase that.

13         Were there agents on the other side of that doorway

14   that aren't appearing in the image?

15   A     I am not sure which doorway you mean.  I apologize,

16   sir.

17   Q     The doorway on the left in the image that goes into the

18   other room of the house.

19   A     We could see other agents through that doorway,

20   absolutely.  One stood at the window for the majority of the

21   day.  But they were there holding a rifle and would not allow

22   people to even look out the window.

23   Q     How long did -- how much time elapsed where you were

24   corralled in that living room area and not free to move

25   around your house?

M. Pence - Direct                              120

1   A     Several hours.  I'd say more than three hours.

2               MR. SCHILLINGER:  Judge, if I can approach again?

3               THE COURT:  You may.

4   Q     I am just going to show you what's been marked as

5   Government's G-4.

6               Ms. Pence, do you recognize those images?  You have

7   seen those before, right?

8   A     Yes, sir.

9   Q     Okay.  And those images depict the other side of

10  your -- the first floor of your house.  That's right?

11  A     Correct.

12  Q     Compared to what's in the defendant's exhibits?

13  A     Yes, sir.

14  Q     What time were those pictures taken?

15  A     The clock on the wall says 10:37.

16  Q     And at that stage, you were moving around your house.

17  That's right?

18  A     These were taken shortly after we were told they were

19  wrapping up and we may move about the first floor, but not to

20  leave that floor.

21  Q     It was about a three-and-a-half or four-hour period

22  that you were kept in one room and then allowed to leave

23  after that?

24  A     Correct.

25  Q     Did you ask any of the agents if you could leave that

1   room while you were corralled in your living room?

2   A     Yes.

3   Q     What did you say?

4   A     We asked multiple times for different things.  I

5   actually asked if I could take everybody with me and go do

6   the very necessary grocery shopping that needed to be done

7   that day, and I was told we may not leave the premises at

8   all, that we must stay in this room.

9   Q     And did you ask to do anything else to leave the

10  premises?

11  A     I asked to see my husband.  I asked to take people to

12  the park.  I asked -- we asked if we could go retrieve

13  reading books and different items from the house, that the

14  children had something to do while we were just sitting here.

15  Q     And did any of that happen?

16  A     We were denied anything that we asked.  I was not even

17  allowed to escort my toddler to the restroom with the agents

18  escorting him.

19  Q     Did you have any contact at all with your husband on

20  that day?

21  A     No.  I asked multiple times to see him.

22  Q     And he was out of the house before you were even

23  downstairs when the FBI arrived?

24  A     Correct.

25  Q     And you didn't speak with him again after that.  That's

M. Pence - Cross                                    122

1    true?

2    A     Nope.

3          MR. SCHILLINGER:  Okay.  Thank you, Judge.  I don't

4    have any other questions.

5          THE COURT:  Mr. O'Hanlon, you may examine.

6    CROSS-EXAMINATION BY MR. O'HANLON:

7    Q     Good afternoon, Ms. Pence.

8    A     Good afternoon.

9    Q     Would you prefer Ms. Pence or Mrs. Pence?

10   A     Mrs., please.

11   Q     You got it.  So back on October 27th of 2021, is it

12   fair to say that that was a pretty upsetting day?

13   A     Very much, yes.

14   Q     Okay.  At the end of that day, your husband had been

15   arrested by the FBI, correct?

16   A     Correct.

17   Q     And your whole house had been searched by the FBI,

18   correct?

19   A     I presume -- you know, I -- I was not a part of the

20   search.  I was kept in a single room.  So I really can't say

21   what was searched.

22   Q     As far as you were aware, there had been a big search

23   at your house.  Fair to say?

24   A     Correct.

25   Q     Okay.  And in the wake of that, your husband was

1   charged with a murder-for-hire --

2   A    Correct.

3   Q    -- charge, correct?

4   A    Yes, sir.

5   Q    And he has been in custody since that time, correct?

6   A    Yes, he has.

7         MR. SCHILLINGER:  Object to that, Judge, just for

8   relevance.

9         THE COURT:  Overruled.  Move on.

10  Q    Okay.  Is it fair to say that you are not happy that

11  your husband was charged in this case?

12  A    I really can't speak to this.  This isn't really what

13  we are here for.

14  Q    All right.  I guess I'm going to ask the question again

15  because it is relevant to your testimony today.

16        THE COURT:  Obviously she is unhappy.  Move on with

17  something relevant, okay?

18  Q    You previously testified that you didn't have any

19  communications with your husband that day, correct?

20  A    Correct.

21  Q    Okay.  Is it fair to say that your husband -- you and

22  your husband had completely different experiences that

23  morning given that you didn't even see him?  Is that fair to

24  say?

25        MR. SCHILLINGER:  Objection, Judge.

M. Pence - Cross                            124

1          THE COURT:  Sustained.

2     Q    So you had no communication with your husband, correct?

3     A    Correct.

4     Q    Okay.  He didn't communicate with you, either before he

5     was arrested, correct?

6     A    Correct.

7     Q    And you were interviewed at one point by

8     Special Agent Lydon, correct?

9     A    I can say I was interviewed.  I'm sorry, I don't know

10    the name of the agent who interviewed me.

