UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | Case No.: 1:21-CR-393 |
| | ) | Honorable David N. Hurd |
| CHRISTOPHER PENCE | ) | Senior U.S. District Judge |
| | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

**Introduction**

Christopher Pence stands before this Court for sentencing subsequent to his plea of guilty entered via a conditional plea agreement pursuant to Rule 11(a)(2) on December 6, 2023. On that date Mr. Pence pleaded guilty to a single count indictment charging him with Use of a Facility of Interstate Commerce in Connection with Murder for Hire in violation of 18 U.S.C. § 1958(a).

Mr. Pence was arrested at his home in Cedar City Utah on October 27, 2021 following the execution of a search warrant by an F.B.I. lead team at his residence. He has remained in custody since that date.

For the reasons detailed herein, a below guideline sentence is appropriate. Mr. Pence acknowledges the seriousness of his conduct and takes full responsibility for his criminal actions. He is a family focused, educated professional with no prior criminal history of any kind prior to this offense. As will be detailed herein, a below guideline sentence of 48 months will meet the 18 U.S.C. § 3553(a) factors because the unique facts of this case, although absolutely serious, do not necessitate punishment

1

as contemplated by the guidelines.

## The Factors to Be Considered in Imposing Sentence

Congress has set forth specific factors the Court should consider before imposing a sentence. Title 18 U.S.C. § 3553 (a) directs the court to impose a sentence sufficient, but not greater than necessary, to comply with the following purposes:

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)     to afford adequate deterrence to criminal conduct;
>
> (C)     to protect the public from for the crimes of the defendant; and
>
> (D)     to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most efficient manner.

*See*, 18 U.S.C. § 3553 (a) (2).

In fashioning such a "sufficient, but not greater than necessary sentence," the Court must consider the nature and circumstances of the offense; the history and characteristics of the offender; the kinds of sentences available; and the sentencing range established by the guidelines. *See*, 18 U.S.C. § 3553 (a) (1), (3), (4).

## The Nature and Circumstances of the Offense

Mr. Pence and his wife Michelle have eleven biological children and five adopted children. The five adopted children play a key role here.  The Pence's came to adopt those kids from Francesco and Christina Cordero. The Corderos met the Pences via an online group for parents of many children who homeschool. In 2019

while the Pences were on a family vacation traveling on the East Coast Ms. Pence received a message from Ms. Cordero that in substance indicated she was concerned for the safety of her children and needed a reprieve from parenting so Ms. Cordero and Mr. Cordero could address his addiction issues.

The Pences discussed the matter and chose to meet the Corderos where they lived in Massachusetts to see if they could help. After initially meeting the Cordero family the Pences continued on their trip and further discussed the situation. They ultimately decided to help, and returned to the Cordero's home. All involved agreed the Pences would care for the Cordero's children and provide the requested reprieve. The original plan was for this arraignment to last six months. However, the Corderos asked to extend the reprieve to a year, and then to three years. During this period the Corderos were under investigation from Massachusetts Department of Children And Family Services [DCF]. When DCF learned the Corderos had sent their children to live with the Pences, the arraignment became untenable. DCF would not allow the long-term placement of the children with the Pences, and the Corderos would not allow the children to return to Massachusetts where they would likely be separated in foster care. A solution was reached – the Corderos consented to the adoption of the children by the Pences.

Over time the Pences learned that Francisco Cordero was suspected of abusing the children prior to their being adopted. While verifying precisely what he did is not possible in this context, DCF suspected the children were subject to physical and sexual abuse by Franciso, and he may have abused drugs while caring for the children

3

as well.

By all accounts the Pences took wonderful care of their five adopted children, but tension grew between the Corderos and the Pences after the adoption was completed.  Without agreement, the Corderos attempted to move onto the Pence's land in Texas, parking their trailer on the Pences' property. It seemed the Corderos wanted to eliminate DCF oversight, day to day parenting responsibilities, and even rent, after they adopted their children out to the Pences. The Pences ultimately moved from Texas to Utah, because of the unwelcome attempts at entry by the Corderos into the day to day lives of the Pences.