11    Q    That's fine.  An agent or I guess perhaps two agents

12    went upstairs with you to the master bedroom?

13    A    Yes.  Yes.

14    Q    All right.  And there was an interview that lasted

15    approximately three hours, correct?

16    A    I have no idea.

17    Q    Okay.  Well, during the period of that interview, you

18    were not aware of what was going on outside of the house,

19    correct?

20    A    I was aware of the doors opening and closing because of

21    the alarms going off and the motion sensors in my bedroom

22    alarming.

23    Q    So when you were in your master bedroom, could you hear

24    what was going on downstairs on the first floor?

25    A    I could -- could I hear what was going on?  I'm sorry.

M. Pence - Cross                                125

1    Are you saying could I hear what was being said?

2    Q    Correct.  When you are in your master bedroom, can you

3    hear a conversation occurring on the first floor?

4    A    In the entryway, yes.

5    Q    Okay.  So someone in the entryway, vice versa, can hear

6    a conversation going on in the master bedroom?

7    A    No.

8             MR. SCHILLINGER:  Objection, Judge.

9             THE COURT:  Overruled.  Go on.

10   Q    When you were interviewed, it lasted approximately

11   three hours, correct?

12   A    I have no idea how long I was interviewed for.

13   Q    Okay.  But fair to say you could not see what was

14   happening in the driveway of the residence at that time?

15   A    I do not believe it was three hours.

16   Q    Okay.  Putting aside the length of the interview, fair

17   to say you couldn't see what was going in the Chevy Tahoe in

18   your driveway while you were being interviewed?

19   A    Yes, sir.

20   Q    While you were being interviewed, do you know for a

21   fact whether agents were allowing the children to do anything

22   on the first floor?

23   A    I do.  I have spoken with my children about this and

24   they have said, no.  Nobody was allowed to leave.  My -- my

25   then 16-year-old --

1          MR. O'HANLON:  Objection.  Move to strike as to

2     hearsay.

3          THE COURT:  No.  You asked the question.  You may

4     answer.

5     A    My 16-year-old was fighting panic attacks and feeling

6     like she needed to try to keep everybody safe and that they

7     weren't allowed to do anything.  She couldn't get anything

8     that would help with anybody just keeping them occupied

9     during this time either.

10    Q    Again, you were not personally on the first floor of

11    the house?

12    A    I was not.

13         MR. SCHILLINGER:  Objection.  It's been asked and

14    answered.

15         MR. O'HANLON:  I have no further questions.

16         THE COURT:  Anything further?

17         MR. SCHILLINGER:  No, Judge.  Thank you.

18         THE COURT:  All right.  You may be excused.  You

19    may stay in the courtroom, if you wish.

20         THE WITNESS:  Thank you, sir.

21         THE COURT:  Next?

22         MR. SCHILLINGER:  Judge, the defense calls the

23    defendant, Christopher Pence.

24         THE CLERK:  Good afternoon, sir.

25         THE COURT:  Okay.  Wait a minute.  Before you are

M. Pence - Cross

1    sworn in, I want you to understand you can refuse to testify,

2    if you wish.  If you do testify, anything you say can be used

3    against you in not only this hearing, but if there is a

4    trial.  Do you understand?

5              THE DEFENDANT:  I understand.

6              THE COURT:  And you are waiving your rights to

7    remain silent as the defendant, are you?

8              THE DEFENDANT:  Yes.

9              THE COURT:  Do you understand again that your

10   testimony could be used against you if this case goes to

11   trial?

12             THE DEFENDANT:  Yes, sir.

13             THE COURT:  All right.  You may -- and you are

14   waiving your right to remain silent?

15             THE DEFENDANT:  Yes, sir.

16             THE COURT:  Swear him in.

17             THE CLERK:  Sir, please state your full name.

18             THE DEFENDANT:  Christopher Robin Pence.

19             THE CLERK:  Spell your last name.

20             THE DEFENDANT:  P-E-N-C-E.

21             THE CLERK:  Thank you, sir.  Please raise your

22   right hand.

23             C H R I S T O P H E R  R.  P E N C E,

24   called as a witness and being duly sworn, testifies

25   as follows:

C. Pence - Direct                              128

1          THE WITNESS:  I'm sorry, your Honor, being

2     underdressed.

3     DIRECT EXAMINATION BY MR. SCHILLINGER:

4     Q     Good afternoon, Chris.  Can you state your name for the

5     record?

6     A     Christopher Robin Pence.

7     Q     Can you tell the Court where you resided prior to your

8     arrest?

9     A     2929 South 6500 West in Cedar City, Utah 84720.

10    Q     I am going to direct your attention to October 27,

11    2021.  On that day can you tell the Court what happened to

12    you?

13    A     Well, it started out like any normal day.  My alarm

14    clock went off at 5:55 and the light in the bathroom goes on

15    at 5:55.  We have our home automated and so it's on a

16    schedule.