The situation described above provides critical context for Mr. Pence's decision making. When any person engages in criminal conduct, typically it is because of a lapse in judgment. Sometimes that lapse in judgment is caused by mental health issues, or addition issues, or anger management issues. Stress, alcohol, and posttraumatic stress disorder are all factors that can cloud a person's judgment and enable criminal conduct where, with more clear thinking, nothing would have happened. Even someone like Mr. Pence with no criminal history, a college education, a high paying job and a happy family life, can still be find themselves in a position that allows for their judgment to temporarily fail.  That does not mean that person is a life-long danger to a community. It means, that for a moment, they exhibited bad judgment.  This is exactly what happened to Christopher Pence.

After agreeing to help the Corderos and take responsibility for their children temporarily, then ultimately agreeing to adopt them and love them as his own

children, Christopher learned more and more about the abusive behavior of Francesco Cordero, all while, the Corderos continued to pressure their way directly into the Pences' lives.  The Corderos ultimately sought the return of the children they had voluntarily adopted out because they could not keep the children safe.

This pressure became too much for Christopher. His judgment failed, and he began to explore an option that he acknowledges now, no one should ever do. He went on the internet, he logged into the "dark web" and reached out to a purported hitman. He attempted to hire a hitman but, almost immediately realized his error, and sought to cancel the job [*see* email communications canceling job and seeking refund, attached here as **Exhibit "A"** at page 11, 14, and 16].

A number of critical facts emerge here – there was no attempt ever made on either of the Cordero's lives. [See Dkt. No. 53, Plea Agreement at page 3-4]. It seems the person Mr. Pence had briefly contracted with was not a hitman at all, but rather a scam artist [*see* FBI Report 9/9/2021 166C-AL-3491673 Serial 1, attached here as **Exhibit "B"** at page 2]. Mr. Pence understands that his criminal conduct is unacceptable and the fact that nothing came of it does not absolve him of his crime. Luckily there was no violence here, and no risk of violence.

Also critical is the fact that Mr. Pence never threatened the Corderos.  Nothing in the plea agreement or PSR or anywhere else in the record indicates Mr. Pence ever contacted the Corderos and said anything like "leave my family alone or you'll regret it". The Corderos first learned of the facts here directly from the Government. Mr. Pence, and no one on his behalf, ever made a threat to the Corderos [*see* FBI

Investigation notes of conversation with the victims, attached here as **Exhibit "C"**] The Corderos, even speculated to the F.B.I. about multiple people that could have seen involved other than Chris Pence – clearly they had not received a threat from Chris directly.

In sum, clouded by the knowledge that his adopted children's abusive birth parents were seeking the return of their children, and refusing to follow the law and the agreement the Corderos and Pences entered into, Christopher with his judgment clouded, made the worst decision of his life.

Lengthy incarceration is unnecessary to further reform Christopher. Certainly the time he has spent in jail already would be more than sufficient to deter any future bad behavior, and thankfully, because no one was ever even at risk of being harmed here, the seriousness of the situation is luckily much lower than it could be. Because no one was harmed, and because there was never even an attempt to hurt the victims here, a sentence of 48 months plus three years PRS would be appropriate here.

### The History and Characteristics of the Offender

Christopher Pence is 43 years old. He was born in Kirkland Washington to parents Shannon and Robyn Pence. Mr. Pence also has a sister, April, who is seven years older than Christopher. Today Christopher has lots of support from his parents, who live with wife and children in Cedar City Utah.

Chris met his wife Michelle as teenagers, and they have been married since 1999. They lived in locations around Washington State until 2019, when because of a need for larger housing for their growing family, they moved to Texas. The Pences

moved to Texas to find more cost-effective housing. Ultimately, it was in Texas where the Corderos initially attempted to squat on the Pences' land, and ultimately because of this difficult relationship, the Pences moved to Utah.

Mr. and Ms. Pence have seventeen children in total – eleven birth children and five adopted children. One of their daughters passed away due to sudden infant death syndrome many years ago.