17          So I got up, I got dressed, put on some deodorant.  I

18    walked out, walked through the bedroom.  I left my wife and

19    our infant there in bed because she normally fed her.  And by

20    the time I got out to the rest of the house, the rest of the

21    house lights were on at 6 a.m., I went upstairs and I got our

22    girls up.  And I went next to the boys' room and I got some

23    of our boys up.  And we went downstairs and we were getting

24    ready to do Bible.  We always do Bible in the mornings.

25    Q     And about what time was it when you started your Bible

1  study?

2  A     Well, so before we started the Bible study, we always

3  start off with prayer and just praying for the day and all

4  that.  But then we also wanted to say happy birthday to our

5  11-year-old daughter because that was her birthday.

6  Q     Did the morning go as planned or did something happen?

7  A     So then we were doing Bible and we were about 20

8  minutes into it when there was a loud bang at the door and

9  followed by the front of the house being lit up with lights.

10  Q     Did you know what was happening?

11  A     No.

12  Q     What did you do next?

13  A     Well, at the time I was still sitting on the floor with

14  Serenity next to me.  I got up and as we were making our way

15  to the door, my son, my oldest son, said, "Isn't that strange

16  how as soon as the knock happened, all the lights turned on

17  at the same time."  I thought, yeah, that was strange, buddy.

18       So I walked three steps down into the -- what we call

19  the sunken living room or the music room, the schoolroom and

20  walked across there.  And as I looked out the window, I could

21  see that there were vehicles blocking all of our vehicles in

22  the driveway.  I walked up the next three stairs to make my

23  way to the front door and I unlocked the deadbolt and opened

24  the door.

25  Q     What happened when you opened the door?

C. Pence - Direct                                           130

1   A      I was -- the first thing I saw was a big black shield

2   right in the entryway.

3   Q      Okay.  And what happened next?

4   A      And I saw some agents with helmets on.  I saw agents

5   with -- looked like everyone there had bulletproof vests on.

6   A lot of them had big black coats on.

7   Q      What did you think when you saw this?

8   A      Well, what I thought was that 10 of my children were

9   directly behind me, and my wife and our infant was upstairs,

10  and our -- two of our toddler boys were also upstairs.  And I

11  saw this massive display of force in front of me and all of

12  that behind me.  It felt like -- it felt like Armageddon had

13  come to my front door and I was the only one standing in the

14  way.

15  Q      So what did you do?

16  A      Well, then I saw that agents had also brought up a

17  couple of sledge hammers and so I thought they are coming in

18  whether I let them in or not.

19  Q      So what did you do?

20  A      Then one of the agents told me that they had a search

21  warrant and then they pushed the door open.  And then they

22  told myself and two of my children to go outside.  We went

23  out on the front deck.  My 12-year-old daughter at the time

24  tried to grab her coat and was denied.  None of us had shoes

25  on.  Some of us weren't wearing socks.  It was mid 30s that

1    morning and we were standing on the cement patio.

2    Q    How long were you out on that patio for?

3    A    I really can't tell you.

4    Q    Was it minutes?

5    A    It felt like a long time.  It was long enough for our

6    feet to be numb.

7    Q    Did you ultimately go back in the house?

8    A    I'm sorry?

9    Q    Did you go back in your house, ultimately?

10   A    Yes.  At that time while we were outside, my oldest

11   daughter, who was at home, came and put her head on my

12   shoulder and she whispered to me, "I'm scared, Daddy."  And I

13   said, "It's okay.  Everything will be all right."  And I kind

14   of was trying to reassure her that I did find it interesting

15   that within a minute, a bunch of armed men came into my house

16   and kicked me and my children outside.

17   Q    Now, you said "kicked."  Nobody kicked you physically.

18   You just mean you were asked to go outside?

19   A    Yes.

20   Q    Do you have any experience with the Army or law

21   enforcement?

22   A    No.

23   Q    So --

24   A    No.

25   Q    You are not familiar with, you know, what equipment is

C. Pence - Direct                                          132

1    used in a raid like this or anything like that?

2    A      No.

3    Q      What did it look like to you?

4    A      It looked like what I saw on news channels of, like,

5    the January 6th riots.  It looked like the WTO riots I saw in

6    Seattle.  It looked very similar.

7    Q      That's -- you are describing the type of equipment law

8    enforcement was wearing in those three incidents?

9    A      Correct.

10   Q      Did there come a time when you had a conversation with

11   an FBI agent who you now know as Brian DeCarr?

12   A      Yes.

13   Q      And that began in the entryway of your house.  Is that

14   right?

15   A      Correct.

16   Q      Can you tell the Court what happened there and --

17   A      Like I said, I don't know how long I was outside, but

18   eventually they let us back in.  They told my children to go

19   into the living room and then they stopped me in the

20   entryway.  They told me that -- they said, "Do you have

21   anything on you?"  I said, "I have my wallet."  They said,

22   "Empty your pockets."  I emptied my wallet, my keys and my

23   cell phone.  I put them on the shoe rack there in the

24   entryway.

25          They then said that they were going to pat me down, and

C. Pence - Direct                          133

1   so they patted me down.  I was then asked if there was anyone

2   else in the house.  I said, "My wife and my parents are

3   upstairs."  I was told to bring them down.