Chris has dedicated his life to providing and caring for children. You can see from his willingness to bring his adopted children into his already large family, that if anything, he puts the wellbeing of children first. While there is no justification for the actions he took here, the fact that Chris's behavior was driven by a fear that the children he had welcomed into his home as his own would be returned to suspected child abusers who had cast their children away. He lost his otherwise good judgment, went on the internet and took steps no-one regrets more now than him.  A below guideline sentence is appropriate here when all of these factors are considered.

## The Guideline Calculation

*Offense Level*

Per the plea agreement, Mr. Pence's base offense level is seven per U.S.S.G. § 2E1.4 is 32.

The government has agreed to recommend a two-level downward adjustment pursuant to U.S.S.G. § 3E1.1(a) based on defendant's acceptance of responsibility and an additional one-level reduction based on the timeliness of that acceptance per

U.S.S.G. §3E1.1(b).

Based on the above adjustments contained in the plea agreement, the defendant's total offense level is twenty-nine.

*Criminal History Score*

The Mr. Pence's criminal history score as assessed by the Probation Department is zero. His presumptive criminal history category is therefore Category I. The defendant adopts Probation's assessment of his criminal history score.

*Zero-Point Offender Adjustment*

Per the plea agreement, the parties were unable to agree as to the applicability of the Zero Point Offender adjustment contained U.S.S.G. § 4C1.1. Mr. Pence meets all of the criteria contemplated by the guideline to receive this two-point downward adjustment.  A defendant qualifies for the downward adjustment when he or she meets all of the following criteria:

> (1) the defendant did not receive any criminal history points from Chapter Four, Part A;
>
> (2) the defendant did not receive an adjustment under §3A1.4 (Terrorism);
>
> (3) the defendant did not use violence or credible threats of violence in connection with the offense;
>
> (4) the offense did not result in death or serious bodily injury;
>
> (5) the instant offense of conviction is not a sex offense;
>
> (6) the defendant did not personally cause substantial financial hardship;
>
> (7) the defendant did not possess, receive, purchase, transport, transfer,

sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights);

(9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and

(10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848. *See* U.S.S.G. § 4C1.1(a).

Mr. Pence clearly meets the requirements of paragraphs, 1, 2, 5, 6, 7, 8, 9, and 10 on their faces.

The ten criteria set forth above fall into two categories – criteria looking at the behavior of the defendant expressly, and criteria looking at the nature of the offense. Subparagraphs 1, 2, 3, 6, 7 ,9 and 10 each include the language "the defendant did not". Criteria 4, 5, and 8 use language that is focused specifically on the offense. This statutory construction is critical – it tells us that certain criteria should be applied specifically to a defendant's conduct, and certain criteria are applied based on the offense.

Comparing criteria 3 and 4 is illuminating. Subparagraph 3 looks at whether or not *a defendant* used violence or credible threats of violence in connection with the offense. Subparagraph 4 looks at whether or not a death or serious bodily injury occurred as *a result of the offense*. Subparagraph 3 is looking specifically at an individual defendant's conduct, while subparagraph 4 looks at the broader impact of the entire offense.

A logical application of this analysis would be a large-scale drug conspiracy where co-conspirators caused serious injury to a person in the course of the conspiracy, but an individual defendant was not personally responsible for that conduct.  In that situation, a defendant would not receive the zero-point offender credit because the offense resulted in a serious bodily injury.

Comparing our facts here to the above example is illuminating. Mr. Pence meets the criteria under subparagraph 4 because his offense did not result in a death or serious bodily injury to another person.

Mr. Pence also meets the requirements of subparagraph three. Preliminarily, it is clear that the Sentencing Commission did not expressly exclude application of U.S.S.G. § 4C1.1 to people convicted of a crime of violence as it is defined at U.S.S.G. § 4B1.1(a). If the Commission intended to categorically exclude that type of offense they certainly would have.  This is evidenced by the categorical exclusion of all sex offenses contained at subparagraph 5 of U.S.S.G. § 4C1.1(a). The only logical reading of U.S.S.G. § 4C1.1(a)(3) is that the Sentencing Commission intended the obvious common meanings of the words used in the paragraph. Subsection 3 looks at the defendant's own conduct and asks if that defendant used violence or a threat of violence.