4   Q    And what did you do to bring them down?

5   A    I started making my way for the stairs so I could go

6   bring them down, but I was stopped two stairs up.  I was

7   actually a little confused.  I didn't know how to bring them

8   down without going and getting them.  I know it may be a dumb

9   moment of mine at the moment, but then one of the agents kind

10  of yelled at me to yell to them.  And so I yelled up and I

11  said, "Come" -- "Everybody come down."  And so I saw my

12  parents' door open and then shut, presumably so my dad could

13  get dressed.  But it told me that at least they heard me.

14  Q    Did you see your wife that morning?

15  A    No.

16  Q    What happened after you called for your parents -- or

17  called your family?

18  A    One of the agents had told me that they needed to speak

19  to me and they said that it was a sensitive topic and that we

20  should talk outside.

21  Q    Did they give you an option of talking in one location

22  or another location?

23  A    Not that I remember.

24  Q    Was it your impression that that conversation was

25  optional?

1    A     No.

2    Q     What did you do?

3    A     I told them, "I don't have my shoes on."  And they

4    said, "Where are they?"  I said, "My shoes are upstairs in my

5    bathroom."  And I was told to go get them.  And as I was

6    walking up the stairs, an agent was following behind me.  And

7    our stairs are set up that it's eight stairs and then a

8    landing and then eight more stairs.

9          So I was walking up to go retrieve my shoes and I was

10   told by the agent who was walking behind me that he said,

11   "Move slowly or you will be shot."  And so I intentionally

12   moved slower than I was.  I thought I was already moving

13   slowly, but I don't know.

14   Q     Were you able to retrieve your shoes?

15   A     I walked through the bedroom, I walked into the

16   bathroom and I got my shoes on successfully, yes.

17   Q     And did you see your wife in the bedroom or the

18   bathroom?

19   A     No.

20   Q     And where did you go from there?

21   A     I then went back out the same way I came.  I walked

22   through the bathroom, back through the bedroom, and walked

23   back down the stairs.

24   Q     And when you got to the bottom of the stairs, what

25   happened next?

1  A     One of the agents motioned for me to go out the front

2  door.

3  Q     Can you describe for me what you mean by "motioned"?

4  A     With his hand.  He kind of presented the door to me.

5  Q     What happened next?

6  A     I don't know if I opened the front door or if someone

7  else opened the front door, but I walked through it, I

8  started walking down the stairs, and I remember, you know --

9  just strangely I remember seeing my breath that morning, you

10  know, because it was cold.  I remember seeing the line of

11  cars going down my driveway.  I remember seeing that this was

12  the most cars I have ever seen at my house, and we have

13  church gatherings at our house.

14  Q     The cars that were in your driveway, they were parked

15  between where your vehicles were and where the main road was.

16  Is that right?

17  A     Yes.

18  Q     Did you think that you could drive your car down the

19  driveway and just leave at that point?

20  A     Absolutely not.

21  Q     What happened next?

22  A     We were making our way towards a Suburban, a Tahoe, and

23  one of the agents said, "Why don't you get in on the other

24  side."  And so I walked around the front of the vehicle to go

25  get in the other side.  I remember opening the door and

C. Pence - Direct                                    136

1    getting in and closing it.

2    Q    Now, it's true nobody physically dragged you to the

3    car.  That's true?

4    A    That is correct.

5    Q    Did you feel that you had the option of going anywhere

6    else besides that car?

7    A    No.

8    Q    Why not?

9    A    Because -- because they had my children and my wife in

10   the home and I wasn't allowed to go with them.

11   Q    What happened once you got in the car?

12   A    I could see Agent Andersen in the car through the other

13   door.  I could see them taking things off.

14   Q    What things?

15   A    Like, if I remember correctly, I saw Andersen taking

16   his vest off, his bulletproof vest.  I saw things being put

17   in the front seat.  I saw them putting things in the back.

18   At the time I would have called it riot gear, but apparently

19   it's not called riot gear.

20   Q    What happened after they took off the gear?

21   A    Agent DeCarr got in next to me and Agent Andersen kind

22   of shuffled past Agent DeCarr and shuffled past me to get in

23   the back seat.  And at the time I could still see his pistol

24   on his hip as he walked right past me, so --

25   Q    So at this stage, you were in the Tahoe with

C. Pence - Direct                                    137

1    Agent Andersen and Agent DeCarr?

2    A    Correct.

3    Q    And you could see their sidearms through just -- right

4    out?

5    A    I could see Andersen's as he walked past me.

6    Q    Okay.  Now, you are aware of the fact that

7    Agent DeCarr -- he did mention to you that you weren't under

8    arrest at that time?  He told you that?

9    A    He did tell me that.

10   Q    Was that a distinction that seemed meaningful to you at

11   that point?

12   A    No.

13   Q    He also told you, you didn't have to talk to him,

14   right?  You had no obligation to talk to him?

15   A    He said I had no obligation to talk to him.

16   Q    Did you even really understand what that meant?

17   A    Well, at the time what it meant to me was that he

18   wanted me to talk to him.

19   Q    Now, if you were going to decline that conversation,

20   where would you have gone to?