Applying that analysis to the facts here, it is clear Mr. Pence meets the criteria in U.S.S.G. § 4C1.1(a)(3).   Subsection 3 sets out two factual situations that would disqualify a defendant from receiving credit under U.S.S.G. § 4C1.1. First, a defendant's use of violence would be disqualifying.  The parties agree that "no attempt

was made on the lives of the intended victims." [Dkt. No. 53, Plea Agreement at page 3-4]. It is straightforward that there was no actual violence here. The defendant personally did not use violence and no other person did.

The defense anticipates the government will argue the second clause within U.S.S.G. § 4C1.1(a)(3), which excepts out defendants who use "credible threats of violence in connection with the offense" applies here. This interpretation is inconsistent with the guidelines definition of threats and the common meaning of the word threat, and should not be adopted by the Court. Mr. Pence's conduct was not a disqualifying "credible *threat* of violence."

The Oxford Dictionary definition of threat is: "a *statement* of an intention to inflict pain, injury, damage, or other hostile action on someone in retribution for something done or not done." [emphasis added]. For a threat to exist, there has to be some sort of statement made from the defendant to a victim, express or implied, that a defendant will do something bad to the victim if a defendant does not get his or her way.

While U.S.S.G. § 4C1.1 lacks an express definition of "credible threat of violence", the Guidelines contemplate threats in more than one location. A threat of death is defined expressly at U.S.S.G. § 2B3.1 note 6. That note is illuminating:

> A threat of death, as used in subsection (b)(2)(F), may be in the form of an oral or written statement, act, gesture, or combination thereof. Accordingly, the defendant does not have to state expressly his intent to kill the victim in order for the enhancement to apply. For example, an oral or written demand using words such as "*Give me the money or I will kill you*", "*Give me the money or I will pull the pin on the grenade I have in my pocket*", "*Give me the money or I will shoot you*", "*Give me your*

11

> *money or else (where the defendant draws his hand across his throat in a slashing motion)*", or "*Give me the money or you are dead*" would constitute a threat of death…. [emphasis added].

Clearly, the Sentencing Commission contemplated that a threat to exist there needs to be a *do this or else* communication between the defendant and the victim. U.S.S.G. § 2B3.1 note 6 continues to on to make clear the need for the threat to be a communication between a defendant and his or her victim:

> The court should consider that the intent of this provision is to provide an increased offense level for cases in which the offender(s) engaged in conduct that would instill in a reasonable person, who is a victim of the offense, a fear of death.

It's clear here - a death threat needs to be made by a defendant to a victim and scare the victim into thinking he or she will be killed during the commission of the offense. Whether express or implied, the threat needs to be a communication between the defendant and the victim.

The guidelines also address threats at U.S.S.G. § 2B3.2 note 2. There, the Sentencing Commission reinforces the principal that:

> any threat, express or implied, that reasonably could be interpreted as one to injure a person or physically damage property, or any comparably serious threat, such as to drive an enterprise out of business. Even if the threat does not in itself imply violence, the possibility of violence or serious adverse consequences may be inferred from the circumstances of the threat or the reputation of the person making it. An ambiguous threat, such as *"pay up or else,"* or a threat to cause labor problems, ordinarily should be treated under this section. [emphasis added].

In plain language, for there to be a threat under the guidelines, there must be a circumstance where a defendant is making an express or implied statement of violence directed at the victim. The "or else" part of "pay up or else" is the threat.

In our case, the Court should apply the same interpretation of the word threat to the "did not use a credible threat of violence" language contained in U.S.S.G. § 4C1.1(a)(3) that is contained within U.S.S.G. § 2B3.1 note 6 and § 2B3.2 note 2. Any other reading would make the guidelines contradictory. Chris Pence simply did not threaten the Corderos. The victims were unaware of the defendant's actions until the Government alerted them to the investigation. There was no "or else" communication between Mr. Pence and the Corderos. In fact, the email communications reproduced in the PSR make it clear – there is only one logical interpretation of those messages – the writer did not want anyone to make any association between him and his plan. There was no "leave us alone or I'll kill you" or even a "leave us alone or else" communication between Mr. Pence and the Corderos. In the absence of that type of communication, there was simply no credible threat of violence that would disqualify Mr. Pence from receiving zero-point offender credit.