21   A    I honestly don't know where I could have gone.

22   Q    Could you have gone back in your house?

23   A    I could have walked past the agents with the rifles,

24   sure.

25   Q    And could you have gotten in your car and left?

C. Pence - Direct

1    A     No.

2    Q     So did you feel like you had a place you could go to

3    besides that Chevy Tahoe?

4    A     No.

5    Q     Now you could see agents out the glass in the Tahoe

6    while you were having your conversation with --

7    A     Yes.

8    Q     -- Mr. DeCarr and Mr. Andersen?

9    A     Yes.

10   Q     Now, there were -- was there a number of agents milling

11   around?

12   A     There were agents that were coming and going to their

13   vehicles.  There were agents that were coming and checking on

14   the vehicle that we were in.

15   Q     When you say checking on it, what do you mean by that?

16   A     Well, there was an agent with an assault rifle that I

17   clearly remember seeing.  He kept coming down the stairs and

18   he'd look around that -- the van that was there and just

19   checked to make sure that the vehicle was okay, I presume.

20   Q     Did you feel like that that agent was guarding the area

21   or surveilling the area in some way?

22   A     Yes.  Yes.  He was -- it looked like he was guarding

23   the vehicles.  It looked like he was guarding -- it looked

24   like he was checking in on the vehicle that I was in.

25   Q     Do you remember was it daylight or was it still dark

C. Pence - Direct                                    139

1    when all this started?

2    A    It was still dark when all this started.

3    Q    And what time was it; do you remember?

4    A    When I heard the knock at the door?

5    Q    Sure.

6    A    6:45, give or take five.

7    Q    How much time lapsed between your initial contact with

8    the FBI and getting in the Tahoe?

9    A    Twenty, 30 minutes.

10   Q    How much time did you spend in the Tahoe that day?

11   A    Over five hours.

12   Q    At the time that you were placed in the Tahoe, were you

13   familiar with what a Miranda warning is?  Have you ever heard

14   that phrase?

15   A    I've heard it on TV shows.

16   Q    You know now what it is, having been through this

17   process?

18   A    Yes.

19   Q    And did you ultimately receive a Miranda warning?

20   A    I received a warning two, two hours into the

21   interrogation.

22   Q    During the interrogation, Agent DeCarr and

23   Agent Andersen were in the Tahoe with you?

24   A    Correct.

25   Q    And at different times, other agents came in and came

C. Pence - Direct                                    140

1   out of the Tahoe and asked you different questions?

2   A     I don't remember if other agents came in to ask before

3   the warning.

4   Q     After the warning?

5   A     After the warning, absolutely.

6   Q     Now, before you received your Miranda warning, you were

7   in the Tahoe.  That's right?

8   A     Correct.

9   Q     And then after you received it, you just were still in

10  the Tahoe in the same spot?

11  A     Correct.

12  Q     Was there any significant pause in time between when

13  you gave your statement that was pre-Miranda and your

14  statement that was after?

15  A     No.

16  Q     It was all one big five-hour block, right?

17  A     Yes.

18  Q     And the vast majority of that five-hour block, you were

19  questioned by Agent DeCarr and Agent Andersen?

20  A     Yes.

21        MR. SCHILLINGER:  Thank you, your Honor.  I don't

22  have any more questions.

23        THE COURT:  Okay.  Mr. O'Hanlon, you may

24  cross-examine.

25        MR. O'HANLON:  Thank you, your Honor.

C. Pence - Cross                                    141

1    CROSS-EXAMINATION BY MR. O'HANLON:

2    Q      Good afternoon, Mr. Pence.

3    A      Good afternoon, sir.

4    Q      How old are you?

5    A      Forty-three.

6    Q      And you have a bachelor's degree in finance from

7    Ashford University, correct?

8    A      That is correct.

9    Q      And fair to say you have worked in the tech industry

10   your whole career?

11   A      Over 25 years, sir.

12   Q      What kind of positions have you held?

13   A      Manager of a computer store.  I owned a computer store.

14   Network engineer, network architect and systems engineer.

15   Q      And you have worked as a network security architect for

16   Microsoft for at least eight years, correct?

17   A      My title is a Systems Engineer III at Microsoft.  Yes,

18   sir.

19   Q      All right.  For eight years, correct?

20   A      For eight years.

21   Q      Now, you signed an affidavit in support of a motion to

22   suppress statements that you gave in this case.

23          Do you recall signing that?

24   A      Yes, sir.

25   Q      Did you understand the part where it said you are

C. Pence - Cross                                           142

1    affirming the following under penalty of perjury?

2    A      Yes, sir.

3    Q      What does penalty of perjury mean to you?

4    A      That additional malfractions (phonetic) would be

5    brought up.

6    Q      Was it your intent that everything in that affidavit

7    was the truth?

8    A      Yes, sir.

9    Q      Did you read that affidavit carefully before you signed

10   it?

11   A      Yes, sir.

12   Q      Okay.  Was it your understanding that everything in

13   there was what actually happened to the best of your

14   recollection?