This interpretation is further supported by the language used in the Safety Valve provisions contained in U.S.S.G. § 5C1.2(a)(2) uses similar language to the zero-point offender language at issue here. Safety Valve eligibility requires that a: defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense." The Safety Valve language contains similar but enhanced criteria compared to zero-point offender. In safety valve, if a defendant induces another to use violence or a credible threat of violence, they are not safety valve eligible. The lack of that language in zero-point offender is critical – clearly the Commission was

interested in the individual defendant's conduct only in the new guideline section.

These are key differences between the Safety Valve and Zero-Point Offender guidelines. U.S.S.G. § 4C1.1(a)(3) does not contain the language "induces another participant to do so". The Sentencing Commission in creating the zero-point offender guideline used language similar, but not identical to that of Safety Valve. They could only have done that with the intention of the differences being important. Otherwise, the Commission could have directly copied the language used in U.S.S.G. § 5C1.2(a)(2) directly into U.S.S.G. § 4C1.1(a)(3). This distinction should not be ignored in the interpretation of this guideline.

This interpretation is consistent with U.S. Supreme Court and Circuit case law reviewing cases with a threat as an element of the crime. To even begin analysis over the existence of "a credible threat of violence" at its base there needs to be some form of statement flowing from the defendant to the victim. *See Watts v. United States*, 394 U.S. 705, 705, (1969) (holding that defendant's statement "If they ever make me carry a rifle the first man I want to get in my sights is L. B. J." was not a threat because it was constitutionally protected political speech.); *see also United States v. Valerio*, 472 Fed. Appx. 61, 62 (2d Cir. 2012) (analyzing a letter defendant letter sent to a co-conspirator which was determined to be a credible threat of violence at the District Court.), *see also United States v. Fernandez*, 636 Fed. Appx. 71, 74 (2d Cir. 2016) (holding that the defendant's statement "he would go up in there and he would stab everybody up" made in earshot of the victim, was a credible threat of violence."). The key point here, is not what was said specifically in each of those cases, it is that the

Courts review of threats at a preliminary level, requires a statement threatening another person in some way. Here, there was no statement by Mr. Pence threatening the Corderos. He did not announce publicly that he intended to kill them as in *Watts*, he did not send the Corderos a letter as in *Valerio*, and he did not threaten them by speaking directly to them or in a place they would hear him as in *Fernandez*. There is simply no way what Mr. Pence did in this case can be qualified as a credible *threat* of violence.

There is a critical distinction between a "risk" of violence and a "threat" of violence that the Government's anticipated interpretation of U.S.S.G. § 4C1.1 lacks. Conduct that creates a risk of violence is not a disqualifying factor under U.S.S.G. § 4C1.1(a)(3). In the absence of the actual use of violence by a defendant or a credible threat of violence, subsection 3 is not implicated.   Here – had a hitman acted subsection 4 would have been likely implicated (the offense would have resulted in serious bodily injury or death).   But where those facts are absent, and the defendant's personal conduct does not involve violence or a threat of violence, he is not disqualified under U.S.S.G. § 4C1.1(a)(3). Mr. Pence's conduct does not disqualify him from receiving zero-point offender credit. Mr. Pence meets each of the criteria set forth in U.S.S.G. § 4C1.1(a) and should receive a two-level downward adjustment in his offense level.

Based on a criminal history category of I, and an offense level of twenty-seven the appropriate guideline range is 70 to 87 months. There is no mandatory minimum sentence here. The statutory maximum sentence is 120 months.