15   A      Yes, sir.

16          MR. O'HANLON:  Okay.  I am showing, displaying

17   Document 21-3, which is in evidence, which is the defendant's

18   affidavit in this case.  And I'm going to highlight paragraph

19   15.

20          It says, "After I was placed in the FBI SUV, I was

21   told by Agent DeCarr that I was not under arrest.  This

22   distinction was meaningless to me when my house was

23   completely overrun with armed and armored FBI agents.  I was

24   not told that I did not have to talk to him or that I could

25   end the questioning at any time."

C. Pence - Cross

143

1    Q      Now, was that true, in fact, that you were not told

2    that you did not have to talk to the agent?

3    A      I still believe that that is true, yes, because that

4    specifically was not said.

5    Q      You don't remember being told that you did not have to

6    talk to them?

7    A      I remember being told that I was under no obligation to

8    talk to them.

9    Q      So you remember being told you were under no obligation

10   to talk to them, but you didn't believe them when they told

11   you that?

12   A      It -- no, I didn't.

13   Q      What is your understanding when you hear, "You are

14   under no obligation to talk to us"?

15   A      Well, if you take my children away from me and you walk

16   me past a bunch of armed men and you tell me, you stick me in

17   a vehicle and then you say that I am under no obligation to

18   talk to you, what it tells me is that you want me to talk to

19   you and that it would be beneficial for my family if you did.

20   Q      Looking at it now, that statement is wrong, correct?

21   A      Which statement?

22   Q      Your statement that you were not told that you did not

23   have -- you did not have to talk to them, the agents?

24   A      I still maintain my statement.

25   Q      So you think for a person who reads that and sees that

C. Pence - Cross                                    144

1    you swore that this is the truth and you swore that no one

2    told you, you did not have to talk to the agents, that

3    someone reading that is going to understand your alternative

4    understanding of that?

5    A     As far as the definition of obligation?

6    Q     You didn't say obligation in your affidavit.  You said,

7    "I was not told I did not have to talk to them," correct?

8    A     That is correct.  And I was not told that I did not

9    have to talk to them.  I was told I was under no obligation

10   to talk to them.

11   Q     Would you agree that's misleading to someone who is

12   reading that?

13   A     Are you asking me to speculate what someone else is

14   thinking?

15   Q     I'm asking you if you read something or someone said, I

16   was told I did not have to talk to this person, would you

17   understand that to have some different meaning from what you

18   just read?

19              MR. SCHILLINGER:  Objection, Judge.

20              THE COURT:  Sustained.

21   Q     Someone reading this would have to understand your

22   interior thought process in order to actually understand --

23              MR. SCHILLINGER:  Objection, Judge.

24   Q     -- what you meant by that, correct?

25              THE COURT:  Sustained.

C. Pence - Cross                                    145

1    Q     Are there any other parts of the affidavit that are

2    similarly incorrect, to your knowledge?

3              MR. SCHILLINGER:  Objection, Judge.

4              THE COURT:  Sustained.

5    Q     You agreed to speak with the agents in the Tahoe,

6    correct?

7              MR. SCHILLINGER:  Objection, Judge.

8              THE COURT:  Overruled.  You may answer.

9    A     I was told that they wanted to speak to me and that it

10   was a sensitive topic and that it should be done outside.

11   Q     You were given the option of whether to speak to the

12   agents or not, correct?

13   A     I don't remember them giving me an option, no.

14   Q     You were given the option further of having the

15   conversation in the residence or in the vehicle, correct?

16             MR. SCHILLINGER:  Judge, I'm just going to object

17   to the form the question.

18             THE COURT:  Overruled.  Answer the question.

19   A     Could you restate it?

20   Q     You were given the option of speaking to the agents if

21   you wanted to speak with them either in the residence or in

22   the vehicle, correct?

23   A     I cannot answer that question.  I don't know.  I don't

24   remember that taking place, no.

25   Q     At no point were handcuffs placed on you, correct?

C. Pence - Cross

1    A    No physical handcuffs were placed on me.

2    Q    So I'm clear, you were never handcuffed, correct?

3    A    No.

4    Q    No one told you before you went out to the vehicle that

5    you were under arrest, correct?

6    A    No.

7    Q    That is correct, yes?

8    A    Correct.

9    Q    You opened the door on the side of the Tahoe that you

10   entered, correct?

11   A    Correct.

12   Q    Agent DeCarr then entered on the other side.  Is that

13   correct?

14   A    Correct.

15   Q    You close the door after entering the vehicle, correct?

16   A    Correct.

17   Q    Again, in your affidavit I want to cite you to the same

18   paragraph, Paragraph 12, the first sentence.  "I was taken to

19   one of the FBI Tahoes and placed in the rear seat."

20        That's what you swore was the truth, correct?

21   A    Mm-hmm.

22            THE COURT:  Yes?

23            THE WITNESS:  Yes.

24   Q    So you walked to the car by yourself, correct?

25   A    No.  I walked to the car with a couple of agents.

1   Q      Did they have their hands on you?

2   A      No.

3   Q      They didn't put you in the car, correct?

4   A      They told me to get in.  They said, "Why don't you get

5   in on the other side."

6   Q      Well, that's not what you said in your affidavit,

7   correct?