**<u>Sufficient but Not Greater than Necessary Sentence</u>**

Christopher has accepted responsibility for her role in this case. There should be no doubt in the Court's mind that a guideline sentence is not necessary here to meet the 18 U.S.C. § 3553(a) factors. I have conferenced with Mr. Pence, and he understands the need for a serious penalty to deter others from similar conduct and has asked me to request the Court consider a sentence of 48 months. Such a sentence would make clear that there are serious consequences for this type of criminal behavior while allowing him to return to the community and begin making amends. He has tremendous family support and will be successful on post-release supervision. Because no one was harmed. Because there was in fact no hit attempted. Because Mr. Pence retracted his request almost as fast as he sent it. Because he has never been in trouble before. Because if the Court grants the requested downward deviation, Mr. Pence would still spend four years in Federal Prison, and for all the other reasons contained herein, we would request the Court sentence Christopher to a forty-eight months plus three years of post-release supervision.

**<u>The Court Should Approve the Conditional Plea Agreement and Allow Mr. Pence's Limited Appeal and Grant a Downward Deviation in Sentencing</u>**

Mr. Pence's plea was entered pursuant to Rule 11(a)(2) and would allow Mr. Pence to preserve his right to appeal. The 1983 amendment to the Federal Rules of Civil Procedure created the conditional plea contemplated by Rule 11(a)(2). The 1983 advisory committee notes make it clear that the conditional plea was a statutory construction to allow for judicial efficiency and avoid delay caused by unnecessary

trials. The Committee noted that:

> a defendant who has lost one or more pretrial motions will often go
> through an entire trial simply to preserve the pretrial issues for later
> appellate review. This results in a waste of prosecutorial and judicial
> resources, and causes delay in the trial of other cases, contrary to the
> objectives underlying the Speedy Trial Act of 1974, 18 U.S.C. § 3161 et
> seq. These unfortunate consequences may be avoided by the conditional
> plea device expressly authorized by new subdivision (a)(2).

The conditional plea agreement here provides for judicial efficiency and preservation
of prosecutorial resources.

Mr. Pence has accepted responsibility here and waived his trial rights,
acknowledging that the evidence against him would be difficult to overcome at trial.
On the advice of defense counsel, Mr. Pence has sought to maintain his legal right to
appeal the limited issue of the Court's Memorandum-Decision and Order issued on
October 18, 2023 [Dkt. No. 52]. An alternative ruling on the defendant's suppression
motion could be potentially dispositive in nature. The conditional plea here is exactly
what is contemplated by the Rule 11(a)(2) and should be allowed by the Court – rather
than proceeding to a time-consuming trial only to preserve this limited appellate
issue, the defendant has accepted responsibility, and seeks to maintain his limited
right to appeal without requiring a full trial, on his attorney's advice.

The conditional nature of the plea should not be interpreted in any way as Mr.
Pence not timely accepting responsibility as contemplated in U.S.S.G. § 3E1.1(a) and
U.S.S.G. §3E1.1(b). The entry of the conditional plea of by Mr. Pence was expressly
made to allow the Government to avoid the use of additional resources to in preparing
for trial. Clearly Mr. Pence takes responsibility for his actions.

## **Conclusion**

Mr. Pence makes no excuses for his behavior and accepted responsibility for his conduct. He understands a lengthy prison sentence is a likely outcome here, and still, he took responsibility for his criminal act. But a lengthy prison sentence is not necessary here – it does not meet any of the 3553(a) factors and would be a disproportionate penalty compared to the nature of Mr. Pence's behavior. Based on the nature and circumstances of the offense a sentence forty-eight months plus three-years post-release supervision is sufficient but not greater than necessary under the circumstances of this case.

Dated: March 12, 2024

*/s/ Eric K. Schillinger*
Eric K. Schillinger
*Attorney for  Christopher Pence*
Bar No.: 516083
11 North Pearl Street, Ste 1700
Albany, New York 12207
(518) 595-9529
eric@schillinger-law.com

## CERTIFICATE OF SERVICE

On the above date the sentence memorandum was filed with the court, and delivered via ECF to the following parties: AUSA Emmet O'Hanlon, Esq.

Dated: March 12, 2024

*/s/Eric K. Schillinger*
Eric K. Schillinger
*Attorney for Christopher Pence*
11 North Pearl Street, Ste 1700
Albany, New York 12207
(518) 595-9529
eric@schillinger-law.com