8   A      What do you mean?

9   Q      You didn't say, "I was instructed by the agents to get

10  in the car."  You say, "The agents placed me in the car."

11  A      Okay.

12  Q      Those are two different things, correct?

13  A      I was placed in the car by agents who were telling me

14  what to do.

15  Q      Right.  You place a child in a car, correct?

16         MR. SCHILLINGER:  Objection, Judge.  I'll withdraw

17  the objection, actually, I guess.  He can answer that.

18  A      Yes.

19  Q      All right.  You place items on your counter, correct?

20  A      Yes.

21  Q      Placing involves somebody putting something somewhere,

22  correct?

23  A      Yes.

24  Q      You were not put in the vehicle physically by anybody,

25  right?

C. Pence - Cross                                    148

1   A      Physically, no.

2   Q      But you swore under penalty of perjury that you were

3   placed in the vehicle, correct?

4   A      Correct.

5   Q      Would you acknowledge that that is misleading to

6   someone who is reading the affidavit?

7          MR. SCHILLINGER:  Objection, Judge.

8          THE COURT:  Sustained.

9   Q      Later on in the affidavit, citing you to Paragraph 16,

10  second paragraph, or, sorry, second sentence.  "From the

11  backseat of the vehicle, I could see agents wielding assault

12  weapons in my home with my family."

13  A      Correct.

14  Q      And this is while you were in the second row of the

15  vehicle?

16  A      Correct.

17  Q      I'm going to show you what's been marked as

18  Defendant's L.

19         MR. O'HANLON:  Permission to approach?

20         THE COURT:  You may.

21  Q      Isn't it true that the van or the Tahoe that you were

22  in was blocked from the residence by at least two other

23  vehicles?

24  A      No.  You could see over the top of the van.

25  Q      So you could see past the first row of the seats in the

1    car, correct?

2    A     No.  You could look out -- basically from where I was

3    sitting, you could look out the side window that Agent DeCarr

4    was sitting at.  You could see over the top of the vehicle

5    and you could see through the windows in the -- what we call

6    the computer room or the sunken living room.

7    Q     And it's your testimony -- or it's your testimony that

8    there was an agent standing there brandishing an assault

9    rifle the entire time that you were being interviewed?

10   A     He would leave and come back.

11   Q     I cite you to Paragraph 13.  You state, "Due to my

12   seating position in the vehicle while looking at

13   Agent DeCarr, I had a clear view of my home and could

14   continuously see agents storming my home."

15         Were agents running into your home while you are

16   sitting in the car?

17   A     They were -- were they running?  Probably not running,

18   no.

19   Q     You didn't say, I saw agents walking into my house.

20   Would that have been more accurate?

21   A     Probably.

22   Q     Isn't it true you saw agents walking in and out

23   carrying items, for example?

24   A     Some were.

25   Q     They weren't brandishing weapons, were they?

C. Pence - Cross                              150

1   A     Some were.

2   Q     So you are saying after the residence was secured, you

3   are still seeing agents walk in and out?

4   A     Yes.

5   Q     Brandishing -- or, sorry, holding weapons?

6   A     Yes.

7   Q     You described it as "storming," correct?

8   A     For the first few minutes, yeah, it was storming.  I

9   would call that storming.  But then it did turn, probably, I

10  would call, into walking.

11  Q     Is there a reason why you chose the word "storming" as

12  opposed to just entering and exiting the building?

13  A     No.

14  Q     You didn't think that using a word like "storming"

15  would invoke images of soldiers like storming a castle?

16            MR. SCHILLINGER:  Objection, Judge.

17            THE COURT:  Overruled.  Go ahead.

18  A     That is at the time what it felt like to me.

19  Q     Looking back on it, would you say it was an

20  exaggeration?

21  A     Not entirely.

22  Q     Because that was how you perceived it?

23  A     Yes.

24  Q     Okay.  You wouldn't say that when you said you were

25  placed in the vehicle, that was an exaggeration?

1    A    No.

2    Q    You wouldn't say when you understood being told you had

3    no obligation to speak to the police that you actually

4    interpreted it as you were required to speak to the police

5    that that was an exaggeration as well?

6    A    No.

7    Q    You assert several times in your affidavit that the

8    agents were wearing riot gear, correct?

9    A    Correct.

10   Q    Have you ever seen depictions of police at an actual

11   riot?

12   A    Other than what I have seen on TV, on the news.

13   Q    They typically have shields, correct?

14   A    Yes.

15   Q    They typically have batons?

16   A    I don't know.

17   Q    They typically have helmets with visors?

18        MR. SCHILLINGER:  Objection, Judge.

19        THE COURT:  Overruled.  If he can answer.

20   A    Some.

21   Q    They typically have protection for their legs?

22   A    I don't know.

23   Q    Isn't it correct that you chose to use the term "riot

24   gear" because it made the agents who executed the search

25   warrant sound scary?

1    A      No.

2    Q      You would acknowledge in retrospect, correct, that the

3    agents were merely wearing body armor, correct?

4    A      In some aspects.

5    Q      Would you grant that describing somebody who is wearing

6    body armor as the same as wearing riot gear is another

7    exaggeration?

8    A      No.  Because to my definition, they were the same.

9    Q      You testified earlier that you and your children were

10   actually moved outside the residence?

11   A      Yes.

12   Q      Where outside the residence?

13   A      On the front porch.

14   Q      How long were you and the other children outside on the

15   front porch?

16   A      As I told Schillinger, I don't remember.

17   Q      One second?  More?  One minute?

18   A      I don't know.  Long enough that my feet were cold.

19   Long enough that we were numb.  I don't know.

20   Q      Okay.  This fact wasn't included in your affidavit,

21   correct?

22   A      Correct.

23   Q      Did you just remember it today?

24   A      No.

25   Q      So you knew it before creating the affidavit, correct?

C. Pence - Cross                                          153

```
 1   A      Yes.

 2   Q      And you just didn't include it, even though you went

 3   through every other step of what happened to you day?

 4   A      I didn't go through every step that happened that day.

 5   Q      You understand that there is surveillance footage that

 6   covers the front porch of the residence, correct?

 7   A      Yes.

 8   Q      So how long should you and 10 of your children be

 9   depicted in that video?

10   A      I still don't know.  You are asking how long I was

11   outside?

12   Q      Well, you said until your feet were numb, correct?

13   A      Correct.

14   Q      And you can't give me a ballpark number of how long

15   that took?

16              MR. SCHILLINGER:  Objection, Judge.

17              THE COURT:  Overruled.  If he can answer it.

18   A      Could have been minutes.

19   Q      So more than a minute?

20   A      Presumably.

21   Q      More than two minutes?

22   A      I still don't know.

23   Q      So the video should depict yourself and how many

24   children on the front porch of the residence?

25   A      Ten.
```

C. Pence - Cross                                      154

1   Q    For at least two minutes.  Fair to say?

2   A    Sure.

3   Q    And this is something that never made its way to your

4   affidavit about what happened to you that day?

5   A    Correct.

6   Q    Even though you are giving all these other examples of

7   the ways that your family reacted to the execution of the

8   search warrant?

9   A    Correct.

10  Q    You did not have a chance to speak with Mrs. Pence that

11  morning, correct, before you went out to speak to the agents

12  in the vehicle?

13  A    Correct.

14  Q    And you were on the stairs going up to get your shoes

15  when you were called and the agent telling you to slow down

16  or that you would be shot?

17  A    That's correct.

18       MR. O'HANLON:  One more minute, your Honor.

19       THE COURT:  Let's move on.

20  Q    It's correct you did not ask to speak to your family,

21  correct, after entering the vehicle?

22  A    That is correct.

23  Q    And no one yelled at you in the vehicle, correct?

24  A    That's correct.

25  Q    And you will grant now that you were told literally the

1    words that the agents told you was that you did not have to

2    speak with them, correct?

3    A    Not in those words, no.  Do you want the exact words?

4    Q    You do recall you were told you were not under arrest,

5    correct?

6    A    Correct.

7              MR. O'HANLON:  I have no further questions.

8              THE COURT:  Redirect, if any?

9              MR. SCHILLINGER:  No, Judge.  Thank you.

10             THE COURT:  Okay.  You may take him down from the

11   stand.  He may be re-shackled, if it's appropriate.

12             Any more witnesses on behalf of the defense?

13             MR. SCHILLINGER:  No, your Honor.  Thank you.

14             THE COURT:  All right.  Is the evidence closed,

15   Counselors?

16             MR. O'HANLON:  It is, your Honor.

17             MR. SCHILLINGER:  Yes, Judge.

18             THE COURT:  Okay.  I'm going to give you

19   exceptionally lengthy time to present a memo, legal memo, to

20   July 14th, on or before, and I'm doing that so that you can

21   order a transcript of the proceedings today which the court

22   reporter will get to you at least by June 30th, if not

23   before, and then you can use that in your memorandum.  And at

24   the moment, I reserve decision on the motion until after I

25   have received memorandums from both of you.  Any questions?

156

1          MR. O'HANLON:  No, your Honor.

2          MR. SCHILLINGER:  No, Judge.  Thank you.

3          THE COURT:  In the meantime, the defendant is

4    remanded to the custody of the United States Marshals as this

5    matter continues to proceed.

6          Mr. McBrearty.

7          THE CLERK:  Court stands adjourned.  Thank you,

8    folks.

9               (Court adjourned, 2:49 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3    I, LISA M. MAZZEI, RPR, Official U.S. Court

4    Reporter, in and for the United States District

5    Court for the Northern District of New York, DO

6    HEREBY CERTIFY that pursuant to Section 753, Title

7    28, United States Code, that the foregoing is a true

8    and correct transcript of the stenographically

9    reported proceedings held in the above-entitled

10   matter and that the transcript page format is in

11   conformance with the regulations of the Judicial

12   Conference of the United States.

13

14                    Dated this 7th day of July, 2023.

15

16

17                    /S/ LISA M. MAZZEI

18                    LISA M. MAZZEI, RPR
                      Official U.S. Court Reporter
19

20

21

22

23

24

25
```